UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

- - -

UNITED STATES OF AMERICA,          .  Case No. 1:09-cr-149
                                   .
          Plaintiff,               .
                                   .  *Hearing*
     - v -                         .
                                   .  Tuesday, October 27, 2009
ARCTIC GLACIER INTERNATIONAL       .  3:35 PM
INC.,                              .
                                   .
          Defendant.               .  Cincinnati, Ohio
. . . . . . . . . . . . . . . .

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE HERMAN J. WEBER, SENIOR JUDGE

For the Plaintiff:     KEVIN C. CULUM, ESQ.
                       DONALD M. LYON, ESQ.
                       United States Department of Justice
                       Antitrust Division
                       Carl B. Stokes U.S. Court House
                       801 West Superior Avenue, 14th Floor
                       Cleveland, Ohio  44113-1857

For the Defendant:     JOHN M. MAJORAS, ESQ.
                       Jones Day
                       325 John H. McConnell Boulevard, Suite 600
                       Columbus, Ohio  43215-2673

For the Petitioners:   DAVID F. AXELROD, ESQ.
                       Axelrod LLC
                       250 Civic Center Drive, Suite 500
                       Columbus, Ohio  43215

Also present:          Hugh A. Adams, Secretary, Arctic
                       Glacier Inc.

Law Clerk:             Amy Peters Thomas, Esq.

Courtroom Deputy:      Darlene Maury

Court Reporter:        Luke T. Lavin, RDR, CRR

*Proceedings recorded in stenotype;*
*transcript prepared by computer.*

P R O C E E D I N G S

   (In chambers at 3:35 PM.)

     THE COURT:  If you'd introduce yourself to the record, please, and to me, please.

     MR. MAJORAS:  I'm John Majoras from the Jones Day firm, counsel for Arctic Glacier International, the defendant.

     THE COURT:  I know your firm.  I don't think I know you.

     MR. MAJORAS:  I don't think so, sir.

     THE COURT:  All right.

     MR. MAJORAS:  And with me is Hugh Adams, who is the corporate representative, and he is counsel to the corporation.

     THE COURT:  And I don't believe I know you, either.

     MR. ADAMS:  We've never met, sir.

     THE COURT:  All right.

     MR. AXELROD:  And I'm David Axelrod, Axelrod LLC.  I represent the petitioner victims Baron Group, et al.

     THE COURT:  And I don't believe we've met, have we?

     MR. AXELROD:  You know, Judge, we met perhaps 20-- well, 20-plus years ago.  Judge Porter introduced us.

     THE COURT:  Oh, sure.

     MR. AXELROD:  And I clerked for him.  And then I've encountered you at a couple of Sixth Circuit judicial conferences.

     THE COURT:  Oh, dear.  Okay.

1          MR. CULUM:  Your Honor, Kevin Culum with the

2  Department of Justice, Antitrust Division.  I've had the

3  fortune of appearing before you a few times.

4          THE COURT:  You're so lucky.

5          MR. LYON:  And I'm Donald Lyon with the Department of

6  Justice, also.  We have not met.

7          THE COURT:  I just want to start with some comments.

8  I imposed my first criminal sentence in December 1955:  $10 in

9  costs in the mayor's court.  I've been imposing criminal

10 sentences ever since.  I have never imposed a sentence that was

11 not mine.  I realize the law, that my only duty here, as far as

12 the type of sentence, is set out in the rules.  So I'm in no

13 way indicating how I might view a (c) plea agreement, but I

14 want you to understand that, whatever I decide, it's going to

15 be my decision.

16         MR. MAJORAS:  (Nods head up and down.)

17         MR. CULUM:  (Nods head up and down.)

18         THE COURT:  It's not the probation department's, not

19 yours.  I'll help you make your record to protect yourselves,

20 but it will be my decision.  And I'm the one that will be

21 reversed by the court of appeals, not you, so we understand

22 each other.

23         MR. MAJORAS:  Yes, sir.

24         THE COURT:  Now, this is a unique situation.  I have

25 no jurisdiction at this point.  There's no charging document

 1  filed in this case.  You can't file the charging document; you

 2  can tender it.  That document is not filed until I say it's

 3  filed.

 4          MR. CULUM:  (Nods head up and down.)

 5          THE COURT:  So really there's nothing to talk about,

 6  gentlemen.

 7          MR. CULUM:  Well, good.

 8          THE COURT:  So that's issue one.  Now, if I had an

 9  indictment, oh, my, I'd be verbose and we could talk and so on,

10  but I don't have that.

11      So the first thing we've got to do is to get the waiver of

12  the indictment and I order the Information filed.  If we can't

13  go forward with that, then we're going to have to recess until

14  some future time.  You either withdraw the Information, go

15  ahead and get an indictment, or go on from there.  Now, that's

16  the first decision you're all going to have to make.

17      Now, the second decision that you have to make will be when

18  will the arraignment take place.  Once I get a charging

19  document, then I have jurisdiction and then I can set the

20  arraignment today, 20 years from now, and you can get a

21  mandamus and do all kind of fancy things, if you wish, but I

22  can set it a reasonable time in the future, and so on.

23      Now, in addition to that, we have two motions filed.

24      Oh, I want to point out something that I want you to

25  understand, Mr. Axelrod.

1    You say in your document -- this is 13.  This is the first

2    one you filed.

3         MR. AXELROD:  Yes, sir.

4         THE COURT:  "Because the arraignment was fast

5    approaching, Mr. Wild wrote to the Court on October 15, 2009,

6    asking that it be postponed.  Mr. Wild learned on October 21,

7    2009 that his request was denied."

8    How did anyone that practices in this court make a request

9    of this Court to do anything by letter?  You don't.

10         MR. AXELROD:  Well, Your Honor, in my defense, I

11    hadn't been hired yet, and I would have told him exactly that.

12         THE COURT:  Okay.  And that I really take issue with.

13    I didn't deny anything.

14         MR. AXELROD:  I understand your comments, Your Honor.

15         THE COURT:  And if he's going to practice in this

16    court -- he's already signed an affidavit.  That may knock his

17    whole firm out of any representation, possibly.

18         MR. AXELROD:  Understood.

19         THE COURT:  Now, I mean, just because they're from New

20    York doesn't mean --

21    Or you're from Washington, although Jones Day has got my

22    finger around their throat.

23         MR. MAJORAS:  I'm in Columbus, Your Honor.

24         THE COURT:  Okay.

25         MR. MAJORAS:  Columbus and Washington.

1          THE COURT:  Okay.

2          MR. MAJORAS:  But I'm in Columbus.

3          THE COURT:  But we do have some poor -- but I'm sorry

4    that they have taken that attitude when all they had to do was

5    to come here and, as we are doing now, trying to discuss the

6    thing and figure out what we're going to do.

7      Now, I don't know how the victims can be disadvantaged;

8    however, there is a very good case out of Texas that a district

9    judge down there struggled with and wrote a very good opinion

10   as to how he handled his case, and so on.  And I've had an

11   opportunity, the law clerks being very good, why, they got it

12   for me, and it's Case Number -- well --

13         MR. CULUM:  Is this the *Dean* case, Your Honor?

14         THE COURT:  What's that?

15         MR. CULUM:  Is this the *Dean* case, Your Honor?

16         THE COURT:  Well, I don't remember names of cases.

17         MR. CULUM:  Okay.

18         THE COURT:  No.  It's *United States of America* --

19   well, no, no.  That's not right.

20     Well, I'll get there.  Oh, gosh.  Okay.  I give up.

21     No.  It's *United States versus BP Products North America,*

22   *Inc.*  It's Criminal Number H07434, Houston Division, Texas,

23   Southern District, Texas, and it's a major undertaking, 71 more

24   pages in which he struggled with something like we're doing.

25   Something like we're doing.  Interesting, the victims in that

1  case --

2      And that's what I guess I should understand today, is how

3  many victims do we have?

4          MR. CULUM:  Your Honor, I think that it's fair to say

5  that there are direct purchasers; there are indirect

6  purchasers.  There are people who have come forward to the

7  department and have talked with us and provided us information,

8  because we're always very interested in helping victims, and

9  victims provide a very valuable piece of evidence for us going

10  forward in our criminal case.

11      To say -- and I will defer in some ways to Mr. Majoras, but

12  to say that there are tens of thousands I think might be an

13  understatement.

14          MR. MAJORAS:  It would depend on how one defines that,

15  Your Honor.  I think, in looking at the papers that I've had a

16  chance to review, I'm not sure how even Mr. Axelrod has defined

17  that.  His most recent papers, at least, indicate to me that

18  there are two entities or two parties that he represents for

19  purposes of his motion, but I may be wrong in that.  Mr. --

20      I apologize.  I'm losing the name of the lawyer who has the

21  class action case.

