# Exhibit A

axelrod

axelrodohio.com
info@axelrodohio.com

(614) 222-2032 office
(614) 222-2033 fax

Axelrod, LLC
250 Civic Center Drive, Suite 500
Cincinnati   Cleveland   Dayton   Columbus, Ohio 43215

Ms. Laura Jensen
United States Probation Officer
Potter Stewart United States Courthouse
100 East 5th Street – Suite 110
Cincinnati, Ohio 45202

      Re:    *United States v. Arctic Glacier, International Inc.*
             Case No. 1:09CR0149

Dear Ms. Jenson:

We submit this letter on behalf of our clients, The Baron Group, Inc. d/b/a Baron's Ice House, Lawrence J. Acker, Brian W. Buttars, Linda Desmond, James Feeney, Ainello Mancusi, Ron Miastkowski, Perry Peka, Patrick Simasko and Wayne Stafford, all of whom constitute victims under the Crime Victims Rights Act, 18 U.S.C. § 3771. Its purpose is to state their objections to the plea agreement, and urge you to recommend the plea agreement's rejection on the grounds that it:

- Minimizes the offense by ignoring relevant conduct;
- Would help Arctic Glacier ("the company") evade its obligation to pay restitution;
- Requires the imposition of a fine that would interfere with the company's ability pay restitution;
- Treats the company as if it has accepted responsibility for its offenses; and
- Deprives the Court of the flexibility to craft an appropriate sentence.

1

I. **Our clients are victims.**

The CVRA's broad definition of "crime victim" covers any person or entity that is "directly and proximately harmed as a result of the commission of a Federal offense."[1] All of our clients constitute crime victims under that definition because, as detailed below:

- The scheme drove up prices for everyone who purchased packaged ice at any level, including both direct and indirect purchasers; and

- It covers every such purchaser, regardless of whether the purchase was from Arctic Glacier or from a co-conspirator.

a. **Prices were driven up for everyone, including both direct and indirect purchasers.**

As you know, our clients include both direct and indirect purchasers. Direct purchasers are those who purchased directly from a co-conspirator. In this case, Kroger and Giant Eagle are examples of direct purchasers. Indirect purchasers are those who purchased from direct purchasers, *i.e.*, at the retail level. All of our individual clients are indirect purchasers, while our corporate client, the Baron Group is a direct purchaser.

When we met, you correctly pointed out that the specific conduct charged in this case is a customer allocation scheme, and asked how such a scheme affected our clients. Customer allocation occurs when companies divvy up customers and potential customers amongst themselves. Allocation can occur either by brand (one company sells to Kroger and the other to Giant Eagle), or by geographic area (one company sells exclusively to customers in Ohio and the other exclusively to customers in Indiana). By allocating customers, the companies reduce or

---

[1] 18 U.S.C. § 3771(e).

2

eliminate competition. Since none of the companies has to worry about its prices being undercut by the other, this drives up prices for everyone, including both direct and indirect purchasers.

Even Arctic Glacier concedes that **direct** purchasers are victims of an antitrust conspiracy. We therefore focus on **indirect** purchasers. Cases under the Victim Witness Protection Act ("VWPA") are instructive because its definition of "victim" is virtually identical to the CVRA's definition of "crime victim."[2] And, courts have held that the VWPA covers victims who are one or more steps removed from the primary offense. For instance, In *United States v. Battista*, the court found that the NBA was a victim of an NBA referee's use of nonpublic information for making illegal wagers, even though **"Battista did not defraud the NBA directly."**[3] The Ninth Circuit has likewise approved VWPA restitution awards "that included losses at least one step removed from the offense conduct itself."[4]

Here, the harm suffered by the indirect purchasers is significantly more direct than that in *Battista*. Because of the inelasticity of the demand for packaged ice, retail outlets – *i.e.*, direct purchasers – were able to pass the overcharges directly on to consumers – *i.e.*, indirect purchasers. In this way, the harm suffered by indirect purchasers may have been greater than that suffered by direct purchasers.