22          MR. AXELROD:  Matt Wild, W-i-l-d.

23          MR. MAJORAS:  Mr. Wild represents the class action,

24  but the class has not been certified yet.  He's simply

25  colleague counsel in that case for indirect purchasers down the

```
 1   purchase line.
 2          THE COURT:  Now, there's an MDL panel handling --
 3          MR. MAJORAS:  Yes, sir.
 4          THE COURT:  Is the purported class action in that MDL?
 5          MR. MAJORAS:  Yes, sir.
 6          THE COURT:  So are all the cases collected in the MDL?
 7          MR. MAJORAS:  There is one case that's outside of it,
 8   but the vast majority of the cases which are filed as purported
 9   national class actions are filed in the MDL.
10          THE COURT:  All right.
11          MR. CULUM:  And, Your Honor, just to --
12      I'm sorry for interrupting.
13          THE COURT:  Sure.  Go ahead.
14          MR. CULUM:  I'm aware of multiple victims who have
15   contacted us directly who have not -- have no intention of
16   joining the class, have not filed Complaints, but have
17   continued to provide information to us and have been, you
18   know -- we conferred with them whenever they've, you know, had
19   ongoing conversations.
20      So certainly, as you well know, having done class, the
21   class is probably not as great as, theoretically, the victims.
22   And as just an aside, technically under an indirect purchaser
23   theory, virtually every person who has ever bought ice,
24   theoretically, under the analysis, is the victim, you know, of
25   the crime.
```

1          THE COURT:  Well, Mr. Wild has even expanded it beyond

2     Michigan now.  He's got a universal situation on indirect.  At

3     least that's what I understood him to tell me.

4          MR. AXELROD:  And, Your Honor, that, as this

5     progresses -- assuming that we have a waiver of indictment and

6     the Information is filed, as this progresses that is probably

7     going to be one of the -- in fact, most assuredly will be one

8     of the issues that the victims will be pursuing, because the

9     victims believe that the plea agreement carves out a narrow

10    part of the exception.

11        And then under 1B1.8, we obviously don't know what Arctic

12    Glacier has told the government, but there is a 1B1.8 reference

13    in the plea agreement, which leads us to believe that Arctic

14    Glacier and its employees and directors have told the

15    government that there's something more there.  And based on

16    other information that Mr. Wild has, his Complaint was filed

17    alleging that it's a nationwide conspiracy.

18         THE COURT:  The one clause in the plea agreement that

19    I don't understand how it relates to our problem, and that is

20    the one that the government says that we are not going to

21    pursue restitution.  And I don't know whether that's an

22    agreement, whether if I approve this plea agreement, that I

23    won't be able to award restitution.  And if that, we're wasting

24    our time.

25         MR. CULUM:  Your Honor, good question.  Historically,

1   because there is the class action lawsuit, apart from what Mr.

2   Axelrod might say, my understanding is they're not seeking

3   restitution ultimately through this action.  I may be wrong,

4   because we have not gotten to the end of the road, but my

5   understanding is they're not seeking restitution, but they

6   might.  But historically and hypothetically, generally victims

7   who file their own independent lawsuit typically want to seek

8   their own restitution in the civil class action lawsuit because

9   they feel that their recompense will be greater in a civil case

10  than here.  And so we take really -- when we see a civil case

11  filed, typically victims in other situations, maybe not here,

12  but resist having the criminal case define what their

13  restitution is, because they feel that it would be very

14  difficult for the sentencing judge to impose restitution.  And

15  because restitution is designed to make someone whole rather

16  than the treble damages which the civil complaint allows, they

17  would prefer to pursue their own remedies.

18       And because we care about the victims, in this case we just

19  had a hands-off.  They have a civil suit; let them decide how

20  they want to do it.  But if they would like to come to this

21  court and seek restitution, we are certainly not opposed to it.

22            THE COURT:  But if they come to this -- Joe Blow comes

23  to this suit and says, "I want ten cents for every bag of ice I

24  bought over the last hundred years" --

25       "Ten."  I know it's seven.

1    -- but I can go ahead and make that determination of

2  whether he's entitled to restitution, or not, under that plea

3  agreement?  That's my problem.

4         MR. AXELROD:  Your Honor, my reading of the plea

5  agreement is it says the government won't ask for restitution.

6         THE COURT:  Yes.

7         MR. AXELROD:  But it doesn't say that the Court

8  doesn't have the power to award it.

9         THE COURT:  I don't know.

10         MR. AXELROD:  I mean, those are the plain words of the

11  plea agreement.

12         THE COURT:  I understand that, but I still don't know.

13         MR. CULUM:  My view is that if you were to impose

14  restitution, it would not be a violation of the agreement.  Mr.

15  Majoras and I may disagree, but my view is that restitution is

16  in your hands.  That's how I understood it.

17         THE COURT:  And at this time, before I waste a lot of

18  time on this case, I want to know whether that's what I'm

19  facing.  I mean, presumptively I will approve your agreement.

20  I mean, in the past I have approved the agreement.  So

21  presumptively I'm -- I'm interested in your agreement if we

22  find out that it is appropriate.

23     Now, I can't tell you about what to put in the agreement,

24  but I do need to understand it, because I don't want you to

25  waste your time.

1            MR. MAJORAS:  The recommended sentencing in the

2  agreement does not include restitution, as you point out.

3  Certainly the Court -- as you've also pointed out, and we're

4  all in agreement -- the Court has its discretion in imposing

5  sentence, the Court's sentence.  The effect that that may have

6  to the extent it is different than the plea agreement will then

7  operate, and I think it's an issue we can address if we get

8  there.

9      I would agree with Mr. Culum.  In a situation like this

10 and, indeed, virtually every case where the division announces

11 an investigation, within a day or two the Complaints that we've

12 seen in this case get filed.  And the MDL, which has its set of

13 rules in terms of determining, for example, the indirect

14 purchasers and whether they have a claim under federal law, all

15 of that is in front of the MDL court.

16     It does go back to the issue, though, in terms of who are

17 the victims that Mr. Axelrod is in front of the Court

18 representing.  Because there is no class certified, he can't

19 represent a class of direct or indirect purchasers.  Mr. Wild,

20 who he's associated with in some respect -- I don't know

21 exactly how -- is representing a class of indirect purchasers,

22 and there would be an inherent conflict now because he is

23 bringing a direct purchaser as part of these proceedings.

24     So I don't want to delay this, but to run it out, if they

25 were to come in and petition the Court, if the Court allows

1  them to be heard on this issue, and argue there should be

2  restitution, going back to what the Supreme Court decided as to

3  how to allocate damages, if any, down through the chain of

4  distribution and to put that as part of the sentencing in this

5  case, certainly I would question the use of the judicial

6  resources, the efficiency, given that those rights are in front

7  of the court in the MDL.

8       But it's still back to if there are two, three, whatever

9  the number of parties he is here in front of, Mr. Culum is

10  correct, the direct purchasers are more than happy to pursue

11  the civil remedy because there are treble damages available and

12  they don't have to share with the indirect purchaser.  I

13  suspect they would have a real problem with that.

14          THE COURT:  I'm just trying to avoid a situation

15  where, if it comes down to the fact that I am faced with the

16  approval of the plea agreement, I can't change it.  I mean, I'm

17  not in any way trying to change it.  And I'm also faced with

18  request for restitution.  Does that void -- and I make a ruling

19  on the restitution, then you have the power over me.  You hold

20  a gun to my head.

21       Which I don't like, but that's your right.  I can commit

22  hari-kari, too.

23       But if I order restitution, why, "We'll withdraw our guilty

24  plea," or something of nature.  That's the problem, and I don't

25  want to be faced with that solution.

1          MR. CULUM:  Your Honor, if I may, I don't think that

2     they have the opportunity to withdraw the guilty plea, because

3     what the agreement is is the United States -- myself and the

4     people at the Department of Justice -- agree that it will not

5     seek a restitution order for the offense charged in the

6     Information.  If I do not make an affirmative effort to seek

7     restitution, there will be no violation of the plea agreement,

8     and that is the agreement.

9          THE COURT:  All right.

10         MR. CULUM:  Wholly apart from whether you

11    independently choose to, particularly in light of the several

12    instances within the plea where we recognize you have complete

13    discretion to either receive or reject, accept or reject the

14    plea agreement.  Here, as I read it, and contractual agreement

15    as it is, as long as the department does not make an

16    affirmative effort to seek restitution --

17       Which we will not do for a variety of reasons.

18       -- I do not believe that Arctic has the opportunity to

19    withdraw its guilty plea.  Mr. Majoras may disagree with me,

20    but I think that contractually, I think that is the agreement.

21         MR. MAJORAS:  Your Honor, until this discussion I have

22    not spent much time analyzing the issue.  I would at this point

23    respectfully disagree.  It would be different than the

24    recommended sentence, and to the extent there's a difference

25    from the recommended sentence, then the clause --

1          THE COURT:  Restitution is not punishment.

2          MR. MAJORAS:  I understand, sir.

3          THE COURT:  I mean, I think that's been determined,

4   and so on.  But there it is, and after you think it through, if

5   that's how you want to proceed, then we're going to have to

6   indict.