Indeed, as pointed out in our initial motion in this case, Arctic Glacier's offenses have sufficiently harmed our clients to give rise to claims under a variety of federal and state laws

---

[2] *Compare* 18 U.S.C. § 3663(a)(2) with § 3771(e). § 3663(a)(2) defines "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered ...." As noted above, § 3771(e) covers any person or entity that is "directly and proximately harmed as a result of the commission of a Federal offense."

[3] 575 F.3d 226, at 231-32 (2d Cir. 2009) (citations omitted; emphasis added).

[4] *United States v. Gamma Tech Industries, Inc.*, 265 F.3d 917, 928) (9th Cir. 2001) (upholding, in conspiracy and mail fraud case, restitution based on victim's inability to use entire inventory of parts supplied by defendant because victim could not identify which parts were defective); *United States v. Koenig*, 952 F.2d 267, 274-75 (9th Cir. 1991) (upholding, in case involving conspiracy to produce and use counterfeit automated teller machine cards, restitution for the cost of reprogramming bank computers after defendants had stolen ATM account information).

with more stringent requirements than the CVRA. Those statutes directly recognize the status of both direct and indirect purchasers as victims in context of an antitrust conspiracy.[5] Thus, it is clear that our clients were sufficiently harmed to constitute "crime victims" under the CVRA.

b. **Purchasers from *any* of the co-conspirators are crime victims.**

When we met, you asked which of our clients purchased from Arctic Glacier. Lawrence Acker, Wayne Stafford and Patrick Simasko purchased packaged ice in the Eastern District of Michigan. It is of no consequence, however, whether they purchased "Arctic Glacier" brand packaged ice. According to the information and plea agreement, the conspirators "allocate[d] customers of packaged ice sold in southeastern Michigan and the Detroit, Michigan metropolitan area."[6] As explained above, this drove up prices for everyone who purchased ice in that area, regardless of from whom.

Furthermore, if – as our clients intend to prove in the class action – the conspiracy was nationwide in scope, then purchasers throughout the country qualify as crime victims. On this point, at least for the time being, we are at the government's mercy. The prosecutors have thus far declined to tell us whether they intend to disclose to the Court conspiratorial acts or other antitrust violations by Arctic Glacier that occurred outside the Eastern District of Michigan. Because it may affect who is deemed a crime victim in this case, we urge you to insist on such disclosures. (The Court should also have that information for the independent reasons that such acts constitute relevant conduct under U.S.S.G. §1B1.3(a)(1)(B) and (a)(2), and are relevant under 18 U.S.C. § 3553(a)(1).)

---

[5] *See* VICTIMS' EMERGENCY MOTION FOR A DECLARATION UNDER THE CRIME VICTIMS RIGHTS ACT AND POSTPONEMENT OF THE ARRAIGNMENT, OR IN THE ALTERNATIVE, POSTPONEMENT OF ACCEPTANCE OF THE PLEA AGREEMENT, at p. 8

[6] Plea Agreement ¶4(b).

4

The identity of the specific conspirator from which a victim purchased ice is irrelevant for an additional reason. Because "co-conspirators are partners in crime ... the law deems them agents of one another."[7] Thus, all of our clients are victims, regardless of whether they purchased from Arctic Glacier or another conspirator. In other words, all who purchased from Home City and Reddy Ice are victims, just as much as those who purchased from Arctic Glacier.

## II. The Plea Agreement should be rejected.

As we discussed during our previous meeting, our purpose is to state our clients' objections to the Plea Agreement. Below, I point out the specific provisions of the Plea Agreement, which are of most concern and should be grounds for rejection.

### a. The Plea Agreement minimizes the offense by ignoring relevant conduct.

In the Plea Agreement, Arctic Glacier discloses facts related only to the customer allocation conspiracy in the southeastern Michigan and the Detroit, Michigan metropolitan area.[8] However, there is sufficient information, which suggests that the conspiracy is nationwide. As noted above, such information constitutes "relevant conduct" under the Sentencing Guidelines and should be to the Court for use in sentencing.