7          MR. AXELROD:  Your Honor, if I may add something.  I,

8   frankly, do not know whether my clients will seek restitution

9   in this case or not.  That's one of the reasons why we asked

10  for time, so that we can make a reasoned decision about whether

11  that's in their interest.

12      Whether someone is a victim under the Crime Victims' Rights

13  Act, though, is very different, under that statute, than under

14  the antitrust law, so I would respectfully disagree with Mr.

15  Majoras' view of that.  But most important, I represent a

16  discrete number of individuals and one entity, and there could

17  be lots of other victims that appear once this is publicized,

18  and they may take a very different view than my clients do

19  about whether they're going to seek restitution.  So this

20  could, as the Court suspects, become a big ball of wax.

21      There is one other issue just like this in the plea

22  agreement --

23      Or, rather, not in the plea agreement.  It's pregnant with

24  its absence.

25      -- which is any reference to whether the Court has

1  authority to put the company on probation.  And Mr. Culum and I

2  have agreed --

3       THE COURT:  I thought they said one to five years.

4       MR. AXELROD:  No, Your Honor.  That's one to five

5  years for payment of the fine.  There's no reference at all to

6  probation.  I think Mr. Culum and I are in agreement that

7  because the plea agreement is silent on that issue, it does

8  allow the Court to impose a period of probation.  Mr. Majoras

9  and I talked about it earlier, and I think he's in agreement

10 with that to some degree, but he can speak for himself.

11      MR. MAJORAS:  It's certainly known to my client and me

12 that in the discussion of an installment payment, as it were,

13 for a fine that under the Guidelines there's a probationary

14 period that is attached to that, logically and reasonably so,

15 we would not at all take a position that probation -- because

16 it's in the Guidelines and, frankly, we expected it -- would

17 somehow violate or cause the plea agreement to be void.

18      THE COURT:  The next item that is troublesome to me is

19 that I do not see how -- I understand how victims have a right

20 to come in and object to punishment.  I mean:  It's too little,

21 too much, and so on.  I understand that.  But I just wonder

22 what means that they have to help me make my decision on what

23 the sentence should be.

24      MR. AXELROD:  Well, Your Honor, probably the best

25 discussion of that is the *Dean* case, which I believe is the

1    appeal from the decision that Your Honor has already cited

2    where the Court talks about the victims being consulted along

3    the way and may not be able to change the outcome.  The Court

4    talked about that in particular in relation to the victims --

5              THE COURT:  Well, that was a mandamus action that

6    emulated from the case.

7              MR. AXELROD:  Yes, sir.  And although mandamus was

8    denied for various reasons --

9              THE COURT:  I understand that.  And then the court of

10   appeals instructed the district judge:  On second thought, you

11   better listen.

12        I'm not talking about listening.  I'm talking about isn't

13   it counterproductive for a person seeking damages from a

14   corporation to insist on a great fine?  Isn't that counter-

15   productive?

16             MR. CULUM:  (Nods head up and down.)

17             MR. AXELROD:  Well, Your Honor, I'm not sure we're

18   going to insist on a great fine.  That's, again, why we've

19   asked for time.

20             THE COURT:  I mean, in other words, to me it's

21   counterproductive.

22             MR. AXELROD:  Well, we're very concerned about

23   preserving the company's assets, and it may be that we object

24   on the grounds that the money should be conserved for the

25   victims or should be in the form of restitution rather than

1  penalty.

2          THE COURT:  Amen, amen.  All right.  That's fine.  But

3  I just have that concern for my victims, so to speak.

4          MR. CULUM:  Your Honor, I received --

5      I'm sorry for interrupting.

6      I came down here from Cleveland, as you know, and I have

7  tried to read the motion and order, and it's -- but one thing

8  that's not clear to me, and it may be in some of the papers I

9  have not seen, I'm not sure who Mr. Axelrod represents, and if,

10 in fact, they are direct purchasers or indirect purchasers in

11 southeastern Michigan or the Detroit metropolitan area.  And as

12 a preliminary matter, the one thing I learned in law school is,

13 standing is important.  And I would like to be able to

14 establish on the record who Mr. Axelrod represents, to ensure

15 that they are people contemplated under the CVRA, just so I

16 understand.

17         MR. AXELROD:  Okay.  And I'm happy to respond.

18     Because this was done so much under the gun, things were

19 not filed in the normal order, and I actually did file a notice

20 of appearance that lists my clients.  They are, in fact, the

21 individuals listed in the beginning of our motion.

22     The Baron Group is a direct purchaser.  Now, The Baron

23 Group did not make its purchase in the Southern District of

24 Ohio or in the Eastern District of Michigan, but it's our view

25 that it was a global because there was a nationwide conspiracy.

1  I mean, regardless of what they have decided to plead to and

2  regardless of -- really what's happened here is they've carved

3  out relevant conduct.  But it doesn't change the fact that it's

4  a Sherman Act count and a conspiracy, and under 3553(e) the

5  Court can look at the totality of the -- or 3553, the Court can

6  look at the totality of the crime, and the totality of the

7  crime includes the location in which The Baron Group was a

8  direct purchaser.

9          THE COURT:  I think that I cannot make the charge.  I

10  can't expand the charge.  I don't know what the charge is.  I

11  mean, as I said, that's my understanding of my responsibility

12  and the separation of the executive branch and the judicial

13  branch, that I cannot say the charge is too little or too much.

14          MR. AXELROD:  Well, I'm happy to brief the issue, Your

15  Honor, but my understanding of the law of restitution is

16  that -- and I think by extension that applies to the CVRA -- is

17  that although the Court is, in fact, limited to the count of

18  conviction, the Court is able to address the entire scheme

19  that's embraced by the count of conviction.

20          THE COURT:  In determining the sentence.

21          MR. AXELROD:  In determining the sentence and in

22  determining restitution.

23          THE COURT:  Not unless it's a fraud.  And maybe this

24  is a fraud.  I don't know.  But how is this handled?  What has

25  the Court said about the Sherman Antitrust Act?  Is it a fraud

animal or --

MR. CULUM:  Well, we may find out soon in the Fifth
Circuit.  That's another case that seems to be a big issue.

Your Honor, in this case we have not pled any type of
fraudulent activity, so at least for this case I think it's
fair to say that, you know, we aren't pleading a fraudulent
conduct.  Apart from whether the Sherman Act has fraud, I'm not
making any representation.  I'm just as to this issue.

Certainly, Your Honor -- and just by way of background, I
did receive this earlier today.  I disagree with some of the
assertions in there.  I don't want to go through each one.  And
I disagree somewhat with the conclusions that are drawn.

But one thing we are in agreement with, and it sounds like
you're in agreement with, we would like -- we are providing
notice.  We are providing an opportunity to confer.

As an aside -- Mr. Wild -- his father contacted me in the
spring of 2008, who is a listed attorney on here.  I talked to
him.  He provided some information.  He knew and has always
known he can call at any time.  I am very open and willing to
always talk to people.

We disagree with whether the CVRA -- you know, some of the
conclusions, but I am willing to confer in the future, and I
believe we could go forward today with the expectation that,
you know, the sentence is certainly not going to be imposed
today.  We will certainly resist any efforts to have any type

1  of sentence imposed.  I don't think anyone contemplated such a

2  thing.

3       I do not believe the CVRA gives anyone the right to delay

4  an arraignment.  I think it gives them an opportunity to be

5  heard, which you're giving them an opportunity to be heard

6  right now.

7       I do think there's a standing issue.  That being said,

8  we're not going to stand on standing, and we just want the

9  Court to know we're doing everything we can to try to hear the

10 concerns of the things.  We thought that a guilty plea was a

11 positive, and, you know, we thought that that -- that was our

12 goal, was to get -- and we think that a $9 million fine on a

13 company that on paper, and even they suggest, has some

14 financial difficulties, we tried to be mindful of the financial

15 problems.  That's why we spread it out over time.  We've been

16 trying to be concerned about the victims.

17      By the same token, there are victims.  There's also -- you

18 know, the public has a right to the guilty plea and the right

19 to fair and equal punishment, and that's what we've certainly

20 tried to accomplish through the plea.

21           THE COURT:  Now I want to change and bring another

22 concern:  the resolution of the directors.

23           MR. MAJORAS:  Yes, sir.

24           THE COURT:  I don't know whether you have that.

25           MR. MAJORAS:  I don't have it.  It's in the courtroom,

1    Your Honor.

2          THE COURT:  It does not specifically give the

3    representative -- Mr. Adams -- the right to waive indictment

4    (handing document).

5          MR. MAJORAS:  Thank you, Your Honor.

6          THE COURT:  You can interpret it that it -- mishmash,

7    but I have to go to the plea agreement, which I can't accept or

8    deny now.  But it doesn't specifically give him authority to

9    waive the indictment.