#### i. The conspiracy is nationwide in scope.

Although there is ample evidence of a nationwide conspiracy, we believe there is substantial additional information that only the defendant and government are in a position to provide. Discovery has not yet begun in the civil class action. Nonetheless, both the civil complaint (the "class action") and the complaint filed on behalf of Mr. McNulty (the "McNulty Complaint"), a former employee of Arctic Glacier and a whistleblower, discuss the national

---

[7] *Anderson v. United States*, 417 U.S. 211, 219 (1974) (citing *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 253 (1940); *Fiswick v. United States*, 329 U.S. 211, 216 (1946)).

[8] Plea Agr. at ¶¶ 4-6.

5

scope of the conspiracy. In his Complaint, McNulty alleges that "Arctic Glacier had agreed with both Home City and Reddy Ice to geographically divide the United States market for the sale and delivery of Packaged Ice, in order to keep prices high in their respective territories."[9]

In addition, other circumstantial evidence suggests a nationwide conspiracy. Obviously, we do not have firsthand knowledge of many of the facts stated below, but expect that they are known to the government and could easily be provided for the Court.

The conspirators' conduct in northern Tennessee is enlightening. Home City has established the infrastructure necessary to sell ice in northern Tennessee, yet only sells to Kroger in Nashville. Our understanding is that Home City is in Tennessee at all only because Kroger will not purchase from Reddy Ice, which otherwise covers Tennessee.

Additionally, though ice sales are linked to the climate, the companies do not compete, even in warm weather states like Florida, Arizona, and California where ice sales would be expected to be high. In fact, we are advised Arctic Glacier "backed away" from buying an ice company in Nevada to avoid competing with Reddy Ice."[10] Further, Reddy Ice pulled out of California, which accounted for approximately ten percent of its sales, and Arctic Glacier agreed not sell in Arizona to eliminate competition in those states.[11] In 2002, Arctic Glacier stopped competing in Oklahoma and New Mexico, both warm weather states, "even though it retained production and distribution facilities in the bordering states of Kansas and Texas."[12]

The prosecutors have, thus far, been unwilling to disclose to us their information concerning conspiratorial conduct occurring outside of the Eastern District of Michigan, or even

---

[9] McNulty Amend. Cmpl. ¶ 25.

[10] *Id.* at ¶ 36.

[11] Amend. Class Action Cmpl. ¶¶ 46-47.

[12] *Id.* at ¶ 49.

6

to tell us whether they will provide that information to you. Nevertheless, there is ample evidence to suggest that the Information and Plea Agreement don't tell the entire story. For instance, the Plea Agreement contains §1B1.8 and cooperation provisions. Specifically, it provides that "pursuant to U.S.S.G. § 1B1.8, the United States agrees that self-incriminating information that the defendant provides ... will not be used to increase the volume of affected commerce attributable to the defendant or in determining the defendant's applicable Guidelines range, except to the extent provided in U.S.S.G. § 1B1.8(b)."[13] Thus, it is clear from the terms of the Plea Agreement that Arctic Glacier has provided or will provide self-incriminatory evidence in addition to the facts stipulated in the Plea Agreement. As you know, the government typically includes such provisions only where the defendant is in a position to provide information about additional offenses.

Additionally, the Plea Agreement provides that the government will recommend the sentence specified therein only if the company has provided full and complete cooperation. Thus, for the government to recommend that the case proceed according to the terms of the Plea Agreement, would implicitly acknowledge that the company has disclosed information about other antitrust violations. It seems very likely that the company was involved in any such violations, or it wouldn't know about them.

## ii. Self-incriminating information about Arctic Glacier's nationwide conspiracy is relevant conduct and should be disclosed to and considered by the Court in sentencing.

As noted above, the government has been unwilling to tell us how much they intend to disclose to the Court. Regardless, any additional self-incriminatory information provided by Arctic Glacier is relevant to its sentence, both under the Guidelines and under 18 U.S.C. § 3553.

---

[13] McNulty Amend. Cmpl. at ¶ 7.

Commentary to the Guidelines clarifies that U.S.S.G. § 1B1.8(b) "does not authorize the government to withhold information from the court."[14] Further, 18 U.S.C. § 3553(a)(1) requires the Court to consider "the nature and circumstances of the offense" in determining an appropriate sentence.[15] Along the same lines, the Guidelines require the Court to consider all relevant conduct.