10          MR. MAJORAS:  Your Honor, I would certainly suggest

11    that paragraph 4, which authorizes Mr. Adams and directs him,

12    on behalf of Arctic International, to prepare, deliver, or

13    cause to be prepared and delivered, and to execute all

14    documents and take or cause to be taken such further actions as

15    he may deem necessary, appropriate, and advisable to fully

16    effectuate the intent of the resolutions, is authorization to

17    do precisely that.

18       The company -- without waiving any attorney-client

19    privilege, Your Honor, the company is certainly aware, and Mr.

20    Adams can speak for himself, is aware of the process and that

21    that is a part of the process to proceed today, but I would

22    suggest that that is, in fact, sufficient authorization.

23          THE COURT:  Does that satisfy you?

24          MR. CULUM:  It does, Your Honor.

25          MR. AXELROD:  Your Honor --

1          MR. CULUM:  Being in hindsight, and hindsight is

2     20-20, I wish I had reviewed it and had insisted that the

3     inclusion of the waiver of indictment had been included, but I

4     do believe that this is sufficient.

5          MR. AXELROD:  Judge, there was one other point -- I'm

6     retreating a little bit -- but where the record may reflect a

7     lack of clarity because I didn't explain our position fully,

8     which is there is the direct --

9          I'm retreating to the standing issue.

10          There is the direct purchaser outside the Eastern District

11     of Michigan to whom I referred.  There are a series of indirect

12     purchasers who made their purchases in the Eastern District of

13     Michigan, and we believe and contend that they are victims

14     under the Crime Victims' Rights Act.  This is sort of where Mr.

15     Majoras and I disagree on how that's to be interpreted, but

16     there's that issue as well.  We believe that those indirect

17     purchasers are nonetheless victims under the Crime Victims'

18     Rights Act and in first standing even if The Baron Group didn't

19     have it, although we believe that it does.

20          THE COURT:  Just maybe you gentlemen know it off the

21     top of your head, but the *Illinois Brick Company versus State*

22     *of Illinois*, have they changed their opinion on whether

23     indirect purchasers have any claim in this matter?

24          MR. MAJORAS:  No, sir.  That is still standing and

25     good law.

1          MR. AXELROD:  And I agree with that.  Although

2   *Illinois Brick* talks about a remedy, it doesn't say that they

3   don't have standing and, in fact, gives them standing to pursue

4   an injunction, because indirect purchasers are harmed by

5   antitrust offenses.

6      But that being said, the Crime Victims' Rights Act does not

7   require a claim that's cognizable under antitrust law.  It

8   doesn't require a claim that's cognizable under any particular

9   law.  It simply says anyone directly or indirectly harmed as a

10  result of the offense is a crime victim under the Crime

11  Victims' Rights Act.  It's a different test entirely.

12          MR. MAJORAS:  I would suggest, Your Honor, I'm not

13  aware that there is a case law that addresses this particular

14  issue that we're talking about in the antitrust context on the

15  Crime Victims' Rights Act.  However, if you look to the

16  reasoning of the *Illinois Brick*, what the Supreme Court was

17  pointing out is there may be any number of parties that, as you

18  chase a potential overcharge, paid some portion of that, but

19  the Court made the determination that to chase that down

20  through all the different layers of indirect is not an

21  appropriate use of the Court's resources and that the penalty

22  of the treble damages is, in fact, sufficient to accomplish

23  some of the other purposes.

24      If you were to take what Mr. Axelrod is saying to an

25  extreme, at what point does the Court draw the line as to who

1  they will hear?  If someone, let's say a restaurant, were to

2  buy packaged ice, doesn't have a machine, and puts it in Cokes

3  that are then sold, does the buyer of a Coke have a claim

4  because of some portion of that ice?

5      And it's not too far reaching to suggest that there is that

6  particular issue.  The Supreme Court has decided not to wade

7  into that, and I would suggest that, by analogy, that would be

8  effective in looking at the Crime Victims' Rights Act.

9          MR. AXELROD:  And conceptually, Your Honor, I agree

10  with Mr. Majoras.

11          THE COURT:  I understand.

12          MR. AXELROD:  But the statute talks about proximate

13  cause, and that's where the proximate cause concept would come

14  into play.

15          THE COURT:  Now, the issue then before me is that,

16  before I can proceed, I have to get the charging document

17  filed.  Can I go ahead and do that today?

18          MR. CULUM:  I believe that the waiver of indictment

19  will be satisfactory, and in that way the Information would be

20  able to be filed.  That's the position of the Department.

21          THE COURT:  And then in the Texas case, the judge had

22  a charging document.  Then he postponed the arraignment, giving

23  you the chance to do what you thought you might do on the --

24          MR. CULUM:  And, Your Honor, if you think that -- if,

25  in your opinion, postponing the arraignment will be helpful,

```
1   we're certainly not opposed to it.  Mr. Adams did come down
2   from Canada.  I believe that the --
3           THE COURT:  That's not very far.
4           MR. MAJORAS:  Winnipeg is a little further, Your
5   Honor, than Toronto.
6           THE COURT:  That is a little farther.
7           MR. CULUM:  Your Honor, I --
8           MR. AXELROD:  It's warmer here.
9           MR. CULUM:  -- think that we will have expanded the
10  Crime Victims' Rights Act by delaying the arraignment.  It does
11  not provide for -- it allows the victims -- and apart from
12  whether we agree as to whether the purchasers outside of
13  Michigan are contemplated under -- if they're CVRA victims.
14      And again I go back to the definition.  I disagree with Mr.
15  Axelrod saying I just read the definition.  It says "directly";
16  it does not include the term "indirectly."
17      But I would concentrate on, first, that apart from the
18  direct purchasers outside the Eastern District of Michigan and
19  the indirect purchasers, we welcome people who believe that
20  they're aggrieved to have an opportunity to speak.  They are
21  having an opportunity to speak here.  I would encourage the
22  Court to let them speak in front of -- in a public setting as
23  well.  They will have the opportunity, and we will -- they can
24  provide probation with a victim impact statement.  They can
25  provide --
```

1    My sense is that Mr. Axelrod -- he's already alluded to the

2   1B1.8 issue.  I think that that's probably going to be

3   something that will need to be briefed.  I think that the

4   Department will have a position on that.  I don't know what

5   that position will be.  I will be directed by my superiors as

6   to what that will be.

7    But I do believe that we can go forward today with the

8   arraignment, but we're not -- there's no -- I think that it's

9   more a -- I think Arctic needs to have some resolution.  I

10  think arraignment will start the clock, and we can come down

11  from Cleveland anytime you want, and we will.  But I just think

12  that Arctic has --

13   And I will give it to Mr. Majoras.  My sense is they have

14  shareholders who are in Canada who have some concerns about

15  trying to get this thing moving.  I believe that the -- I know;

16  I don't believe.  I know that the victims will have an

17  opportunity to be heard, to have their concerns addressed, and

18  we welcome.  And we will confer with them and we will make sure

19  that all the considerations of the Crime Victims' Rights Act is

20  fulfilled.

21   We think that we've already -- we have and will continue to

22  fulfill the Act and the requirements.

23        THE COURT:  Mr. Wild gave me a choice.  He so

24  graciously gave me a choice in that to postpone the arraignment

25  or to postpone accepting the plea agreement until after a

1    presentence investigation.

2           MR. AXELROD:  And we did do that in the motion, Your

3    Honor.

4           THE COURT:  Well, I appreciate that.

5           MR. AXELROD:  Well, not that we get to give you a

6    choice.  You get to give us choices sometimes, but we don't get

7    to give them to you.

8       But we proposed one or the other.  We believe postponing

9    the arraignment would be the appropriate course, because as the

10   *Dean* case -- well, first, I think I'm a really persuasive guy.

11   And I think that if we didn't have a plea agreement or if I

12   could influence it before it became accepted by the Court, it

13   would have differences from what it has now.  And I believe

14   that.

15      The *Dean* case talks about that issue and it says maybe the

16   victim's lawyer wouldn't be able to change the plea agreement

17   if we went back and did it over again, but that's not the

18   point.  Congress said victims have a right to participate in

19   the plea negotiation process and --

20          MR. CULUM:  Excuse me, Mr. Axelrod.  Where does it say

21   that?

22          MR. AXELROD:  Well, it says it in the *Dean* case here.

23   It says the policy --

24          MR. CULUM:  But the statute does not.

25          MR. AXELROD:  Well, I'm reading the *Dean* case.  It

1  says, "In passing the Act, Congress made the policy decision --

2  which we are bound to enforce -- that the victims have a right

3  to inform the plea negotiation process by conferring with

4  prosecutors before a plea agreement is reached."

5      They go on a couple of paragraphs later and say, "It's also

6  true, and we cannot know whether the Court considered, that

7  resourceful input from the victims and their attorneys could

8  facilitate the reaching of an agreement.  The point is, it does

9  not matter.  The Act gives the right to confer."