To ensure that the Court is able to discharge its statutory obligation, the United States Attorney's Manual requires that "the attorney for the government ... assist the sentencing court by [a]ttempting to ensure that the relevant facts are brought to the court's attention fully and accurately."[16] The Antitrust Division separately recognizes this duty.[17] Accordingly, the Plea Agreement provides that "the United States will fully advise the Court ... of ... all material facts relating to the defendant's involvement in the charged offense **and all other relevant conduct.**"[18] This includes information provided under § 1B1.8. Moreover, as discussed below, such information is also supposed to be available for use in obtaining restitution.[19]

Conduct is "relevant" if it is either part of a "common scheme or plan" or the "same course of conduct."[20] Where, as here, a plea bargain reduces the criminal conduct set forth in the

---

[14] *Commentary to U.S.S.G. § 1.B1.8.*

[15] 18 U.S.C. § 3553(a)(1).

[16] *United States Attorneys' Manual* (§ 9.27.10); *See also Criminal Tax Manual* at ¶ 5.01[6] ("Counsel for the government should make a full statement of facts to the court for use at sentencing").

[17] *See Model Annotated Corporate Plea Agreement* (July 13, 2009) at ¶ 8(d)).

[18] Plea Agr. at ¶ 11; emphasis added.

[19] *See, e.g., United States v. Peyton,* 186 Fed. Appx. 81, 83, 2006 WL 1788445 at *2 (2d Cir. June 19, 2006) ("Sentencing Guidelines § 1B1.8 creates no exception to th[e] statutory mandate for victims discovered as a result of [defendant's] own cooperation. By its terms, § 1B1.8 shields information provided by a defendant pursuant to certain proffer agreements only from use in the calculation of defendant's 'applicable guideline range.' To the extent that [defendant] attempts to extend this shield to restitution ... he is wrong").

[20] *See* U.S.S.G. 1B1.3. As the Sixth Circuit explained in *United States v. Four Pillars Enterprise Co., Ltd.,* "For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose or similar modus operandi. ... Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the

8

indictment or information, the government is obligated to inform the court of the omitted conduct. It is improper for the government to limit what it tells the court to just the conduct to which the defendant pled guilty.[21]

Any conspiracy in which Arctic Glacier engaged involving the sale of packaged ice would clearly be "relevant conduct," even if it were a separate conspiracy or its effects limited to sales outside of southeastern Michigan. *Velez, supra,* and *Seiler, supra,* demonstrate that such conduct would be "relevant conduct" even though not mentioned in the Information or Plea Agreement because it is part of a "common scheme" and the "same course of conduct." The government therefore has a duty to reveal it to the Court and public for use at sentencing.

### b. The Plea Agreement helps Arctic Glacier evade its obligation to pay restitution.

The Plea Agreement provides that the government won't ask for restitution in this case because of the availability of a civil remedy. This effectively annexes the class action to this case for the purpose of restitution. Consequently, the Plea Agreement's effect on the class action – including whether it undermines the class action as a vehicle for restitution – should be considered.

---

operandi. ... Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." *United States v. Four Pillars Enterprise Co., Ltd.*, 253 Fed. Appx. 502, 510 (6th Cir. 2007) (citation omitted).

[21] For example, in *United States v. Velez*, the "[a]ppellant conted[ed] that the district court erred by considering material beyond that contained in the charging information [which was limited by the negotiated plea agreement]." *United States v. Velez*, 1 F.3d 386, 387 (6th Cir. 1993). That defendant engaged in a two-year conspiracy in which he or his co-coconspirators cashed fake payroll checks in Ohio, Kentucky, Tennessee, West Virginia, North Carolina, South Carolina, Illinois and Iowa. Pursuant to a plea bargain, however, the defendant was charged and pleaded guilty to conduct that took place only in Iowa. In determining the sentence, the district court relied on the unlawful conduct in all of the states not just Iowa. The *Velez* court affirmed the sentence holding that "[t]he activities occurring in other states were part of the same course of conduct." *Id* at 389. *See also United States v. Seiler*, 348 F.3d 265, 269 (D.C. Cir. 2003) (holding that relevant conduct for sentencing and restitution included profits from parallel scheme involving same codefendant contractor's employee with which defendant conspired even though scheme involved different bids and a different subcontractor/coconspirator); *Four Pillars, supra,* 253 Fed. Appx. at 510 (holding that "relevant conduct" for use in calculating fine in prosecution of Economic Espionage Act violation included theft of formulas not specified in the indictment).