10          MR. CULUM:  And, Your Honor, you've read the Act.

11  You've read this many more times than I have.  It says the

12  right to confer with the government.

13      From beginning in March of 2008 I have been willing.  I

14  don't pick the phone up every time something happens and -- for

15  a variety of reasons.  Many of the other victims have --

16  they're working; they're doing their thing.  They know they can

17  call me.  Many others have been doing whatever.

18      As I read the Act, it does not give the conferring before a

19  plea agreement.  It says the right to confer with the

20  government.  It does not say the right to confer on plea

21  agreements.  And I'm just reading the Act.

22          MR. AXELROD:  And, Judge, I mean, I really did not

23  intend to make this about whether the government has or has not

24  fulfilled its responsibilities, because I'm not above blame if

25  I can avoid getting into that.  But the statute in 3771(a)(4)

specifically refers to the right to be reasonably heard at any
public proceeding involving a plea.  And that's not a plea
negotiation.

        MR. CULUM:  No.

        MR. AXELROD:  But it does say in (d)(3), it talks
about asserting rights in the district court if no prosecution
is underway.  I mean, it's clear from that statement alone that
rights under this statute attach before prosecution is
underway.

   Furthermore, it's not the victim's responsibility to reach
out to the government.  3771(c) says that the government is
required to use, quote, their best efforts to see that crime
victims are notified of and accorded the rights described in
subsection (a).  We say the statement that "I answer the phone
and I'm willing to talk" does not fulfill that responsibility.

        MR. MAJORAS:  Your Honor, and I apologize for
prolonging this, but there's one other issue I'm compelled to
raise in terms of our proceedings today.

   My client would certainly like to proceed to the
arraignment today, and there are some considerable financial
considerations facing the company.  It is important to have a
certainty in the process as the company moves forward in
arranging various financial commitments that it must for its
business, and those are a matter of public record in terms of
debt financing that the company has.

1    We had intended, if we had gone forward with the

2  arraignment, simply to raise this at the end, that we wanted

3  the Court to know we would proceed expeditiously in cooperating

4  with the probation officer to provide her all the information

5  needed for the report.  And we would still intend to do that,

6  but prolonging the arraignment is an issue for the company as

7  it draws that process out.  So we're not here to ask that we be

8  considered victims here, but I think in the context of an

9  antitrust case where you're talking about a significant

10  competitor and the effect it may have, that's important.

11    Our view, we're not really in this issue as to what

12  conferences may or may not have been able to occur between the

13  parties.  But in terms of the information that Mr. Axelrod or

14  Mr. Wild had about this investigation ongoing, being skilled

15  attorneys in the area and understanding where investigations go

16  and what the potential is to move forward, there has been

17  contact in doing it.  We don't think there will be any value in

18  delaying the arraignment further than today.

19       THE COURT:  What finality is there to the guilty plea

20  other than the opportunity to argue that what you've agreed to

21  is fair and just?  That's all it is.

22       MR. MAJORAS:  That's correct, sir.  It's more of a

23  timing issue.  If we were to delay, put off the arraignment for

24  some period of time, whatever that might be, there's the then

25  time necessary -- assuming the arraignment goes forward,

1   there's time necessary for the probation officer to put

2   together the various reports and the back-and-forth information

3   that's needed.  We're pushing that period forward, and that

4   period is one of considerable concern to the company.

5           THE COURT:  In your filings are you going to

6   adequately point out to your shareholders and your stock

7   purchasers that this situation is still fluid?  I mean, in

8   other words, you're saying you want certainty and that will

9   give you some financial advantage.  You put that into your

10  filings and you're setting yourself up for a later on --

11          MR. MAJORAS:  We don't take a position --

12          THE COURT:  And I don't know whether you're a Canadian

13  company or an American company.  I don't know that.

14          MR. MAJORAS:  The holding corporation is a Canadian

15  company.

16          THE COURT:  You're both American companies, I should

17  add, technically.

18          MR. MAJORAS:  The certainty issue is not one of

19  providing a financial benefit or some type of benefit we

20  wouldn't otherwise have absent certainty.  It is the ability to

21  move forward with respect to financing.

22    Mr. Adams is very involved with the company in these areas.

23  He's also involved -- we've provided various disclosures since

24  this investigation was announced.  But if he has some

25  additional information to respond that you wanted to hear, Your

1    Honor, we'd be happy to provide it.

2           THE COURT:  There it is.  I don't see any disadvantage

3    in going ahead at least with the proceedings.  You can enter a

4    plea of guilty today.  I don't know what disadvantage that is.

5    I'm trying to indicate in the very best way that I can that the

6    plea agreement is subject to a fluid situation.  I don't know

7    what the answer is.

8      I realize I can impose a hundred million dollar fine.  I

9    realize that.  I don't know how that would help the victims.  I

10   don't know how that would help you.  I'm willing to -- I mean,

11   if I find out that -- if I, in my discretion, determine that,

12   then you'll have to withdraw your guilty plea and you go to

13   trial, and I suppose I'll have to -- I won't have to hear it

14   because I've already expressed my concerns.

15          MR. AXELROD:  Judge, I've been surprised before, but I

16   will be very surprised if you hear me arguing that the Court

17   should impose a bigger fine than is already provided in the

18   plea agreement.  I doubt that that's going to be my position.

19     I can imagine a lot of other things that I might ask the

20   Court to do, but, you know, as I look at this from the victims'

21   perspective, I mean, this has gone on for years, and the idea

22   that ten days' or two weeks' further delay is going to change

23   the situation or further harm the company is actually a

24   surprise to me.

25          THE COURT:  Well, what will ten days gain you?

1          MR. AXELROD:  It will gain me the ability to spend

2     some time with the government -- Mr. Culum -- and to talk to

3     him about the plea agreement.  As it stands now and as the

4     Court has acknowledged, if we go forward, the plea agreement is

5     a take-it-or-leave-it proposition for the Court.  You can't

6     change it, and it locks the Court in to certain things.  I will

7     be trying to persuade Mr. Culum that some aspects of it should

8     be changed to allow the Court greater flexibility.

9          Now, it may be that, if I'm able to persuade him of that,

10    there won't be a plea agreement, and that could happen.  But

11    the Act contemplates that I have the right to try.  And

12    although the Court could reject it, once we go down the road

13    and the plea is entered and there's a presentence investigation

14    report and there are all of the things that we all know happen

15    in a case, it becomes harder to say, "Never mind.  We're going

16    to go back to the drawing board."  It's much easier to do that

17    now than it will be 60 days from now when all of that

18    additional work has been done.

19          MR. CULUM:  Your Honor --

20          THE COURT:  I'm willing to give him ten days.  I'll

21    put it that way.

22          MR. CULUM:  Your Honor, if I may just make an

23    observation, which I just -- it just dawned on me.  One of the

24    criticisms that is in the paper of me and of the Department is

25    that we did not confer with Mr. Axelrod in advance of the plea.

1      Is that a fair statement, Mr. Axelrod?

2          MR. AXELROD:  Well, it was not intended as a criticism

3  of you, but we argue that that violated our rights.

4          MR. CULUM:  Okay.  That I did not contact you and

5  confer with you.

6          MR. AXELROD:  Well, I wasn't in the case.  But Mr.

7  Wild.

8          MR. CULUM:  And that's the point.  That's the point.

9          MR. AXELROD:  Mr. Wild.

10         MR. CULUM:  And I've conferred with Mr. Wild last

11  week.

12         THE COURT:  All right.  We can make a record on that,

13  and then we'll go ahead with the proceedings today if Mr.

14  Wild's conferred with you.

15         MR. CULUM:  I mean, we conferred with him last week.

16  I've conferred with other victims along the way.  I conferred

17  with Mr. Wild's father.

18      I'm willing to delay it ten days.  From the Department's

19  standpoint, we want to make sure that we satisfy the Crime

20  Victims' Rights Act.  It just was an odd thing to me, as I was

21  sitting here -- I met Mr. Axelrod today, I talked to him for a

22  long time last night, and will continue to provide whatever

23  information necessary to ensure that the victims' rights are

24  ensured.

25      I am objectively concerned about the company as well.  And,

1   Your Honor, I will be frank.  There is the company and there

2   are a lot of individuals who work at the company.  And I am

3   concerned about people who have nothing to do with the conduct

4   at issue who could be harmed by further delay, and that is my

5   own personal concern.  I am concerned about people who are

6   driving ice trucks.

7            THE COURT:  Well, there's more than 200 or not less

8   than a thousand.

9            MR. CULUM:  Right, exactly.

10            THE COURT:  According to your paperwork.

11            MR. CULUM:  Correct.

12            MR. MAJORAS:  Your Honor, if I could, there really is

13   an urgency in terms of the financial situation of the company,

14   of the commitments they have.  I would actually ask if Mr.