9

When we met, you asked whether the burden involved in ascertaining the victims' losses would outweigh the need to provide restitution, as discussed in U.S.S.G. § 8B1.1(b)(2). However, it may be especially important for the Court to order restitution in the criminal case because of the company's efforts at defeating the class action, discussed below. Various procedural devices may be employed to lessen the burden. For instance, in *United States v. Bernardini*,[22] the Court recognized that restitution could be paid to the government, as trustee for the victims of an offense, to be disbursed during the period of probation. Additionally, claims for restitution could be entertained for as many as twenty (20) years after sentencing by having the government file a lien on behalf of the victims.[23]

The government may treat the Plea Agreement as permitting Arctic Glacier to limit its public admissions to conduct occurring solely in the Eastern District of Michigan. This would severely limit the value of those admissions to the victims, leaving many of them – those outside of the Eastern District of Michigan – out in the cold.

Further, limiting the company's public disclosures in that way would enable it to use procedural devices and loopholes to prevent information regarding conduct outside of the Eastern District of Michigan from being revealed in the class action. The company's conduct so far suggests that it will do everything possible to stonewall discovery. For instance, the company has refused to provide any discovery at all until its motion to dismiss is decided  Further, once discovery is permitted, it will be difficult for Plaintiffs to ask focused questions about violations of which they are left unaware.

---

[22] 112 F.3d 606 (2d Cir. 1997).

[23] *See* 112 F.3d at 611; 18 U.S.C. § 3663(h)(1) (1994) (an order of restitution may be enforced by the government "in the manner provided for the collection and payment of fines in subchapter B of chapter 229 of this title [*i.e.*, 18 U.S.C. §§ 3611-3615]"); *id.* § 3613 (1994) (a fine is a lien in favor of the United States, which continues until the liability is "satisfied, remitted, or set aside," *id.* § 3613(a) (1994), or until it becomes unenforceable by the passage of 20 years from the date of the judgment or by the death of the defendant, *see id.* § 3613(b) (1994)).

10

As you know, Arctic Glacier recently filed a Motion to Dismiss in the civil case in which it seeks to dismiss claims relating to criminal activity occurring outside of the Eastern District of Michigan on the ground that it "pled guilty to a more limited conspiracy, not the national conspiracy alleged in the Complaint."[24] By limiting the criminal case to conduct in the Eastern District of Michigan, while leaving restitution to a civil action that it seeks to dismiss, Arctic Glacier is attempting to dramatically minimize its exposure to restitution. In sum, the company wants to "have its cake and eat it, too."

### c. The Plea Agreement provides for a fine that would interfere with the company's ability to make restitution.

The Plea Agreement requires Arctic Glacier to pay a fine of $9 million and leaves restitution to civil proceedings. However, Arctic Glacier's public filings show that Arctic Glacier is in a precarious financial situation. Thus, the imposition of a fine will jeopardize its ability to make restitution.

Under U.S.S.G. § 8C3.3(a), "[t]he court shall reduce the fine below that otherwise would required ... to the extent that imposition of such fine would impair its [the defendant's] ability to make restitution."[25] Further, 18 U.S.C. § 3572(b) specifically provides that there should be no fine that interferes with a defendant's ability to pay restitution. Finally, the Antitrust Division's policy seems consistent in rejecting a fine under these circumstances.[26]

Arctic Glacier's Third Quarter Report to Unitholders reports $167.6 million in long-term debt.[27] $60 million is in secured notes that come due on January 4, 2010.[28] Although Arctic

---

[24] *Direct Purchaser Plaintiffs' Opposition to the Motion to Dismiss the Consolidated Amended Class Action Complaint Filed by the Arctic Glacier and Reddy Ice Defendants*, pg. 10.

[25] U.S.S.G. § 8C3.3(a); *accord Four Pillars, supra*, 253 Fed. Appx. at 514.