15   Adams could briefly let the Court be aware of that.

16            THE COURT:  Sure.

17            MR. MAJORAS:  I want to be careful that I put it on

18   the record with accuracy.  Mr. Adams will be able to.

19            THE COURT:  Sure, sure.

20        And you're an attorney, are you?

21            MR. ADAMS:  Yes.  I'm the Canadian counsel for Arctic

22   Glacier Income Fund.  And for the record and your information,

23   that fund is a publicly traded entity with its units listed on

24   the Toronto Stock Exchange, and that entity has investors.  It

25   has some 39 million units outstanding at the present time.

 1      Those units were trading, before this investigation
 2   started, somewhere around $15 a unit.  They went down to below
 3   a dollar a unit primarily, in my view, as a consequence of the
 4   uncertainty, the fear that was generated by the uncertainty of
 5   the investigation.
 6      It went down to, as I say, below a dollar, and on the 13th
 7   of October when it became publicly known and the plea agreement
 8   was publicly filed both in Canada and released publicly in the
 9   United States, the stock price went up to just a little bit
10   over four dollars, and that recovery has settled back to about
11   $3.80 today.  And I'm speaking in Canadian dollars, not U.S.
12   currency.
13      It shows the effect on the market of the announcement, and
14   the announcement was very clear.  You asked about what we had
15   to tell the public.  We made it very clear that the agreement
16   remained subject to Court approval.  So everybody knows that,
17   and the lenders have been told that.
18      Arctic is financed by a syndicate of three lenders:  the
19   Toronto Dominion Bank, the Bank of Nova Scotia, and Roynat,
20   which is a subsidiary of the Bank of Nova Scotia.  Both their
21   Canadian arms and their U.S.-based arms are part of that
22   syndicate.
23      There is an intercreditor agreement that brings in John
24   Hancock Life Insurance Company, and John Hancock Life Insurance
25   Company owns $60 million of senior secured notes that come due

1   and have to be repaid on January 4th of 2010.  And the message

2   that the company has been given is:  if this is not resolved

3   before then, the company's loan is at risk.

4            THE COURT:  How can it be resolved before then?

5            MR. ADAMS:  I mean, we need to have -- we hope to have

6   Your Honor pass sentence before that date.

7            THE COURT:  It won't happen.

8            MR. ADAMS:  Well, then the company has a huge problem.

9            THE COURT:  I understand.  It won't happen.

10           MR. ADAMS:  And a further delay in the arraignment is

11   going to exacerbate that.

12           THE COURT:  Well, I mean, I'm willing to go ahead, but

13   there's no way you can be sentenced by January the 10th or

14   whatever it is.

15           MR. ADAMS:  Well, I appreciate that's within your

16   control and that puts a job on my plate to deal with.

17           THE COURT:  Well, just there's no way that can happen.

18   I mean, Home City Ice is still messing around.

19      And I took that plea how long ago?

20           MR. CULUM:  June of 2008.

21           MR. MAJORAS:  Our concern here, given the motions that

22   have been filed, is that by having an additional delay from the

23   arraignment, to the extent people were paying attention and

24   obviously now will have a record, is the delay itself will

25   cause the further uncertainty.  We've got to deal with the

1   uncertainty.

2       We're just raising the issue, Your Honor, and we would

3   respectfully ask that we proceed today.

4           MR. AXELROD:  Your Honor, if I may, two points.  One,

5   and I know it was unintentional, but Mr. Culum has given the

6   Court the impression that there was a timely conferring with

7   Mr. Wild.  In fact, there was no communication at all with Mr.

8   Wild until he found the plea agreement on his own, it had

9   already been entered, and he reached out to Mr. Culum.  So we

10  were not afforded the rights to confer before the plea

11  agreement was entered that are explained in the *Dean* case and

12  guaranteed by the Act.  That's number one.

13      Number two, if I could predict the stock market, I wouldn't

14  be here.  I'd be on an island in the Caribbean somewhere

15  sunning myself, as I suspect everybody else in the room would.

16  Nobody knows what's going to happen to the stock.  After years

17  of investigation, I respectfully urge the Court that it's not

18  too much to give the victims the ten days that the Court

19  mentioned earlier to talk to Mr. Culum and to see if we can

20  have some influence on how this thing is crafted so that the

21  victims' rights are protected.  Perhaps, as the Court

22  suggested, by a lesser fine.  There are lots of things that we

23  might do if we have a chance to spend some time with the

24  parties working on it.

25          THE COURT:  Go ahead.

1       MR. CULUM:  Your Honor, if you feel the best thing is

2  ten days, that's fine.  I just wanted to let you know what I

3  understood Artic's problems to be.  For us, we'll be here when

4  you tell us to be here.

5       THE COURT:  I apologize to the world and everyone

6  else, but there is no way that this can be investigated and

7  determined by that particular deadline.  And so that deadline's

8  got to be extended some way, or else John Hancock is going to

9  close the company and you guys are all out.

10      MR. CULUM:  The good part is, I get paid by Uncle Sam.

11      THE COURT:  You get paid; I get paid.  But that's what

12  we're -- there's just no way that that can happen.

13      MR. MAJORAS:  All right.  We do believe that there

14  is -- even though that can't happen -- and we, of course, were

15  cognizant of the timing issues -- putting in the additional

16  delay simply raises the uncertainty level because it does

17  appear to come as a direct result of a motion which, at least

18  to outsiders, will view as an attempt to somehow change or

19  crater the deal.

20      THE COURT:  What time is it, 4:30?

21      MR. CULUM:  No.  I was looking at ten days.  I was

22  thinking to myself --

23      MR. MAJORAS:  4:30.

24      MR. CULUM:  -- ten days will be November 11th, I

25  think.

1          THE COURT:  That's a holiday in the United States.

2          MR. CULUM:  Yes, it is.

3          MR. ADAMS:  And in Canada.

4          THE COURT:  Is it?

5          MR. ADAMS:  Yeah.

6          MR. AXELROD:  And we will know whether we'll have

7    casinos in Cincinnati, Columbus, Cleveland and Toledo.

8          THE COURT:  You're here now; you can talk.  Are you

9    prepared to discuss it?  Have you got enough information?

10         MR. AXELROD:  Well, Judge, I first heard of this case

11   I think Wednesday, at night, while I was traveling and didn't

12   get to work on this case until over the weekend.  And there are

13   so many things that I don't know that --

14      And Mr. Wild has spent a substantial period of time with

15   the civil case --

16         THE COURT:  Sure.

17         MR. AXELROD:  -- and he knows the issues so much

18   better, that I can't responsibly tell the Court that I can do

19   what needs to be done this afternoon.

20         THE COURT:  Mr. Wild was invited to come today.

21         MR. AXELROD:  Well, you know, I may now tell him that

22   he should stay in New York.

23      (Courtroom deputy leaves chambers.)

24         THE COURT:  The -- well, my brains just left, so I'll

25   have to wait a while.

1      Is there anything else you want to add to the record at

2  this time?

3          MR. CULUM:  Your Honor, defer to your opinion,

4  obviously, but I mean, they did ask, in the alternative, X or

5  Y.  It seemed that they felt that their rights would be

6  preserved if we did not impose sentencing today and they have a

7  meaningful opportunity to provide their input before

8  sentencing.  And we certainly would encourage to do that, and

9  therefore would ask --

10      And we will certainly confer with them.  We'll go to New

11  York.  We'll go to Columbus.  They can come to Cleveland.

12  Everyone wants to come to Cleveland.  Whatever, you know.

13      So I think that they did offer an alternative that they

14  felt satisfied their concerns, and I would opt that, you know,

15  making sure that we don't impose sentence today and that the

16  plea is taken under advisement would be an appropriate use of

17  judicial discretion.

18      (Courtroom deputy returns to chambers.)

19          THE COURT:  This is one suggestion that I might have,

20  that we could go into a formal session.  Now that you've

21  convinced me that you have the authority to waive the

22  indictment, I could order the Information filed and then simply

23  say that it's my convenience to recess this for a few days, if

24  that will help you with your shareholders.  It's my fault, not

25  yours.

1    I mean, that's what judges are for.

2         MR. ADAMS:  Well --

3         MR. MAJORAS:  Certainly, Your Honor, any time that we

4    can save in the process is valuable time.

5         THE COURT:  And if -- if, if -- all these things can

6    be worked out, and I don't know where Home City is now.  See,

7    that's in the back of my craw, too.

8         MR. CULUM:  (Nods head up and down.)

9         THE COURT:  Home City's plea agreement was 23 million,

10   minimum.

11        MR. CULUM:  24.

12        THE COURT:  24 million?

13        MR. CULUM:  (Nods head up and down).  But there is a

14   substantial assistance provision within that.

15     (Portion of proceedings placed under seal.)

16        MR. MAJORAS:  The volume of commerce was substantially

17   higher between the two, essentially double, I believe, between

18   Home City and the Arctic.

19        THE COURT:  And I trust Mr. Wild has the volume of

20   commerce?