[26] *See Model Annotated Corporate Plea Agreement* (July 13, 2009) at ¶ 9.

[27] *Q3, Third Quarter Report to Unitholders* at 10.

[28] *Id. at 8.*

11

Glacier is working on extending or refinancing the notes, it acknowledges being unable to predict whether it will be successful in doing so.[29] At the November 11, 2009 proceeding, Mr. Majoras, corporate counsel for Arctic Glacier, stated that the company would be better able to refinance or extend its debt if its sentence were imposed by the time the debts come due in January, which Judge Weber responded would be impossible. This underscores the company's immediate financial hurdles. As if that were not enough, Arctic Glacier also reports debt of $100.1 million under a revolving term credit facility, which matures on May 31, 2011.[30]

This mountain of debt jeopardizes the company's ability to pay restitution. The $9 million fine provided for in the Plea Agreement would make the situation worse, and for that reason, should not be imposed.

### d. The Plea Agreement treats the company as if it has accepted responsibility for its offenses.

The Plea Agreement provides a downward departure for cooperation and implicitly suggests acceptance of responsibility. To the contrary, its motion to dismiss the class action reflects Arctic Glacier's desire to evade responsibility for its offenses. If the case proceeds to sentencing under the terms of the Plea Agreement, the company will unjustly receive the kind of sentence that should be reserved for truly repentant defendants.

As noted elsewhere, the Plea Agreement provides that civil cases will be the sole vehicle through which victims will obtain restitution or other recompense. Arctic Glacier moved to dismiss claims in the class action relating to criminal activity that occurred outside the Eastern District of Michigan. Its primary argument, founded on *Bell Atlantic Corp. v. Towmbly*,[31] is that

---

[29] *Id.*

[30] *Id.*

[31] While the Motion is still pending, it is clear that defendants have met notice requirements in place following *Bell Atlantic Corp. v. Twombly* decisions. 550 U.S. 544 (2007).

12

claims relating to such offenses are not stated in enough detail. Thus, the company seeks to defeat the action to which the Plea Agreement relegates restitution. If the company manages to suppress information relating to other misconduct, it will escape paying full restitution in either the criminal case or the class action. These games make the company undeserving of leniency.

### e. The Plea Agreement deprives the Court of the flexibility to craft an appropriate sentence.

Finally, the Plea Agreement should give the Court the flexibility to craft an appropriate sentence. Although we do not ask you to make specific recommendations beyond rejection of the Plea Agreement, we may ultimately ask the Court to impose as elements of an appropriate sentence:

- The establishment of a restitution fund;
- As a condition of probation, cooperation in the determination of the loss suffered by the victims.[32] Because restitution is relegated to the class action and other civil cases, this condition is especially important; and
- A requirement that the company publicly acknowledge the entirety of its offenses, including all relevant conduct.

### III.  Conclusion

The company has engineered the legal equivalent of a "Catch 22 for the victims," whereby it may prevent its victims from learning much from the criminal case, while seeking to dismiss their class action for their alleged failure to plead in sufficient detail. That would not be just under any circumstances, but the injustice magnified by the Plea Agreement's relegating restitution to civil cases, which obviously would include the class action.

---

[32] This type of condition is common in criminal tax cases, where defendants are routinely ordered to cooperate in the assessment and collection of the tax deficiency.

13

Under ordinary circumstances, we would simply urge the Court to impose a sentence that differs from the government's recommendations in the Plea Agreement. But, here, as you know, the Plea Agreement is a take-it-or-leave-it proposition, pursuant to Rule 11(c)(2)(C). Therefore, we urge you to recommend that the Court "leave it" by rejecting the Plea Agreement.

Finally, we note that we are aware of no statute or rule that requires us to send copies of this letter to the prosecutors or counsel for Arctic Glacier. Nevertheless, consistent with our position that justice will better be achieved in sunlight rather than secrecy, we will provide copies of this letter to the parties.

Thank you for your consideration.

Very truly yours,

David F. Axelrod

Cc: Kevin C. Culum, Esq.
John M. Majoras, Esq.
Matthew S. Wild, Esq.