21        MR. AXELROD:  Your Honor, I assume so.

22        THE COURT:  I mean in all the information he mailed

23   me.

24        MR. MAJORAS:  It's in publicly available documents,

25   Your Honor.

1          THE COURT:  So I presume that that can be determined.

2          MR. AXELROD:  I assume so, Your Honor.

3          THE COURT:  But, you see, I also have the

4     responsibility to make my sentences compatible with the

5     sentences of others.  See, that's part of my reason, and that's

6     why I need the information that I must have, because I know

7     Home City is in the process.

8          MR. CULUM:  (Nods head up and down.)

9          THE COURT:  And I don't know about this other one.  Is

10    he coming in here, or is that one coming in too, the third one?

11         MR. CULUM:  Your Honor --

12         THE COURT:  Don't answer if you can't.

13         MR. CULUM:  I'm sure that he would like to meet you as

14    much as everyone else has enjoyed meeting you.

15         THE COURT:  Okay.  Well, all right.  But if there are

16    any more in the woodwork, I don't want to see them.

17       All right.  Well, I will go ahead, if you wish, today on

18    getting a charging document.  I'll recess the arraignment

19    for --

20       What do we have?

21         COURTROOM DEPUTY:  I have Tuesday, November 10th, at

22    10:00 o'clock.

23         THE COURT:  Tuesday, November the 10th, at 10:00

24    o'clock.  And I will take the responsibility for the delay.

25         MR. MAJORAS:  Thank you, Your Honor.

1          MR. AXELROD:  Thank you, Your Honor.

2          MR. CULUM:  Thank you.

3          THE COURT:  This is under seal.  Is that agreeable?

4          MR. AXELROD:  Yes, sir.

5          MR. MAJORAS:  Yes, Your Honor.

6          MR. CULUM:  I think it's up to the victims to

7    determine that.

8          MR. AXELROD:  Yes, sir.

9          THE COURT:  I think it should be at this time.

10         MR. AXELROD:  And we agree wholeheartedly.

11         MR. CULUM:  I think we would probably like a --

12         THE COURT:  Oh, you get it.

13         MR. CULUM:  Okay.

14         THE COURT:  No, no, no.  You can get it, but it's not

15   on the Internet.  See, all our transcripts go on the Internet

16   worldwide.

17         MR. CULUM:  You're not --

18         THE COURT:  I can't help you guys want the ball of

19   clear sailing.

20         MR. MAJORAS:  Your Honor, there's one other issue you

21   raised at the very outset on this restitution point and the

22   effect it has on the agreement.  Now that we do have some

23   additional time, we would like to address that and then we will

24   get back to you.

25         THE COURT:  And then if you want to withdraw it, why,

```
 1   that's fine.
 2             MR. MAJORAS:  Yes, sir.
 3             THE COURT:  Back to square one.
 4             MR. ADAMS:  Just one point of clarification.
 5             THE COURT:  Sure.
 6             MR. ADAMS:  In terms of the proceedings being under
 7   seal, the information that I have received today --
 8             THE COURT:  Is under seal.  Oh, that.  No, you can use
 9   that.
10             MR. ADAMS:  But I'm able to speak to --
11             THE COURT:  You can use it to your individuals.  Just
12   tell them, when you tell it, that they're supposed to keep it
13   to themselves.  I don't think your competitors need to know
14   this.
15             MR. MAJORAS:  No.
16             MR. ADAMS:  Well, the only problem that I have, sir,
17   is that the conversations that we now need to have will be with
18   multiple bankers and credit committees and insurance companies,
19   and I can't -- like if I'm told I can't share that with them --
20             THE COURT:  No.  You can share anything with them.
21   I'll take it out from under seal, then.  We won't put it under
22   seal.  You go ahead, because you have a real tough job ahead of
23   you.  I know that.
24             MR. ADAMS:  Right.
25             MR. MAJORAS:  You had one number that was mentioned
```

1    that you may have some concerns about, if I heard it correctly.

2        (Portion of proceedings placed under seal.)

3            MR. CULUM:  Oh.  It's --

4            MR. MAJORAS:  No, okay.  We don't have any objection

5    to not being under seal.

6            MR. AXELROD:  We don't -- whichever the Court thinks

7    is the right course is fine with the victims.

8            THE COURT:  I mean, if they have to come up with that

9    sum of money, 60 million, by the first of the year, we want

10   them to stay in business, I think.

11           MR. AXELROD:  Yes, we do, Your Honor.

12           MR. MAJORAS:  I can assure we won't be sending the

13   transcripts, I don't think, to the -- but we just want to make

14   sure that we can talk about it without violating anything.

15           THE COURT:  All right.  I will put it this way.

16     How can we do that as far as filing it?  If it's not filed,

17   it's not --

18           THE REPORTER:  May we go off the record?

19           THE COURT:  Yes.

20     (Discussion off the record.)

21           THE COURT:  So I think there we just have to let it

22   run that way, and as I say, you've got to convince your

23   investors.

24           MR. CULUM:  But just to clarify for the record, the

25   reason we are delaying the arraignment --

1          THE COURT:  Is my convenience.

2          MR. CULUM:  Is your convenience.

3          MR. MAJORAS:  And we'll do that in open court?

4          THE COURT:  Right.

5          MR. MAJORAS:  Yes, sir.

6          THE COURT:  Oh, yes.  I'll even put on a robe.

7     Okay.  We're in Judge Beckwith's courtroom?

8          COURTROOM DEPUTY:  We are.

9          THE COURT:  My gosh.  Well, we won't have a courtroom

10    by November the 10th, will we?  It's not going to be -- it's

11    been down 18 months.

12         MR. MAJORAS:  Oh.

13         MR. AXELROD:  Wow.

14         THE COURT:  18 months I've been a nomad.

15         MR. MAJORAS:  Thank you, Your Honor.

16         MR. AXELROD:  Thank you, Judge.

17         MR. CULUM:  Thank you.

18    (Chambers proceedings recessed at 4:40 PM.)

19    <u>AFTER RECESS</u>

20    (In open court at 4:50 PM.)

21         THE COURT:  Proceed, Ms. Maury.

22         COURTROOM DEPUTY:  Judge, on the docket this afternoon

23    is Criminal Action 09-149, United States of America versus

24    Arctic Glacier International Inc.

25    Appearing on behalf of the government is Kevin Culum.

1   Appearing on behalf of the defense is John Majoras.  Appearing

2   on behalf of the victims group is David Axelrod.

3        THE COURT:  The matter is before the Court for waiver

4   of indictment at this time.  The first item that the Court

5   wishes to take up is the authority of the representative of the

6   corporation.

7        MR. MAJORAS:  Your Honor, John Majoras for the

8   defendant.  The Court has before it --

9        And I could bring another copy if you would like.

10       THE COURT:  I have a copy.

11       MR. MAJORAS:  Thank you, sir.

12       -- the resolution of the directors of Arctic Glacier Inc.

13  which is dated September 29th, 2009.  With respect to paragraph

14  4 of this resolution, Your Honor, it is certainly our view that

15  the board of directors have fully authorized the corporate

16  representative and corporate counsel Mr. Adams to execute all

17  papers necessary to proceed with the plea in this case, and we

18  have, indeed, executed two copies, two originals of a waiver of

19  indictment.

20       THE COURT:  Thank you.

21       Mr. Adams, do you have any questions about your authority

22  at this time?

23       Just remain seated.  This is going to take some time.

24       MR. ADAMS:  No, Your Honor.

25       THE COURT:  And are you familiar with the Information

1   that was proposed in this case?

2           MR. ADAMS:  Yes.  I've read it, Your Honor.

3           THE COURT:  And, of course, you are an attorney; isn't

4   that correct?

5           MR. ADAMS:  I am qualified in Canada, Your Honor.

6           THE COURT:  And you are represented by an attorney?

7           MR. ADAMS:  I am here as a representative of the

8   defendant and --

9           THE COURT:  And are you also -- is the defendant

10  represented by an attorney?

11          MR. ADAMS:  And the defendant is represented.

12          THE COURT:  What is that attorney's name?

13          MR. ADAMS:  Mr. John Majoras, Your Honor.

14          THE COURT:  And I think probably at this time it would

15  be worthwhile to be sure that you've --

16      I understand what the charge is in this case.  And, Mr.

17  Majoras, have you explained the charge to the defendant?

18          MR. MAJORAS:  Yes, Your Honor.

19          THE COURT:  At this time would you please, Mr. Culum,

20  read the Information to the record so that we all understand

21  what the charge is.

22          MR. CULUM:  Yes, Your Honor.

23      The Information is entitled "*United States of America v.*

24  *Arctic Glacier International Inc.*"

25      Title:  Information.  Conspiracy To Restrain Trade, 15

1   U.S.C. Section 1.

2       The United States of America, acting through its attorneys,

3   charges:

4       1.   Arctic Glacier International Inc. is hereby made a

5   defendant on the charge stated below.

6       Title:   Description Of The Offense.   I.

7       Paragraph 2.   Beginning January 1st, 2001, and continuing

8   until at least July 17th, 2007, the exact dates being unknown

9   to the United States, the defendant and co-consipirators

10  entered into and engaged in a conspiracy to suppress and

11  eliminate competition by allocating packaged-ice customers in

12  southeastern Michigan and the Detroit, Michigan, metropolitan

13  area.   The charged conspiracy unreasonably restrained

14  interstate trade and commerce, in violation of Section 1 of the

15  Sherman Act, 15 U.S.C. Section 1.

16      Paragraph 3.   The charged conspiracy consisted of a

17  continuing agreement, understanding, and concert of action

18  among the defendant and co-conspirators, the substantial terms

19  of which was to allocate packaged-ice customers in the

20  southeastern Michigan and the Detroit, Michigan, metropolitan

21  area.

22      II.   Title:   Means And Methods Of The Conspiracy.

23      Paragraph 4.   For the purposes of forming and carrying out

24  the charged conspiracy, the defendant and co-conspirators did

25  the following things, among others:

    (a) participated in meetings and conversations to discuss packaged-ice customers in southeastern Michigan and the Detroit, Michigan, metropolitan area;

    (b) agreed during those meetings and conversations to allocate packaged-ice customers in southeastern Michigan and the Detroit, Michigan, metropolitan area;

    (c) exchanged information during those meetings and conversations for the purpose of monitoring and enforcing adherence to the agreements to allocate customers in southeastern Michigan and the Detroit, Michigan, metropolitan area; and

    (d) refrained from competing for packaged-ice customers that were so allocated.

    III.   Title:   Defendant And Co-Conspirators.

    Paragraph 5.   Arctic Glacier International Inc., the defendant, is a corporation organized and existing under the laws of the state of Delaware and does business in multiple states, with its principal place of business in St. Paul, Minnesota.   During the relevant period, the defendant acquired various packaged-ice manufacturers doing business in Michigan.

    Paragraph 6.   Various individuals and corporations not made defendants in this Information participated as co-conspirators in the events charged and performed acts and made statements in furtherance of it.

    Paragraph 7.   Whenever this Information refers to any act,

deed, or transaction of any corporation, it means that the corporation engaged in the act, deed, or transaction by or through its officers, employees, agents or other representatives while they were actively engaged in the management, direction, control, or transactions of its business or affairs.

IV.  Trade And Commerce.

Paragraph 8.  During the period covered by this Information, the defendant and co-conspirators:  (1) manufactured packaged ice; (2) distributed packaged ice to retailers in southeastern Michigan and the Detroit, Michigan, metropolitan area; and (3) caused packaged ice to be purchased from, sold to, or distributed from or to, individuals and companies located inside and outside the southeastern Michigan and the Detroit, Michigan, metropolitan area.

Paragraph 9.  During the period covered by this Information, substantial quantities of packaged ice manufactured and sold by the defendant was shipped across state lines in continuous and uninterrupted flow of interstate trade and commerce.

10.  The business activities of the defendant and co-conspirators that are the subject of this Information were within the flow of and substantially affected interstate trade and commerce.

V.  Title:  Venue.

1          Paragraph 11.  The conspiracy charged in this Information

2     was formed and carried out within the Southern District of

3     Ohio, Western Division.  At least one of the conspiratorial

4     meetings or discussions described above took place in

5     Cincinnati, Ohio, which is located within the Southern District

6     of Ohio.  Acts in furtherance of this conspiracy were carried

7     out within five years preceding the filing of this Information,

8     all in violation of Title 15, United States Code, Section 1.

9          The Information is signed by Christine A. Varney, Assistant

10    Attorney General; Scott D. Hammond, the Deputy Assistant

11    Attorney General; Marc Siegel, the Director of Criminal

12    Enforcement; Scott Watson, the chief of the Cleveland field

13    office; and myself, Kevin Culum.

14          THE COURT:  Mr. Majoras, have you explained to the

15    defendant the right it has to go to a grand jury?

16          MR. MAJORAS:  Yes, sir.

17          THE COURT:  And does the defendant wish to have the

18    facts of this case presented to the grand jury, or has it

19    indicated its consent to be charged by Information?

20          MR. MAJORAS:  It has indicated its consent to be

21    charged by Information.

22          THE COURT:  I'll ask the representative of the

23    defendant, does the defendant understand the nature and meaning

24    of the offense charged in the Information?

25          MR. ADAMS:  Yes, Your Honor.

1        THE COURT:  And has the defendant discussed it with

2  the lawyer?

3        MR. ADAMS:  Yes, Your Honor.

4        THE COURT:  Mr. Majoras, based on your conferences

5  with this defendant, what is your belief that its understanding

6  of the nature and the meaning of the offense is?

7        MR. MAJORAS:  The defendant understands that the -- it

8  certainly understands the meaning of the Information and the

9  conduct that has been described in the Information and agrees

10  with respect to that conduct as set forth in the facts of the

11  plea agreement.

12        THE COURT:  And does the defendant understand that it

13  cannot be put on trial in this court unless a grand jury

14  composed of at least 16, but not more than 23, people agree

15  that there's probable cause that the defendant committed this

16  offense?

17        MR. ADAMS:  Yes, we understand that, Your Honor.

18        THE COURT:  And do you understand that by proceeding

19  in this manner you're not giving up any of your other

20  constitutional rights?  The defendant has a right to plead not

21  guilty, be tried by a jury, be represented by a lawyer

22  throughout the proceedings, face the prosecution witnesses,

23  have the right of compulsory process to call witnesses on its

24  behalf, and the United States must prove the charges beyond a

25  reasonable doubt.  You also have this right to waive the

1  indictment and proceed to trial if you desire.

2     Do you understand?

3          MR. ADAMS:  That is clearly understood, Your Honor.

4          THE COURT:  Do you have any questions about the charge

5  or the Information?

6          MR. ADAMS:  No questions.

7          THE COURT:  Do you have any question about any of the

8  proceedings up to this point in time?

9          MR. ADAMS:  No questions, Your Honor.

10          THE COURT:  If it is the corporation's desire to

11  proceed and give up its right to have the grand jury consider

12  the case, you may sign the written waiver here in open court at

13  this time.

14     Mr. Culum, is there anything further I should discuss with

15  the defendant before I accept the waiver?

16          MR. CULUM:  No, Your Honor.

17          THE COURT:  Let the record show I observed the

18  representative of the defendant signing the written waiver here

19  in open court and that it is in keeping with the resolution of

20  the board of directors, September 29th, 2009.

21          MR. MAJORAS:  Your Honor, may I approach to hand it

22  up?

23          THE COURT:  Please.

24     (Mr. Majoras hands document to the courtroom deputy.)

25          THE COURT:  Does the defendant have any questions

1    about the waiver or the proceedings?

2              MR. ADAMS:  No questions, Your Honor.

3              THE COURT:  The Court will accept the waiver and order

4    the Information filed.  It has become the charging document in

5    this case and, due to commitments that the Judge has at this

6    time other than this case, the matter will be recessed until

7    November the 12th at 10:00.

8              COURTROOM DEPUTY:  November the 10th, Judge.

9              THE COURT:  November the 10th at 10:00 o'clock.

10   November the 10th at 10:00 o'clock.

11      Mr. Axelrod, is that date convenient with you?

12             MR. AXELROD:  Your Honor, I'll make it convenient.

13             THE COURT:  All right, sir.  Thank you.

14      Is that convenient?

15             MR. ADAMS:  Yes, Your Honor.

16             MR. CULUM:  Yes, Your Honor.

17             MR. MAJORAS:  Yes, Your Honor.

18             THE COURT:  And the Court will at that time continue

19   this proceedings and the parties -- I guess at this time, why,

20   we'll continue the matter.

21      Is there anything further, Mr. Axelrod?

22             MR. AXELROD:  No, sir.

23             MR. MAJORAS:  No, Your Honor.

24             THE COURT:  Anything further?

25             MR. CULUM:  No, Your Honor.

1          THE COURT:  Any questions on behalf of the

2    corporation, Mr. Adams?

3          MR. ADAMS:  No questions.  Thank you for your time,

4    Your Honor.

5          THE COURT:  So be it.  Thank you.

6          MR. MAJORAS:  Thank you, Your Honor.

7          COURTROOM DEPUTY:  All rise.  This honorable court is

8    now adjourned.

9       (Proceedings concluded at 5:00 PM.)

10                          - - -

11                  C E R T I F I C A T E

12          I, Luke T. Lavin, RDR, CRR, the undersigned, certify

13   that the foregoing is a correct transcript from the record of

14   proceedings in the above-entitled matter.

15

16                         s/Luke T. Lavin
                           Luke T. Lavin, RDR, CRR
17                         Official Court Reporter

18                          - - -

19

20

21

22

23

24

25