1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


- - -


| | |
|---|---|
| UNITED STATES OF AMERICA, | . Case Number 1:09-cr-149 |
| | . |
| Plaintiff, | . Cincinnati, Ohio |
| | . |
| - v - | . Thursday, February 11, 2010 |
| | . 10:00 a.m. Hearing |
| ARCTIC GLACIER | . |
| INTERNATIONAL, INC. | . |
| | . **Sentencing Hearing** |
| Defendant. | . |

. . . . . . . . . . . . . . . . . . . . . . . . . . .

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE HERMAN J. WEBER, SENIOR JUDGE

APPEARANCES:

For the Plaintiff:     UNITED STATES DEPARTMENT OF JUSTICE
                       BY:  Kevin C. Culum, Esq.
                       and  Donald M. Lyon, Esq.
                       Antitrust Division
                       Carl B. Stokes United States Court House
                       14th Floor
                       801 W. Superior Avenue
                       Cleveland, Ohio  44113-1857


For the Defendant Arctic Glacier International, Inc:

                       John M. Majoras, Esq.
                       Jones Day
                       325 John H. McConnell Boulevard
                       Suite 600
                       Columbus, Ohio  43215-2673


For the Petitioners:  David F. Axelrod, Esq.
                      Axelrod LLC
                      250 Civic Center Drive
                      Suite 500
                      Columbus, Ohio  43215

2

```
For the Victims Group - Martin McNulty and Gary Mowery:
                         Daniel Low, Esq.
                         Kotchen & Low LLP
                         2300 M. Street NW, Suite 800
                         Washington, D.C.  20037

                         Matthew S. Wild, Esq.
                         Levitt & Kaizer
                         148 E. 78th Street
                         New York, New York  10075

Also Present:

Hugh A. Adams (Deft's Corporate Rep.)

Gary Mowery

Laura Jensen (U.S. Probation Department)

S/A James Brennan (FBI)

Don Brown (Economist)

James R. Nelson, Esq. (Counsel for Reddy Ice)

James (Jay) Stautberg (Home City Ice Corporate Rep.)

Michael A. Roberts, Esq.

Ralph W. Kohnen, Esq. (Afternoon Session)


Law Clerk:              Amy Peters Thomas, Esq.

Courtroom Clerk:        Darlene Maury

Court Reporter:         Mary Ann Ranz
                        810 Potter Stewart U.S. Courthouse
                        100 East Fifth Street
                        Cincinnati, Ohio 45202

                             -   -   -
```

3

1      THURSDAY, FEBRUARY 11, 2010

2          P R O C E E D I N G S          (10:09 a.m.)

3          THE COURT:  Please be seated.

4      Proceed, Ms. Maury.

5          THE CLERK:  Judge, on the docket this morning is

6  Criminal Action 09-149:  *United States of America versus*

7  *Arctic Glacier International, Inc.*

8      Appearing on behalf of the Government is Kevin Culum and

9  Don Lyon.

10     Appearing on behalf of the Defendant Corporation is John

11 Majoras.

12     Appearing on behalf of the Victims Group is David Axelrod

13 and Daniel Low.

14         THE COURT:  I want to give everyone that wishes to

15 speak an opportunity to speak, and I want to be sure that I am

16 not leaving anybody out.

17     Mr. Nelson, are you going to speak in this case?

18         MR. NELSON:  I am not, Your Honor.

19         THE COURT:  Thank you.

20     I know Mr. Axelrod isn't.

21     Hello, there.

22     (Laughter.)

23         MR. AXELROD:  Good morning, Your Honor.

24         THE COURT:  Good morning.

25     I think the rest have indicated that they will -- will

4

1    speak.

2         MR. AXELROD:  Your Honor, with the Court's

3    permission, he is not in the courtroom now, but Mr. Wild from

4    New York is here.  He's not admitted -- he's not noted to be

5    admitted *pro hac vice.*  He does not intend to speak.

6         THE COURT:  That's good.

7         MR. AXELROD:  We understand that, Your Honor.

8         THE COURT:  Okay.  We understand each other on that

9    one.

10        MR. AXELROD:  We do, Your Honor.

11        THE COURT:  All right.

12        MR. AXELROD:  But with the Court's permission, since

13   he has a superior knowledge of the facts, to help me with

14   documents, I'd like to have him sit --

15        THE COURT:  Sure.

16        MR. AXELROD:  -- in the well with me.

17        THE COURT:  Sure.  Well, we'll wait.  He's coming

18   shortly?

19        MR. AXELROD:  Sure.  But we don't need to wait, Your

20   Honor.

21        THE COURT:  Oh, all right.  Okay.

22        MR. AXELROD:  Thank you, Judge.

23        THE COURT:  I wouldn't want him to miss my golden

24   words.

25      The matter's before the Court for the determination of

1   whether the Court will accept the Rule 11(c)(1)(C) sentencing

2   agreement, and then, depending on the Court's decision there,

3   whether the defendant wishes to withdraw their plea of Guilty

4   and -- or whether we can proceed with the sentencing.

5       The Court has before it at this time the Information,

6   which is the charging document in this case, which is a matter

7   of public record and been available to the parties for -- too

8   long, really -- for some time.

9       I have before me the written consent of the Directors of

10  Arctic Glacier International, Inc.  That is a matter of public

11  record and is available to the parties.

12      I have before me the Plea Agreement, which is a matter of

13  public record and available to the parties.

14      I also have before me the Presentence Report that I

15  requested before I make any determination in this matter,

16  under the date of January the 21st, 2010.

17      Has the United States received a copy of that report?

18          MR. CULUM:  Yes, Your Honor.

19          THE COURT:  Has the defendant received a copy of that

20  report?

21          MR. MAJORAS:  Yes, Your Honor.

22          THE COURT:  Mr. Adams, have you received a copy of

23  that report?

24          MR. ADAMS:  Yes, Your Honor.

25          THE COURT:  And have you had a chance to discuss it

6

1    with your lawyer?

2          MR. ADAMS:  Yes, I have, Your Honor.

3          THE COURT:  I also have an addendum to the

4    Presentence Report that was provided to the Court under a date

5    of January the 27th, 2010.

6      Has the United States received a copy of that report, that

7    addition?

8          MR. CULUM:  Yes, Your Honor.

9          THE COURT:  And has the defense?

10         MR. MAJORAS:  Yes, we have, Your Honor.

11         THE COURT:  Mr. Adams, have you received a copy or

12    discussed it with your lawyer?

13         MR. ADAMS:  Yes, Your Honor.

14         THE COURT:  The Court has not granted the request of

15    Mr. Axelrod representing a group for a -- for the Presentence

16    Report.  However, I will refer to the Presentence Report in

17    what I consider the relevant additions to the Information that

18    are made in the Presentence Report.

19      I will ask everyone to speak in turn.  And before I do, I

20    think it would be worthwhile, so we can focus our concerns, by

21    making a statement at this time, which I will dictate into the

22    record.

23      The Information in this case -- and if you can't hear me,

24    why, please tell me to speak up.  I can be heard.

25      The Information in this case charges a conspiracy to

7

1 restrain trade in violation of Title 15, United States Code 1,

2 beginning at least as early as January 1, 2001, and continuing

3 until July 17, 2007.

4     The factual basis for the charge is stated in the Plea

5 Agreement by the parties.

6     During the relevant period, the defendant was a

7 corporation organized and existing under the laws of

8 Delaware.  The defendant acquired various packaged ice

9 manufacturers doing business in Michigan.  The defendant,

10 through its parent and subsidiary corporations (collectively,

11 "Arctic Glacier") was a producer of packaged ice in multiple

12 states and was engaged in the sale of packaged ice.  Packaged

13 ice is marketed for human consumption and is sold in blocks

14 and various bag sizes.  The defendant's Michigan subsidiaries

15 employed more than 200 full-time equivalent employees, but

16 less than 1,000.  Arctic Glacier sales of packaged ice

17 affected by the conspiracy totaled 50.7 million.

18     During the relevant period, the defendant, through

19 certain of its executives and employees of the subsidiary

20 corporations and the predecessor company acquired in

21 December 2004, participated in a conspiracy to allocate

22 customers of packaged ice sold in southeastern Michigan and

23 the Detroit, Michigan metropolitan area.  In furtherance of

24 the conspiratorial activities, the defendant, through certain

25 of its executives and employees of its subsidiary corporations

8

1    and predecessor company acquired in December 2004, engaged in

2    discussions and attended meetings with representatives of one

3    or more other packaged ice producers.  During these

4    discussions and meetings, agreements were reached to allocate

5    customers of packaged ice in southern Michigan -- in

6    southeastern Michigan and the Detroit, Michigan

7    metropolitan area.

8        During the relevant period, packaged ice was sold by one

9    or more of the conspirator firms, and equipment and supplies

10   necessary to the production and distribution of packaged ice,

11   as well as payment for packaged ice, traveled in interstate

12   commerce.  The business activities of Arctic Glacier and its

13   co-conspirators in connection with the production and sale of

14   packaged ice affected by this conspiracy were within the flow

15   of, and substantially affected, interstate trade and commerce.

16       Acts in furtherance of this conspiracy were carried out in

17   the Southern District of Ohio, Western Division.  At least one

18   of the conspiratorial meetings or discussions described above

19   took place in Cincinnati, Ohio, which is located within the

20   Southern District of Ohio.

21       The Plea Agreement continues.  The defendant

22   understands that the statutory maximum penalty which may be

23   imposed against it upon conviction for a violation of Section

24   One of the Sherman Antitrust Act is a fine in an amount equal

25   to the greatest of:

9

1      $1 million [verbatim];

2      Twice the gross pecuniary gain the conspirators derived

3  from the crime; or

4      Twice the gross pecuniary loss caused to the victims of

5  the crime by the conspirators.

6      In addition, the defendant understands that:

7      Pursuant to 18 United States Code, Section 3561(c)(1), the

8  Court may impose a term of probation of at least one year, but

9  not more than five years;

10      Pursuant to 18B1.1 [verbatim] of the United States

11  Sentencing Guidelines -- or 18 United States Code, Section

12  3563(b)(2) or 35 -- or 3663(a)(3), the Court may order it to

13  pay restitution to the victims of the offense; and

14      (c) pursuant to 18 United States Code, Section

15  3013(a)(2)(B), the Court is required to order the defendant to

16  pay a $400 special assessment upon conviction for the charged

17  crimes.

18      18 United States Code, Section 3551(c) provides:

19      An organization found guilty of an offense shall be

20  sentenced in accordance with the provisions of Section 3553,

21  to:

22      (1) a term of probation as authorized by subchapter B; or

23      (2) a fine as authorized by subchapter C.

24      A sentence to pay a fine may be imposed in addition to a

25  sentence to probation.  A sanction authorized by Section 3554,

1   forfeiture, the 3555, which is the order of notice, or 3556

2   may be imposed in addition to the sentence required by this

3   section.

4       The defendant understands that the Sentencing Guidelines

5   are advisory and not mandatory. But the Court must consider

6   the Guidelines in effect on the day of sentencing, along with

7   the other factors set forth in 18 United States Code, Section

8   3553(a) in determining and imposing sentence.

9       The defendant understands that the Guidelines

10   determination may be made by the Court by a preponderance of

11   the evidence standard. The defendant understands that

12   although the Court is not ultimately bound to impose a

13   sentence within the applicable Guidelines range, its sentence

14   must be reasonably based upon consideration of all relevant

15   sentencing factors set forth in 18 United States Code, Section

16   3553(a).

17       And in deference to the Court of Appeals, I understand

18   that my duty is to impose a sufficient sentence, not greater

19   than necessary, and they'll determine whether it's reasonable

20   or not.

21       Pursuant to U.S. Sentencing Guidelines 1B1.8, the United

22   States agrees that self-incriminating information that the

23   defendant provided to the United States pursuant to this Plea

24   Agreement will not be used to increase the volume of affected

25   commerce attributable to the defendant or in determining the

11

1   defendant's applicable Guidelines range, except to the extent

2   provided in U.S. Sentencing Guideline 1B1.8(b).

3       Paragraph 8 of the Plea Agreement renders the foregoing

4   irrelevant to my determination of the sentence in this case,

5   because if this Court adopts the Plea Agreement, it must

6   impose a sentence agreed to by the parties in this sentence

7   agreement pursuant to Federal Rule of Criminal Procedure

8   11(c)(1)(C).

9       The Court's authority here is limited to the acceptance or

10  rejection of the sentence stated by the parties in the Plea

11  Agreement.  In making its decision, the Court must avoid any

12  impairment of the prosecutorial discretion of the Attorney

13  General or any officer under his direction.  Thus, the Court

14  cannot comment or make any suggestions regarding the

15  sentencing agreement stated by the parties.

16      The Court is limited to one issue:  Whether the Rule

17  11(c)(1)(C) sentencing agreement is sufficient, but not

18  greater than necessary, to comply with the purposes set forth

19  in Title 18 United States Code, Section 3553.

20      Pursuant to Federal Rule of Criminal Procedure

21  11(c)(1)(C), the United States and the defendant agree that

22  the appropriate disposition of this case is, and agree to

23  recommend jointly that the Court impose, a sentence requiring

24  the defendant to pay the United States a criminal fine of

25  $9 million, payable in installments as set forth below, with

12

1  interest accruing under 18 United States Code, Section

2  3612(f)(1)(2) -- (f)(1) and (2).

3      The defendant understands that the Court will order it to

4  pay a $400 assessment, pursuant to 18 United States Code,

5  Section 3013(a)(2)(B), in addition to any fine imposed.

6      The United States and the defendant agree to recommend, in

7  the interest of justice pursuant to 18 United States Code,

8  Section 3573(d)(1) and United States Sentencing Guideline

9  8C3.2(b), that the fine be paid in the following installments:

10     Within 30 days of imposition of sentence, $1 million (plus

11 any accrued interest); at the one-year anniversary of

12 imposition of sentence, $1 million (plus any accrued

13 interest); at the second-year anniversary, 1.5 million (plus

14 any accrued interest); at the three-year anniversary,

15 1.5 million (plus any accrued interest); at the four-year

16 anniversary, 1.5 million (plus any accrued interest); and at

17 the five-year anniversary, 2.5 million (plus any accrued

18 interest), provided, however, that the defendant shall have

19 the option at any time before the five-year anniversary of

20 prepaying any part of the remaining balance (plus any accrued

21 interest) then owing on the fine.

22     The parties agree that they are not aware at this time of

23 any aggravating or mitigating circumstances of the kind, or to

24 a degree, not adequately taken into consideration by the

25 United States Sentencing Commission in formulating the

13

1  Sentencing Guidelines justifying a departure pursuant to

2  United States Sentencing Guidelines 5K2.0.  The parties agree

3  not to seek or support any sentence outside the Guidelines

4  range nor any Guidelines adjustment for any reason that is not

5  set forth in this Plea Agreement.

6      United States and the defendant agree that the applicable

7  Guideline fine range exceeds the fine contained in the

8  recommended sentence set out on paragraph 8 above.  Subject to

9  the full and continuing cooperation of the defendant, as

10  described in paragraph 14 of this Plea Agreement, and prior to

11  sentencing in this case, the United States agrees that it will

12  make a motion, pursuant to United States Sentencing Guidelines

13  8C4.1, for a downward departure from the Guideline fine range

14  and will request that the Court impose the recommended

15  sentence set out in paragraph 8 of this Plea Agreement because

16  of the defendant's substantial assistance in the government's

17  investigation and prosecution of violations of federal

18  criminal law in the packaged ice industry.

19      Subject to the ongoing, full and truthful operation of the

20  defendant described in paragraph 14 of this Plea Agreement,

21  and before sentencing in this case, the United States will

22  fully advise the Court and the Probation Office of the facts,

23  manner, and extent of the defendant's cooperation and its

24  commitment to prospective cooperation with the United States'

25  investigation and prosecution, all material facts relating to

14

1  the defendant's involvement in the charged offense, and all

2  other relevant conduct.

3      The United States and the defendant understand that the

4  Court retains complete discretion to accept or reject the

5  recommended sentence.

6      If the Court does not accept the recommended sentence, the

7  United States and the defendant agree that this Plea

8  Agreement, except for paragraph 12(b) below, shall be rendered

9  void.

10      If the Court does not accept the recommended sentence, the

11 defendant will be free to withdraw its guilty plea, pursuant

12 to Federal Rules of Criminal Procedure 11(c)(5) and (d).  If

13 the defendant withdraws its plea of guilty, this Plea

14 Agreement, the guilty plea, and all statements made in the

15 course of any proceedings under Federal Rule of Criminal

16 Procedure 11 regarding the guilty plea or this Plea Agreement,

17 or made in the course of plea discussions with an attorney for

18 the government, shall not be admissible against the defendant

19 in any criminal or civil proceedings, except as otherwise

20 provided in Federal Rule of Evidence 410.  In addition, the

21 defendant agrees that if it withdraws its guilty plea pursuant

22 to this subparagraph of the Plea Agreement, the statute of

23 limitation period for any offense referred to in paragraph 16

24 of this Plea Agreement shall be tolled for the period between

25 the date of the signing of the Plea Agreement and the date the

15

1    defendant withdrew its Plea Agreement, or for a period of

2    60 days after the date of the signing of the Plea Agreement,

3    whichever period is greater.

4         In light of the availability of civil causes of action,

5    the United States agrees that it will not seek restitution --

6    a restitution order for the offense charged in the

7    Information.

8         This Court -- or this Court then referred the matter to

9    the United States Probation for a presentence investigation

10   and report, and I've already placed it in the record, dated

11   January the 21st, 2010, and an addendum submitted on

12   January 27, 2010.

13        The relevant portion of the Presentence Report is the

14   offense level computation.

15        Pursuant to United States Sentencing Guidelines 8C2.3(a),

16   for each count covered by the United States Sentencing

17   Guideline, 8C2.1 uses the applicable Chapter 2 Guideline to

18   determine the base offense level and apply, in the order

19   listed, any appropriate adjustment contained in that

20   Guideline.

21        The Guideline for a violation of 15 United States Code,

22   Section 1 is found at U.S. Sentencing Guidelines 2R1.1, which

23   covers offenses involving bid-rigging, price-fixing or

24   market-allocation agreements among competitors.

25        According to United States Sentencing Guidelines 2R1.1(a),

16

1    the base offense level is 12.

2        The only specific offense characteristic that applies is

3    the enhancement for volume of commerce under U.S. Sentencing

4    Guidelines 2R1.1(b)(2).  In this case, the volume of commerce

5    in the affected area of business for the year in which the

6    offense took place -- excuse me -- for the years in which the

7    offense took place, was $50.7 million.

8        According to the United States Sentencing Guideline

9    2R1.1(b)(2)(C), offenses involving a volume of commerce more

10   than 40 million but less than a hundred million require that

11   six levels be added.  Consequently, the total offense level is

12   18.  Pursuant to the table in the United States Sentencing

13   Guideline 8C2.4(d), an offense level of 18 generates a fine of

14   $350,000.

15       According to United States Sentencing Guideline 8C2.4, the

16   base offense level -- the base offense [verbatim] is the

17   greatest of:  The amount from the table in subsection (d) of

18   this Guideline determined under United States Sentencing

19   Guideline 8C2.3; or the pecuniary gain to the organization

20   from the offense; or the pecuniary loss from the offense

21   charged by the organization.

22       According to United States Sentencing Guidelines

23   2R1.1(d)(1), in lieu of the pecuniary loss under subsection

24   (a)(3) of the United States Sentencing Guidelines 8C2.4, the

25   baseline, use 20 percent of the volume of affected commerce.

17

1    In this case, the affected commerce is $50,700,000.

2    Twenty percent of this fine is $10,140,000.  The pecuniary

3    gain to the organization is unknown.  Therefore, 20 percent of

4    the volume of affected commerce will be the baseline, as this

5    figure is greater than the fine on the table in subsection

6    (d)(3) -- Section (d), 350,000.

7        According to the United States Sentencing Guideline 8C2.5,

8    a culpability score starts at 5.  According to United States

9    Sentencing Guideline 8C2.5(b)(1) -- (b)(3)(B)(i), if the

10   organization has 200 or more employees and an individual

11   within high-level personnel of the organization participated

12   in the offense, three points are added.

13       In this case, three Vice Presidents of the corporation

14   participated in the instant offense between 2001 and 2007.

15   The corporation has between 200 and a thousand employees.  You

16   add plus three.

17       Prior history, none.

18       Violation of an order, none.

19       Obstruction of justice, none.

20       Effective compliance and ethics program, none.

21       Self-reporting cooperation and acceptance of

22   responsibility.  The corporation has made a statement in this

23   case accepting responsibility for its role in the offense.

24   Therefore, pursuant to United States Sentencing Guideline

25   8C2.5(g)(2), since the organization fully cooperated in the

18

1  investigation and clearly demonstrated recognition and

2  affirmative acceptance of responsibility for its criminal

3  conduct, the culpability score is decreased by two points.

4  The culpability score is 6.

5       According to United States Sentencing Guidelines 8C2.6,

6  the applicable minimum and maximum fine multipliers are

7  determined from the table under this Guideline.

8       Based on a culpability score of 6, the minimum multiplier

9  is 1.2, while the maximum multiplier is 2.4.

10      The base fine is 10,140,000.  Therefore, the fine range is

11  12,168,000 to 24,336,000.  And the fine adjustments are none.

12      As I have already said previously, that the only decision

13  the Court can make in this case is to either impose a sentence

14  agreed to by the parties pursuant to 11(c)1.(C) [verbatim], or

15  deny the acceptance of the Plea Agreement and permit the

16  defendant to withdraw its plea of guilty.

17      Therefore, the balance of the Presentence Report is really

18  not material or relevant to my consideration of this case,

19  although, of course, we've all read it.  And if any of the

20  parties wish me to consider any of the parts of the report,

21  I'll be glad to consider anything you make public.  I will not

22  make any more of the report public than what I've just said.

23      That, I hope, ends my preliminary statement in the matter.

24      And to assist me in making my decision as to whether to

25  accept or deny the Plea Agreement and determine whether it is

19

1   sufficient, but not greater than necessary, to the fulfillment

2   of our responsibility to Congress under 18 United States Code,

3   Section 3553 and the subsequent statutory provisions --

4   because the sentence agreed to is a statutory sentence, the

5   enforcement of the agreement will be under the statute, not

6   under any order of this Court.  That is of concern to this

7   Court.  However, I pointed out to you that I recognize it's a

8   statutory sentence.  And with that ends my comments.

9       And Mr. Culum or Mr. Lyon, it's your responsibility to

10  convince me that this is a sufficient sentence to vindicate

11  the wrong done by the defendant.

12      You may proceed.

13          MR. CULUM:  Thank you, Your Honor.

14      Before I begin my remarks, there's one comment that I want

15  to make sure that it's to the Court.

16      Either because of lack of drafting or lack of foresight or

17  just an assumption on our part, there is one thing we want to

18  make sure that the Court knows, and that is when imposing a

19  fine, if you choose to impose the sentence here, the

20  Guidelines in this case, if imposed, would require a term of

21  probation on the part of the company.  And we think that the

22  term of probation is absolutely essential in this case.  It

23  provides --

24          THE COURT:  I can't impose probation in this case.

25  I'll explain why.  But the statute that authorizes me to

20

1   impose a sentence in this case says probation or fine, or

2   probation and a fine.  And there is no probation provided for

3   in the Plea Agreement.

4        MR. CULUM:  But -- but -- but the Plea Agreement,

5   Your Honor, and it may have been an unartful part on our part,

6   we were silent on probation, which means to us you have the

7   discretion to impose it.

8        THE COURT:  I do not agree with you, because I cannot

9   depart downward.  And probation will be an additional burden

10  on this company, and I'll make it an additional burden on this

11  country [verbatim].  So I don't have discretion to impose

12  probation in this situation.

13       MR. CULUM:  Okay.  Well, I'm hoping counsel for the

14  company may accede to probation.

15       THE COURT:  He can't, without going back to his Board

16  of Directors.

17       MR. CULUM:  Okay.

18    Your Honor, a $9 million fine in this case, considering

19  the conduct at issue, the financial condition of the company,

20  will more than -- will be sufficient, but not greater than

21  necessary, to prevent future conduct in this case.

22    The United States has spent a great deal of time looking

23  at the facts in this case.  And let me be clear before other

24  people jump in on this.  We've listened to the arguments of

25  various people.  We've not found an issue on conspiracy.  This

21

1  is the most serious readily provable offense that we have been

2  able to -- that we have developed in this case.

3      A $9 million fine is a very significant hit on this

4  company.  My understanding is the financial condition of the

5  company is perilous.  It is under siege right now.  And we

6  believe that the $9 million fine is sufficient, but not

7  greater than mandatory.

8      And again not -- I will look at the Plea Agreement again.

9  And obviously, Your Honor, you have looked at it very clearly

10 and you have a very good sense as to whether probation is

11 possible.

12     Certainly as in terms of a meeting of the minds, I believe

13 that Mr. Majoras and myself had a meeting of the minds that

14 probation would be allowable, and I believe that it was part

15 of -- an intrinsic part of the Plea Agreement.

16         THE COURT:  I'm perfectly willing to grant you a

17 continuance so that you can discuss that and get -- and

18 Mr. Adams can get appropriate authorization to address that

19 with his Board of Directors and the Board of Directors give me

20 authority to accept his plea of guilty.  But that's my problem

21 right now.  And I've tried desperately through these

22 proceedings to get everybody to think about this.

23         MR. CULUM:  Yes, you have, Your Honor.

24         THE COURT:  And I have -- I can't make any

25 suggestions.

22

1          MR. CULUM:  I understand that.

2      And let us -- could we take three minutes and just see if

3  -- if I'm correct that it was an intrinsic part of the Plea

4  Agreement, probation was part and parcel of this agreement,

5  and that there's no further need to obtain additional consent?

6  Because I believe that was intrinsic within the Plea

7  Agreement.

8      But can we have three minutes?

9          THE COURT:  Certainly.  And please read carefully the

10  authorization of the Board of Directors, which I've tried to

11  do.  It says that he can do certain things, but he has to make

12  the plea under the Plea Agreement.

13          MR. CULUM:  Should we step out in the hallway?

14          THE COURT:  Sure -- no, no.  That's all right.  I'll

15  recess at this time.

16      Mr. Axelrod, I guess I'm running your case for you to a

17  point.

18          THE CLERK:  All rise.

19      (At 10:45, a brief recess was taken.)

20                          *  *  *          (10:55 a.m.)

21          THE COURT:  Is the plaintiff ready to proceed?  Just

22  are you ready to proceed?

23          MR. CULUM:  Yes.

24          THE COURT:  Is the defense ready to proceed?

25          MR. MAJORAS:  Yes, sir.

23

1        THE COURT:  Mr. Axelrod, you're not involved yet.

2   Proceed.

3        MR. MAJORAS:  Your Honor, John Majoras for Defendant

4   Arctic Glacier.

5        In following up on Mr. Culum's comments, Arctic Glacier

6   certainly agrees that we have had the discussions with the

7   government with respect to whether there could be a probation

8   imposed as part of the Guidelines with respect to enforcement

9   of the payment over time because of installment of payment.

10        Mr. Adams, without waiving any privilege, has had that

11   discussion with the Board of Directors of Arctic Glacier.  He

12   can respond to that if you need him to do so.

13        That discussion took place prior to the resolution of the

14   board, the written consent of the directors, which was dated

15   September 29, 2009.  It is not a surprise, nor would the

16   company consider it to be a problem in terms of acceptance of

17   the plea if that probation were attached.

18        With respect to the authorization of Mr. Adams here today

19   and throughout these proceedings, we would submit -- and

20   Mr. Adams, again, can again respond if Your Honor prefers --

21   that numbered paragraph 4 of the written consent which states

22   that as a representative of Arctic and Arctic International,

23   he is authorized, empowered and directed, for and on behalf of

24   Arctic International, to prepare and deliver, or cause to be

25   prepared and delivered, and to execute all documents and take

24

1    or cause to be taken such further actions as he may deem

2    necessary, appropriate and advisable to fully effectuate the

3    intent of the foregoing resolutions and to comply with the

4    provisions of any of the documents and instruments approved or

5    authorized thereby.

6         We submit that that provides him the full authority with

7    respect to the probation, and that if the Court were to impose

8    probation as -- by the Guidelines, it would not violate -- or

9    would not void the Plea Agreement.

10             THE COURT:  Mr. Adams should testify if you want to

11   proceed, or we can, as I say, recess until this afternoon and

12   maybe you can get a resolution faxed in or clarify -- give you

13   some information.

14             MR. MAJORAS:  We could -- we could recess and do

15   that, Your Honor, I suppose.  We don't want to waste the

16   Court's time, most certainly.

17        Mr. Adams would be prepared to testify along the lines I

18   just outlined to the Court.  If the Court would find that to

19   be of value in resolving this, we would be happy to do that.

20   If that is of no import to the Court, then we probably would

21   just seek a resolution --

22             THE COURT:  I'm sorry?

23             MR. MAJORAS:  I'm sorry.  If that would not be of

24   value to the Court, then we would have to ask for a recess to

25   seek a resolution.

25

1      THE COURT:  It says, "The intent of the resolution."

2  And it says "execution, delivery and performance of the Plea

3  Agreement between" -- I'm reading No. 1 -- "Arctic

4  International and the United States Department of Justice is

5  approved, in substantially the form presented to the Board of

6  Directors.  The Board of Directors deems it advisable and in

7  the best tradition of Arctic International to settle the

8  claims brought by the Department of Justice against Arctic

9  International."

10      No. 2, Mr. Adams is -- is empowered to act alone hereby

11  and is authorized, empowered and directed, for and on behalf

12  of Arctic, to execute and deliver the Plea Agreement.

13      And I'm really at a loss.  These directors might not be

14  there tomorrow.  Mr. Adams might not be there tomorrow.  And

15  then some other lawyer might come in here and tell the Court,

16  "Oh, Court, you -- you shouldn't have gone ahead on the Plea

17  Agreement."  And that's my concern.  This is a criminal case

18  and I need to have the dots -- dots appropriately applied, and

19  so forth, and T's crossed.

20      And I'm willing to go ahead with the sentencing today

21  under the original Plea Agreement.  But if probation is a very

22  important part of it -- well, I can't comment.  I can't make

23  any suggestion.

24      MR. CULUM:  Your Honor, again without waiving any

25  work product on our part of the Department, and not speaking

26

1    for Arctic, when discussing the Plea Agreement, probation was

2    understood.  One issue that existed was the length of the

3    probation, in part because we felt that by, you know, however

4    long it took to pay the fine, the Guidelines would determine.

5    So as long as they were paying the fine, we understood that

6    probation was required under 8D1.1.

7        Certainly our understanding, Mr. Majoras' understanding,

8    and the Board of Directors, from what I understand, they

9    understood it as well.  It is -- it may have been a failing on

10    our part to not to include it.  But we looked at -- if it

11    wasn't included, much as I said initially in our meeting in

12    chambers when you asked about restitution and I took the

13    position and it was the position of the Department that we

14    would not violate -- the Plea Agreement would not be violated

15    if, for example, you imposed restitution, because the United

16    States -- our agreement was the United States would not

17    recommend restitution.

18        And likewise here, we may -- we're silent as to probation.

19    And our understanding was that if you impose probation, that

20    that was -- we all recognize that was a possibility.  But we

21    -- we have a very limited agreement and it's the $9 million.

22    And if you were to impose probation, I think there was an

23    understanding that that would be within the confines of your

24    discretion.

25        THE COURT:  I didn't write the law under Rule

27

1   11(c)(1)(C).  I don't want to express my opinion of the case

2   law that has developed under that section.  I am only bound by

3   that case law.  One, I have one obligation:  To determine

4   whether the agreement, as written, can be accepted under 3553.

5   Period.  That's my only -- I can't even -- I can't even make a

6   suggestion that maybe you should have dotted an "i."  I can't

7   do that.

8        MR. CULUM:  Thank you, Your Honor.

9     I just do believe that, at least as "i," it may have been

10  dotted, but it may not be as clear as we would like.

11    I defer to Mr. Majoras.

12       MR. MAJORAS:  As I indicated, Your Honor, either --

13  at this point in time Mr. Adams would be prepared to testify

14  substantially, as I indicated, if that would be of some value

15  to the Court.  If however --

16       THE COURT:  Can he sign a resolution?  He's

17  secretary.  Can he provide me a resolution that -- that the

18  acceptance of the Plea Agreement would include probation?  I

19  don't know.  I don't think -- I don't think -- I realize it's

20  very tenuous.

21       MR. MAJORAS:  If Mr. Adams could respond to that,

22  Your Honor.  He could --

23       THE COURT:  And I appreciate it.  And I recognize you

24  as a lawyer.

25    And I appreciate that, Mr. Adams.  I don't ask you to be

28

1    sworn because I accept your representation.

2          MR. ADAMS:  Thank you, Your Honor.

3      The context of the certified copy of the resolution that

4    you have in front of you followed numerous board meetings.

5    This was a synopsis of the specific resolution authorizing

6    execution of the Plea Agreement.

7      It was intended -- and, certainly, I can provide a

8    certified copy of the other resolutions that were enacted at

9    the same meetings, which certainly went far enough to give me

10   the authority to produce today a certified copy of a

11   resolution giving authority to the Court, or at least not

12   trying to fetter the Court's discretion in terms of probation.

13         THE COURT:  Well, then, let them fax it to us or

14   whatever -- however you want to draft it.  Why, we can recess

15   until, say, 1 o'clock so you can provide me that resolution.

16     (Messrs. Majoras and Adams confer privately.)

17         MR. MAJORAS:  Yes, Your Honor.  That would be

18   sufficient for us to have the resolution signed by Mr. Adams.

19         THE COURT:  Thank you.

20     Well, we'll recess until 1 o'clock.  Does that

21   inconvenience anyone that they would like to speak before

22   then?  I don't know what your schedule -- travel schedules

23   are, whatever.

24     Mr. Axelrod, of course, will stay, I'm sure.

25         MR. AXELROD:  Yes, sir.

29

1          THE COURT:  I thought so.

2          MR. LOW:  Your Honor, if there is an opportunity to

3    speak before the recess, we would appreciate that.

4          THE COURT:  Well, certainly go ahead.  And -- go

5    ahead and speak at this time, if you wish.  And you can speak

6    from wherever you wish, or use the lectern.

7          MR. LOW:  Your Honor, Daniel Low on behalf of Movants

8    Martin McNulty and Gary Mowery.

9      If I could, I would like to briefly address Mr. McNulty's

10   situation and read a statement that he's provided to me to

11   read on his behalf.  I'd like to give Mr. Mowery, who's here,

12   an opportunity to speak on his behalf.  And then I would like

13   to briefly address the Court on the legal issues related to

14   their request for restitution.

15     Mr. McNulty was a packaged ice executive for Party Time

16   Ice, which was acquired by Arctic Glacier in December of 2004.

17   While at Party Time, Mr. McNulty was told by Chuck Knowlton

18   about the conspiracy to allocate customers.  And Mr. Knowlton

19   threatened to boycott --

20          THE COURT:  What year was this?

21          MR. LOW:  This was -- he learned --

22     At various times he was told about the conspiracy, dating

23   back to as early as 1997, but not directly from Mr. Knowlton.

24   From other Party Time distributors.

25          THE COURT:  This is Party Time talking?

30

1      MR. LOW: Yes, which is the company that was acquired

2  by Arctic Glacier and is referenced in the --

3      THE COURT: So Arctic Glacier wasn't involved in

4  these conversations?

5      MR. LOW: Correct, except --

6      THE COURT: All right.

7      MR. LOW: -- insofar as they acquired that liability.

8    Mr. Knowlton told Mr. McNulty that if he left Party Time,

9  he would -- that Mr. Knowlton could boycott him from

10  employment anywhere in the packaged ice industry.

11      THE COURT: That was Party Time talking?

12      MR. LOW: Right, Your Honor.

13      THE COURT: Okay.

14      MR. LOW: After Party Time was acquired by Arctic

15  Glacier, Mr. McNulty had discussions with Keith Corbin of

16  Arctic Glacier, who was an Arctic Glacier executive.

17    Mr. Corbin instructed Mr. McNulty to participate in the

18  customer allocation conspiracy and threatened to arrange a

19  boycott by the industry of Mr. McNulty if he refused to

20  participate.

21    Mr. McNulty, in fact, refused to go along with the

22  conspiracy and he was fired by Arctic Glacier. He went to the

23  Department of Justice and he cooperated with the Department in

24  investigating the criminal conspiracy. He made tape

25  recordings and assisted them. He applied to various other

31

1    companies in the packaged ice industry.

2          THE COURT:  When was this?

3          MR. LOW:  This would have been beginning --

4          THE COURT:  After Corbin's conversation, or --

5          MR. LOW:  After Corbin's conversation.

6          THE COURT:  When was he terminated?

7          MR. LOW:  He was terminated in late July of 2005.

8          THE COURT:  And then he went to -- did he go to the

9    DOJ after that or before?

10          MR. CULUM:  Your Honor, he left Party Time as early

11   as March of 2005.  I think it was February.  I know that he

12   had a period of time where he got, like, severance time.  But

13   his time at the Party Time ended, I believe, by March of 2005.

14   I may be incorrect.  I'm fully certain --

15          THE COURT:  He was never employed by Arctic?

16          MR. CULUM:  Arctic Glacier.  He was employed by

17   Arctic Glacier from approximately the end of 2004 through

18   approximately March of 2005.

19          THE COURT:  All right.  Thank you.

20          MR. LOW:  Your Honor, I think it was in fact a little

21   bit earlier.  I think it was the end of January that he was

22   terminated; signed a severance agreement I believe in March of

23   '05.  He made the decision to go to the government.

24          THE COURT:  Was the severance agreement with Arctic?

25          MR. LOW:  Yes, Your Honor.

32

1          THE COURT:  All right.

2          MR. LOW:  He made the decision to go to the

3    government shortly before he was terminated, contacted them

4    shortly thereafter.  Initially, the state government

5    authorities and a few months later contacted the Department of

6    Justice.

7      He started applying to other packaged ice companies later

8    in 2005 and was unable to obtain employment with any company.

9      There were two individuals who told him that he would not

10   be able to obtain employment in the industry until he stopped

11   cooperating with the government.  Those were Geoff

12   Lewandowski, who was a former Arctic Glacier employee who said

13   he had conversations with Arctic Glacier about Mr. McNulty, as

14   well as Mr. Fiaz Simon, who said he was speaking on behalf of

15   Charles Knowlton of Arctic Glacier.

16         THE COURT:  I thought Knowlton was with Party Time.

17         MR. LOW:  Mr. Knowlton was with Party Time.  Party

18   Time, after it was acquired --

19         THE COURT:  Okay.

20         MR. LOW:  -- Mr. Knowlton went with -- went over to

21   Arctic Glacier.

22     And because Mr. McNulty was directly harmed by acts in

23   furtherance of the conspiracy, he's moving for restitution in

24   this case.

25     I'd like to read a statement by Mr. McNulty.  I'll come

33

1   back to the legal issues around restitution.  And this is a

2   short letter from Mr. McNulty.  It says:

3       "I would like to say to the Court that the conspiracy

4   has ruined me.  I fought back against incredible odds in

5   an attempt to prove that I was being blackballed from an

6   industry which I had spent nearly 14 years of my life

7   working in.

8       "I was offered large sums of money by the

9   conspirators if I would only agree to stop talking to the

10  Feds.  I refused to do so.

11      "I initially contacted the Department of Justice over

12  four and a half years ago, because I felt that I had to

13  fight back against an organization headed by men who quite

14  literally felt that they owned me and my career.

15      "Now, after so much additional information has been

16  brought to the forefront and so many of these individuals

17  have admitted their guilt, I see that said organization

18  was even more despicable than I ever imagined.

19      "Obviously, I'm not the only person that they

20  attempted to destroy, nor would I ever claim to be.

21  However, I'm a victim of the defendants in every

22  sense -- morally, ethically, and I would ask the Court to

23  rule legally.

24      "Your Honor, I do not have the ability to articulate

25  to you the toll which my deciding to blow the whistle on

34

1    these individuals has taken on my family, my marriage, our

2    health, even my faith.  Suffice it to say that all have

3    been rocked to the core.

4        "Candidly, I oftentimes find myself questioning

5    whether or not I should have blown the whistle when I'm

6    faced with the realization of the hell on earth which my

7    wife and child have endured these past five years.

8        "Lastly, for I honestly do not know whether or not

9    my decision to blow the whistle was worth it or not, I can

10   say unequivocally that absent my doing so, I strongly

11   believe that these defendants would absolutely still be

12   conducting the various unlawful actions which they have

13   pled guilty to."

14   I would ask Gary Mowery to speak.

15           THE COURT:  Certainly.

16           MR. MOWERY:  Thank you, Your Honor.

17           THE COURT:  Introduce yourself to the record, please.

18           MR. MOWERY:  I'm Gary Mowery.  I reside in Bowling

19   Green, Ohio.

20   I do thank the courts for taking this sentencing

21   seriously.

22   I understand that antitrust laws were written to protect

23   our economical system in the U.S. and also to protect

24   competition that it could flourish, thrive.

25   In 2003, actually 2002, my family, my two son-in-laws and

35

1    my son made a decision to enter into the ice industry to

2    package and produce a product and take it to the market.

3         In our relevant market in northwest Ohio, we pretty much

4    had two customers or two suppliers of ice -- one being Home

5    City Ice, and one being Sterling's Ice out of Wauseon, Ohio.

6         My son-in-law worked for --

7              THE COURT:  I thought your company made ice.

8              MR. MOWERY:  My company did make ice.

9              THE COURT:  Oh, okay.  All right.

10             MR. MOWERY:  My son-in-law worked for Sterling's Ice

11   Company in 2000 and 2001.  He came to work for me in my

12   industrial supply business in 2001.

13        In 2002, we learned that Sterling's was getting out of the

14   ice industry, they were no longer going to make ice.  And we

15   found that the market needed a second competitor.  We chose to

16   purchase an ice machine, a piece of property that was an old

17   ice company that was still there but not operational.

18        Before we had moved our machine into our building, we were

19   contacted by a representative, two representatives, of Home

20   City Ice and we were intimidated.  We were kind of told that

21   to get in the ice industry properly would be -- suggested that

22   we buy an existing ice company.  And we decided we did not

23   want to buy an ice company, we wanted to start a business on

24   our own, make a product, and take it to market.

25        We hit the market in April of 2003.  And there was a

36

1    little ice company that came out of Monroe, Michigan called

2    Arctic Refrigeration.  We took one of his customers, and we

3    got a phone call, very disturbing phone call, swearing at us,

4    cursing us, explaining that ice industry rules predict that --

5    state that you're not able to solicit one another's customers.

6        I said, "Well, how can that be?  What are you telling me?

7    Where do I get my business?"

8        "Well, new customers are up for grabs."

9        Shortly thereafter we were placing merchandisers and

10   picking up customers, and the following week we were picking

11   those merchandisers up.  Our competitor did actually predatory

12   acts of antitrust laws where they actually literally gave free

13   ice, rebate checks, discriminatory allowances.

14       I contacted our attorney in May of 2003.  One month after

15   we had been in business, we filed a state suit.  We had

16   contracts that were written.  Contracts were broken.  I was

17   pretty disturbed.  My son --

18            THE COURT:  You did file suit?

19            MR. MOWERY:  We did file a state suit.

20            THE COURT:  I understand.  All right.

21       Now, this was because of the antitrust violations?

22            MR. MOWERY:  Correct.

23            THE COURT:  All right.

24            MR. MOWERY:  I started trying to figure out what we

25   got into.  I started making phone calls to other ice

37

1    companies.

2         THE COURT:  What time was this?  What was the time?

3    When?

4         MR. MOWERY:  We're only in business one month.

5         THE COURT:  Well, what year?

6         MR. MOWERY:  April -- I'm sorry, May of 2003.  We

7    started in April 2003.  We filed suit in May of 2003, and the

8    action didn't cease.  We were out there competing in an

9    industry --

10        THE COURT:  Did you sue Arctic Glacier?

11        MR. MOWERY:  We actually filed suit against Home City

12   Ice.

13        THE COURT:  Home City.  All right.

14        MR. MOWERY:  So, I started making calls, trying to

15   figure out, you know, what's going on.  I made a number of

16   phone calls throughout Ohio, Indiana, Michigan, Illinois, West

17   Virginia.

18     Our attorney at one point, our second attorney, approached

19   the FBI, and I actually cooperated as a cooperating witness.

20   I made phone calls.

21        THE COURT:  This was on the state suit?

22        MR. MOWERY:  This is on -- oh, we had dropped our

23   state suit --

24        THE COURT:  All right.

25        MR. MOWERY:  -- in 2004.  We filed federal -- federal

38

```
 1   suit in -- I'm sorry.  We filed -- we dropped our state suit
 2   in 2003.  We filed a federal antitrust suit in 2004.
 3            THE COURT:  Now, where did you file that, Toledo?
 4            MR. MOWERY:  We filed that in Toledo, Federal
 5   District Court.
 6            THE COURT:  And what happened?
 7            MR. MOWERY:  We tried to get it to trial.  We just --
 8   we could not hang on as a company.  We were actually -- I feel
 9   we were forced to settle, get out of the market.
10      In 2005, when we met with the FBI, September 2005, they
11   asked me if I'd be willing to cooperate and make tape
12   recordings.  I said, "Most certainly," you know.  "This
13   industry is not right."
14            THE COURT:  Now, were you still making ice then?
15            MR. MOWERY:  We were still making and distributing
16   ice.
17      I made phone calls, like I say, in a number of states.  I
18   talked to 20 different ice companies, and there's probably
19   tape recordings on maybe ten different ice companies, and
20   pretty much they have all said, "Well, you know, we have a
21   gentleman's agreement" -- or "We have agreement not to compete
22   with other ice companies."
23      And a number of them have stated that, well, if I call --
24   if my customer calls Home City, they'll refuse to take them
25   on, and vice versa.
```

39

1    As we were unable to make money in the ice industry, I

2 tried to get out and I tried to get out with a little bit of

3 honor.  I contacted a number of different ice companies to see

4 if they'd be willing to buy us and nobody was interested.

5         THE COURT:  Well, I thought that you had an offer of

6 $600,000 at one time.

7         MR. MOWERY:  We did have an offer of $600,000.

8         THE COURT:  And that you sold it for 480-something?

9         MR. MOWERY:  Ultimately we accepted 450,000.

10    I didn't want to sell the company.  You know, at $600,000

11 -- not that it was a dollar amount that was important; I just

12 didn't want to sell it to a competitor that was forcing us

13 out.

14    My family was very upset that I didn't.  Our offer expired

15 a week or two later.  I called Home City and said if we could

16 come to terms on some other issues, I'd be willing to sell it.

17 And they said, "Well, our offer's been pulled.  We no longer

18 want to buy you."  I said, "Okay."  We're weren't gonna stay

19 in the ice business.

20    We -- at that time I started contacting other companies to

21 see if they would buy us.  I contacted at this point Chuck

22 Knowlton, who was an Arctic Glacier employee, and I

23 tape-recorded his conversation for the Justice Department.

24 And Mr. Knowlton said that we could not -- Arctic Glacier

25 would not buy us because we are in Home City's territory.

40

1      I said -- and I kind of knew that there was a territory

2  there at the Ohio -- at the Ohio-Michigan border, because it

3  had come up before in previous conversations with

4  Mr. Knowlton, particularly when he was with Party Time.

5            THE COURT:  You weren't located in Bowling Green

6  then?

7            MR. MOWERY:  We were actually located in Grand

8  Rapids, Ohio, which is a little ways southwest of Toledo.  Our

9  plant was probably --

10            THE COURT:  What road is it on?

11            MR. MOWERY:  It's off from Route 6, which runs over

12  to Bowling Green.  Our plant was located about a half an

13  hour --

14            THE COURT:  Below Route 20 then, Grand Rapids?

15            MR. MOWERY:  Yes, below Route 20.

16            THE COURT:  Between 6 and 20?

17            MR. MOWERY:  Correct.  It's kind of Route 24 runs --

18            THE COURT:  That's not too close to the Michigan

19  border.

20            MR. MOWERY:  Actually, we're about a half hour from

21  the Michigan border.

22            THE COURT:  Well, I'd say 30, 40 miles.

23            MR. MOWERY:  Thirty miles would be fair.

24            THE COURT:  Okay.

25            MR. MOWERY:  We actually tried to --

41

1    Our first summer, our philosophy was, you know, Hey, let's

2  not go get customers until we can prove to ourselves that we

3  can prove to ourselves that we can make ice and put it in a

4  bag.  Until we did that, we didn't go out and market.

5    As soon as we went out in the market in April, it was

6  pretty intense.  The competition was really intense.  We're

7  trying to make ice, now deliver it, pick up customers.

8    When the summer ended, we went back out in the fall and we

9  tried to go get some new customers, and we went around and

10  they said, "Well, we can't deal with you.  We have an

11  exclusive dealing contract with" -- in most cases it was Home

12  City Ice.  We were not --

13    THE COURT:  This was Kroger's and other businesses,

14  is that where you went to?

15    MR. MOWERY:  Mostly convenience stores, ma-and-pa gas

16  stations.  Most of the larger chain operations like Wal-Mart

17  and Meijer's, you know, they had national contracts.  BP's,

18  they had national contracts.

19    THE COURT:  These companies had contracts with local

20  companies?

21    MR. MOWERY:  They had -- they had contracts with,

22  most of them in our area, with Home City.

23    THE COURT:  They had contracts?

24    MR. MOWERY:  Correct.

25    THE COURT:  All right.

42

1       MR. MOWERY:  So, you know, there was a whole market

2   there that we couldn't even touch.

3       But then we started hitting the streets again.  We found

4   out now the little ma-and-pa stores are contracted up and

5   there's hardly anywhere to get new business.

6       We tried to start a route into Michigan.  We weren't able

7   to secure any customers.  We sold to one customer up at --

8   near the racetrack.  I had contacted one customer called The

9   Pit at the racetrack, and he said, "Oh, when I first bought

10  this place, Party Time -- I called them to get a competitive

11  quote on ice, as maybe tried to get a different supplier, and

12  I received a call back from Home City Ice."

13      THE COURT:  You have five more minutes, sir.

14      MR. MOWERY:  Okay.  In the process of trying to sell

15  our company, I had made a telephone conversation to Keith

16  Corbin in Tennessee.  Keith Corbin was a sales manager of some

17  capacity for Arctic Glacier.  Keith told me in that

18  conversation that he was somewhat -- I expressed an interest

19  in selling to them.  He seemed interested.  He talked to me.

20  When I explained to him I was in Home City's territory, they

21  said, "Oh, it's just way too small."  I had to be at least

22  $5 million to be considered to be purchased.

23      And throughout this period I was contacted by a number of

24  ice companies to join ice associations, Great Lakes Ice

25  Association.  I was also encouraged to become a member of

43

1   International Packaged Ice Association.

2       Keith Corbin had made a statement that I could not sell

3   ice to FEMA unless I had the International Packaged Ice

4   Association label on my bags.  And, you know, my ice was

5   approved by the U.S. Department of Agriculture.  We actually

6   made ice.  We took city water, which was good water, that was

7   -- and we cleaned it up.  We filtered it and we softened it

8   and we made better ice than drinking water.  And I was told

9   that I could not sell ice to --

10              THE COURT:  You didn't --

11              MR. MOWERY:  -- FEMA.

12              THE COURT:  You didn't join any of these

13  organizations?

14              MR. MOWERY:  No.

15              THE COURT:  You were an independent person?

16              MR. MOWERY:  Right.  We tried to -- I asked him,

17  "Well, why should I join?"  "Well, you know, you could get

18  some help" --

19              THE COURT:  Well, I don't want to divert you from

20  what you want me to understand --

21              MR. MOWERY:  Right.  So --

22              THE COURT:  -- because the time is getting a little

23  short.

24              MR. MOWERY:  In the process of trying to move our

25  suit along, we had listed a number of witnesses.  One of them

44

1   was Chuck Knowlton.  And we asked Chuck to testify to what was

2   going on in the industry.  And Chuck signed the statement that

3   my attorney -- we have a copy of it.  It was submitted to the

4   Justice Department.  His statement contradicted what he said

5   on the tapes.  He contradicted --

6           THE COURT:  You were having a trial?

7           MR. MOWERY:  I'm sorry?

8           THE COURT:  You were having a trial?

9           MR. MOWERY:  No, we were collecting depositions.

10          THE COURT:  Ah.

11          MR. MOWERY:  And statements.  And that statement was,

12  well, you know, the conspiracy existed even when we were

13  trying to get out of the market.

14      So I'm asking on behalf of the courts to consider my

15  family.  We went into the business.  We currently still owe

16  about $300,000 from that venture.  We're still paying debts

17  today.

18      The fine that's being opposed [verbatim] on Arctic

19  Glacier, if I do the math right, it's less than one penny a

20  bag.  When we were in the industry --

21          THE COURT:  Well, I can fine them a hundred million

22  dollars.

23          MR. MOWERY:  I understand.

24          THE COURT:  Do you understand that?

25          MR. MOWERY:  Right.

45

1          THE COURT:  And that puts them out of business, I

2    suppose.

3          MR. MOWERY:  I understand.

4          THE COURT:  Right?  Would you like me to put them out

5    of business?

6          MR. MOWERY:  They put me out of business.

7          THE COURT:  Well, I -- I understand your feeling.

8    And, I mean, it's a thought in my mind:  I might as well just

9    put them out of business.

10          MR. MOWERY:  The average consumer was probably

11    cheated 2- to $3 a year, to the best of my knowledge.  My

12    family's -- we were the competition.  When we were in the

13    market, ice was a dollar thirty-nine down to $0.99.  We're

14    gone; ice is a dollar seventy-nine.  I was up at the Holton

15    Lake area a couple weeks -- a month ago; it was a dollar

16    ninety-nine.  On the way over on the turnpike in Cleveland it

17    was two oh nine.

18          THE COURT:  Gas is more expensive now than it was

19    when you were in business.

20          MR. MOWERY:  Right.  But the cost hasn't changed.

21          THE COURT:  Well, cost of gasoline, don't you have to

22    deliver ice?

23          MR. MOWERY:  It was $3.50 for a can of diesel when I

24    was in the business.  Diesel now is two dollars and --

25          THE COURT:  I'm sorry.  I didn't realize you had

46

1    diesel trucks.

2            MR. MOWERY:  Speaking of diesel costs, I also talked

3    to somebody --

4            THE COURT:  I'm sorry.  I don't want to divert you --

5            MR. MOWERY:  Right.

6            THE COURT:  -- you've got to conclude.

7            MR. MOWERY:  I just want to explain another example

8    of conspirators working together.

9        Apparently, in an ice association meeting a representative

10   -- I was told a representative of Home City mentioned --

11           THE COURT:  You were told?

12           MR. MOWERY:  Right.

13           THE COURT:  You weren't there?

14           MR. MOWERY:  No.

15           THE COURT:  Thank you.

16           MR. MOWERY:  Okay.  I was told that at a roundtable

17   discussion that they were going to introduce a field surcharge

18   for -- because the diesel price went up.  And I do believe a

19   lot of the industry adopted that fuel surcharge.  You know,

20   it's just another example of the ice companies working

21   together to conspire to raise the price.  And --

22           THE COURT:  Well, I'm gonna have to close your

23   remarks --

24           MR. MOWERY:  I understand.

25           THE COURT:  -- now.  You can make them, oh, sometime

47

1   later this afternoon when we continue, if you wish.

2         MR. MOWERY:  All right.  I appreciate it.

3         THE COURT:  All right.

4         MR. MOWERY:  Thank you for your time.

5         THE COURT:  I'm sorry.  Your time --

6     Come on up.  It's all right.

7     But I'm recessing till -- well, now it's going to be two

8   o'clock.

9         MR. LOW:  Would you like me to address you now, or --

10        THE COURT:  Well, I don't know.  You're the one that

11  interrupted my flow of the procedure here.  I'm trying to

12  accommodate you, but I didn't realize I was going to be

13  involved in a lengthy discourse.

14        MR. LOW:  I apologize, Your Honor.  I have about five

15  or ten minutes.

16        THE COURT:  Sir, we're going to have that at two

17  o'clock.

18        MR. LOW:  Okay.  Thank you, Your Honor.

19        THE COURT:  We'll recess until two o'clock.

20        THE CLERK:  All rise.

21     (At 11:32 a.m., court was in recess until 2:00 p.m.)

22                          *   *   *

23

24

25

48

1                    AFTERNOON SESSION        (2:15 p.m.)

2          THE COURT:  Is the United States ready to proceed?

3          MR. CULUM:  Yes, Your Honor.

4          THE COURT:  Defense ready to proceed?

5          MR. MAJORAS:  Yes, Your Honor.

6          THE COURT:  I have been handed a resolution.

7      Is the government satisfied with that resolution as giving

8  me authority to continue in this matter?

9          MR. CULUM:  Yes, Your Honor.

10          THE COURT:  Would -- would you explain it to me?

11          MR. CULUM:  Me, or --

12          THE COURT:  Well, I don't know.  You're the one

13  that's gonna have to defend it if it goes up.

14          MR. CULUM:  Thank you, Your Honor.  My understanding

15  is -- to the extent that I am incorrect, Mr. Majoras will

16  correct me.

17      This makes it explicit, which I believe was already

18  implicit within the written consent from September 29th, 2009,

19  which says that if this Court were to impose probation, that

20  that would not allow the defendant in this case to withdraw

21  its guilty plea.  That's how I understand the -- the seminal

22  issue in this consent.

23          MR. MAJORAS:  Your Honor, Mr. Culum has it correct.

24  Just for the record, I'd like to note that what we are talking

25  about is a Written Consent of Directors of Arctic Glacier

49

1    International, Inc., dated February 11, 2010.  And by the

2    terms of this consent which followed a convening of the Board

3    of Directors of Arctic Glacier, Mr. Adams has been given

4    express consent that if a probation order is part of a

5    sentence in conjunction with our Plea Agreement, the company

6    does not object to it and certainly authorizes Mr. Adams to

7    enter into any agreement or execute any documents that might

8    be necessary to do so.  We believe that this document does in

9    fact do so.

10           THE COURT:  And that would be the understanding that

11   the Board of Directors had at the time of the plea?

12           MR. MAJORAS:  Yes, sir.  This would make it express

13   what we believe was implicit in the Board's decision after

14   expressly reviewing the possibility of probation as a part of

15   the installment method by which the fine would be paid as set

16   forth in the Plea Agreement.

17           THE COURT:  And, Mr. Adams, on behalf of the

18   corporation, it's your understanding that a sentence of

19   probation is authorized by your plea?

20           MR. ADAMS:  Yes, Your Honor.

21           THE COURT:  And that that would include the

22   information -- or the advice that the Sentencing Guidelines

23   gives me in Chapter 8?

24           MR. ADAMS:  Yes, Your Honor.

25           THE COURT:  And that I can use my own discretion in

50

```
 1   what I impose after appropriate procedure as far as the

 2   Chapter 8 conditions are concerned?

 3           MR. ADAMS:  Absolutely correct, Your Honor.

 4           THE COURT:  All right.  Thank you very much.

 5           MR. MAJORAS:  Your Honor, I know that we provided a

 6   courtesy copy during the recess.

 7       Is that sufficient for the record, or should I hand up

 8   a --

 9           THE COURT:  I would enter one officially into the

10   record.  I'm sorry, I may have marked on this.

11           MR. MAJORAS:  I was afraid you might have, Your

12   Honor.

13       So, for the record the defense is offering the Arctic

14   Glacier International, Inc. Written Consent of the Directors

15   dated February 11, 2010, and its Schedule A, which was the

16   Written Consent of Directors dated September 29, 2009, which

17   is already in the record.  May I approach, Your Honor?

18           THE COURT:  As I understand it, you were speaking,

19   sir.  You want to continue, Mister --

20       Well, I don't know whether you interrupted -- I don't know

21   what your schedule is.  That's what I'm trying to accommodate.

22           MR. LOW:  Your Honor, I could wait, or whatever is

23   most convenient.

24           THE COURT:  If it's no longer a problem, why, we'll

25   let the gentleman continue.
```

51

1           MR. LOW:  Yes, Your Honor.

2           THE COURT:  He can continue.  I'm sorry.  You're --

3    I'll get it correctly.

4       (Messrs. Low and Mowery confer privately.)

5           THE COURT:  You may continue your discourse.

6           MR. MOWERY:  I'll keep this short.

7       In summary -- I'm Gary Mowery, again for the record.

8       In summary, we were fighting a conspiracy long before the

9    government got involved.  We feel that we were victims of

10   conspiracy which had territorial agreements other than

11   southeast Michigan.  And I'm asking the courts to consider

12   restitution for our family, who suffered a great deal of

13   financial loss because of our entering into the ice industry.

14      Thank you.

15          THE COURT:  Thank you.

16          MR. LOW:  Your Honor, Daniel Low again on behalf of

17   Mr. McNulty and Mr. Mowery.

18          THE COURT:  Now, I've been handed an affidavit or a

19   statement from Mister --

20          MR. LOW:  Mr. McNulty.

21          THE COURT:  McNulty.

22          MR. LOW:  That relates to the request that other

23   victims --

24          THE COURT:  Oh, okay.

25          MR. LOW:  -- addressing Mr. McNulty's restitutional

52

1  request.

2          THE COURT:  You authorized me to receive it.

3  However --

4          MR. LOW:  Yes.

5          THE COURT:  Oh, all right.

6          MR. LOW:  Your Honor, Mr. McNulty and Mr. Mowery move

7  for restitution under the CVRA.

8      Under the MVRA and VWPA, a victim is defined as a person

9  directly and proximately harmed as a result of a commission of

10  an offense for which restitution may be ordered, including in

11  the case of an offense that involves as an element a scheme,

12  conspiracy, or pattern of criminal activity, any person

13  directly harmed by the defendant's criminal conduct in the

14  course of the scheme, conspiracy, or pattern.

15      The offense here, of course, is -- 15 USC, Section 1 -- is

16  a conspiracy offense.  Thus, victims who are directly harmed

17  by the defendant's criminal conduct in the course of the

18  conspiracy, or by any reasonably foreseeable action of the

19  co-conspirators, would apply to make Mr. McNulty and

20  Mr. Mowery victims.

21      Courts have recognized that the definition of "victim" is

22  broader than just the intended targets of the conspiracy, but

23  also includes innocent bystanders who suffered collateral

24  damage and those who were injured when they attempted to stop

25  the wrongful conduct.

53

1      For example, in the case of *Moore versus United States*, an

2  Eighth Circuit decision, there was an innocent bystander --

3          THE COURT:  What circuit?

4          MR. LOW:  Eighth Circuit.

5          THE COURT:  Thank you.

6          MR. LOW:  -- an innocent bystander in a bank robbery

7  who was a found to be a victim of the bank robbery, where one

8  of the robbers pointed their guns at the victim.

9      In *United States versus Donaby*, which is a Seventh Circuit

10 decision, the defendant was involved in a conspiracy to rob a

11 bank.  After the robbery, police officers spotted the getaway

12 car and engaged a high-speed chase.  One vehicle was damaged

13 in the chase, and the court held that the police department

14 was a victim who was entitled to restitution for the damages

15 caused to the police department's vehicle.

16     In the case that's perhaps the most analogous to

17 Mr. McNulty's situation, *United States versus Garcia-Castillo*,

18 which is a Tenth Circuit decision, law enforcement personnel

19 attempted to apprehend a group of train robbers near the

20 border with Mexico.  The robbers fled and officers chased them

21 across the border.  The officers, on the other side of the

22 border with Mexico, were attacked by a group of men.

23     The Tenth Circuit affirmed the order of restitution for

24 injuries suffered by the officers, finding it was reasonably

25 foreseeable that the law enforcement agents could confront and

54

1  seek to apprehend the thieves and that bodily harm could

2  result from that encounter.

3      And finally, one look at the last case, *U.S. v. Donaghy*,

4  which is a 2008 District Court decision out of New York.

5  Defendant pleaded guilty to a conspiracy to commit wire fraud

6  and conspiracy to transmit wagering information in which he

7  placed bets based on inside information that he had obtained

8  from an NBA referee.  The NBA sought restitution as a victim,

9  even though the defendant, Battista, was not himself employed

10  by the NBA, and the conspiracy was not targeted at winning

11  money from the NBA but from third-party bettors who lacked the

12  inside information.  The Court held that the NBA was a victim

13  of the Defendant Battista.

14          THE COURT:  Is that the Ninth Circuit?

15          MR. LOW:  That one was district court in New York,

16  Your Honor.

17          THE COURT:  Oh, district.  Thank you.

18          MR. LOW:  In this case, Mr. McNulty and Mr. Mowery

19  were both innocent bystanders who suffered harm which was

20  direct and proximate harm caused by acts of Arctic Glacier and

21  its co-conspirators, and these acts were made in furtherance

22  of the conspiracy.

23      Mr. McNulty refused to participate in the conspiracy;

24  assisted Mr. Culum and the Justice Department in its

25  investigation.  And in retaliation, Defendant Arctic Glacier

55

1  boycotted Mr. McNulty from the packaged ice industry.

2      Like the officers in the *Garcia-Castillo* case, Mr. McNulty

3  attempted to stop the conspirators, and as a foreseeable

4  result of that was intentionally and directly harmed by

5  defendant.

6      Mr. Mowery attempted to sell his company to Defendant

7  Arctic Glacier, but because it was in a territory that had

8  been allocated to Home City, one of Arctic Glacier's

9  conspirators, Arctic Glacier refused to purchase this company,

10  thereby driving down its price below the market price.

11      Arctic Glacier's actions were in furtherance of the

12  customer-allocation conspiracy.  In order for that conspiracy

13  to be most effective, the conspirators could not purchase

14  packaged ice companies in each other's territories.

15      For those reasons, I believe that Mr. Mowery and

16  Mr. McNulty fit the definition of "victim" under the relevant

17  statute and are entitled to restitution in this case.

18          THE COURT:  Were there any civil actions filed by

19  Mr. McNulty resulting from his experience?

20          MR. LOW:  Yes, Your Honor.  There is currently a

21  civil action pending.

22          THE COURT:  So there is a civil action available to

23  him?

24          MR. LOW:  Yes, Your Honor.  That is not true for

25  Mr. Mowery.  He filed a civil action which he was forced to

56

1  settle just because he did not have the resources to see it

2  through to trial.

3          THE COURT:  But he settled the case?

4          MR. LOW:  Yes, Your Honor.

5      There is -- in the letter addressed to you, that issue is

6  addressed.

7      (Mr. Low reviewing his file.)

8          MR. LOW:  I'm not finding it at the moment.

9      But there is case law that a restitution order is

10  appropriate even if there has been a settlement, as long as

11  the victim's not been fully compensated.

12          THE COURT:  And how long did that case pend?

13          MR. LOW:  Mr. Mowery's case?

14          MR. MOWERY:  Two-and-a-half years.

15          MR. LOW:  About two-and-a-half years, Your Honor.

16          THE COURT:  Took that long to determine a value to

17  it?  That's all I'm asking.  Just it took that long to

18  determine the loss?

19          MR. LOW:  Your Honor --

20          THE COURT:  And he's not satisfied with the loss

21  determination, as I understand it.

22          MR. LOW:  The settlement of that case was the sale.

23  What he received was the sale price --

24          THE COURT:  I see.

25          MR. LOW:  -- below market, Your Honor.

57

1          THE COURT:  I just want the record to understand that

2    it took two-and-a-half years for one alleged victim to

3    determine a loss, which was settled.  And then additional

4    claim for restitution now?

5          MR. LOW:  Your Honor, I don't think the value of the

6    loss --

7          THE COURT:  I'm not arguing with you.  I'm just

8    trying to --

9       And if you want to have any facts that you want to explain

10   my rendition there, why, please do.  But don't argue.  I mean,

11   you know, you made your argument.

12         MR. LOW:  Yes, Your Honor.

13         THE COURT:  And you represent both these defendants?

14         MR. LOW:  Yes.

15         THE COURT:  Not "defendants" --

16         MR. LOW:  Victims, Your Honor.

17         THE COURT:  Alleged victims.

18         MR. LOW:  Yes, Your Honor.

19         THE COURT:  All right.  Thank you.

20         MR. LOW:  Thank you.

21         THE COURT:  And you represented them in the federal

22   case, too, that was settled?

23         MR. LOW:  I did not, Your Honor.

24         THE COURT:  I didn't think you were that old.

25      (Laughter.)

58

1          MR. LOW:  Thank you, Your Honor.

2          THE COURT:  Thank you.  I'm at a loss to know how

3   to --

4       This is a nice gadget, isn't it?

5       (Laughter.)

6          THE COURT:  Let's see.  Since we're discussing that,

7   that phase of the case, Mr. Axelrod, do you want to --

8       Well, before you do, are there any other victims here?  I

9   have a list of the people present, but I don't know that

10  anyone else has asked to speak.

11      So, Mr. Axelrod, Darlene will need a few minutes to set up

12  your ELMO.  So, probably go ahead and do that now.

13         THE CLERK:  Okay.

14         THE COURT:  And then, Mr. Culum, you can address that

15  now or later as we go through it.  However you choose.

16         MR. CULUM:  Your Honor, I will address any issues you

17  have when -- when -- a little bit later.

18         THE COURT:  All right.

19      (The Court and Clerk confer regarding the operation of the

20  ELMO.)

21         MR. AXELROD:  Your Honor, before I start, I've given

22  these to both the government and to the defense.  I have a set

23  of the exhibits that I'm going to use, in the order in which

24  I'm going to use them, that I would like with the Court's

25  permission to tender them to the Court.

59

1          THE COURT:  That's fine.

2          MR. AXELROD:  Your Honor, I start where the Court

3   started when we first met in chambers on, I believe it was,

4   October 27th, when Your Honor said that despite this being a

5   Plea Agreement under 11(c)(1)(C), whatever sentence the Court

6   imposes would be the Court's sentence, rather than a sentence

7   -- rather than a sentence of the parties.

8      I respectfully urge, and the tenor of my remarks will be,

9   that this is not a sentence.  The sentence in the Plea

10  Agreement is not a sentence that the Court would have arrived

11  at on your own.  And for that reason alone, but for additional

12  reasons I'm about to go through, it should be rejected.

13     I also want to start with something that Your Honor said

14  at the sentencing of Mr. Larson last week.  And I wrote this

15  down as precisely as I could, so this is close to a verbatim

16  quotation.

17     Your Honor said:

18     "Our country is in tragic shape now because of the

19  activities of our heads of industry, because of executives

20  breaking the law, whether on Wall Street or Main Street."

21     Your Honor, we couldn't agree more.  We believe those

22  comments quite accurately reflect the need to impose

23  significant punishment on this company, much more significant

24  than the punishment that would be provided in the Plea

25  Agreement just in a general way, and also because, as Your

60

1   Honor has heard and we'll hear, we believe that the Plea

2   Agreement does not reflect the true scope of the conduct that

3   the company engaged in and we believe there's significant

4   evidence certainly significant enough to trouble the Court

5   about accepting these -- uncritically accepting the government

6   and defense version of the offense.  It should cause the Court

7   concern and to ask some very pointed questions before even

8   considering further accepting the Plea Agreement.

9       One other point before I turn to this specific case, which

10  as the Court knows I was present last week and I'm well aware

11  of the sentences imposed on the individual defendants and the

12  reasons for them.  And I mention that because those are three

13  individuals whom the Court treated with a reasonable amount of

14  leniency, partly -- perhaps in significant part -- because, as

15  you said at the time, they did not profit from the offense.

16      We now have in the courtroom, at least institutionally,

17  the defendant who did profit from the offense and should be

18  treated accordingly.

19      I want to be clear what we are and are not asking for

20  today.  Your Honor has made it very clear that what's before

21  the Court is whether to accept or reject the Plea Agreement.

22  And we understand that and we only -- we ask only one thing,

23  and that it be rejected.

24      I will talk about some other things not for the purpose of

25  asking the Court to do them today, but rather to show the

61

1   Court that should the Plea Agreement be rejected, should the

2   defendants -- the defendant come back before the Court with a

3   different kind of Plea Agreement, whether it be under 11(c)(1)

4   -- c(1)(A) or (B), the Court would have a variety of options

5   to craft a sentence that is much more appropriate in light of

6   the conduct that has occurred in this case.

7        Your Honor, what we ask for is not unprecedented.  There's

8   very recent and very powerful precedence for it.  All we need

9   look at is Judge Rakoff's September 19th, 2009 opinion

10  rejecting the consent judgment in the SEC's case against Bank

11  of America.  The facts are different but the principles are

12  the same.

13       We believe that what Judge Rakoff did in that case is a

14  paradigm for the way courts should scrutinize this sort of

15  agreement:  By asking the parties, including the government,

16  very pointed questions about what the evidence really shows.

17        Just to illustrate -- see if I can do this correct.  The

18  highlighting does not show up very well, Your Honor.  But at

19  the top of page 4 in the upper left-hand column, Judge Rakoff

20  uses very harsh terms, but he describes more or less what

21  we're confronted with in this case, or what the victims, at

22  least we believe, were confronted with in this case, and that

23  is two parties who are attempting to serve their mutual

24  interest in having this Plea Agreement approved to the

25  derogation while neglecting the interest of the victims.

1      Judge Rakoff asked a lot of questions as reflected in that

2   opinion, and his comments are reflected there and his

3   conclusions are reflected there.

4      I suspect, although I don't know, that because that was an

5   SEC case and because it was quite a big case, that case

6   received the same sort of review, perhaps even more review,

7   than this case has received from the Department of Justice.

8      The settlement it --

9           THE COURT:  This wasn't a criminal case?

10          MR. AXELROD:  No, Your Honor, it was not.

11          THE COURT:  Thank you.  All right.

12          MR. AXELROD:  It was a consent judgment in a civil

13  case.

14      I think that the fact that this is a criminal case and

15  that Your Honor is presented with a pair of -- a pair of

16  handcuffs, more or less, in sentencing, that this case

17  receives greater scrutiny than that case.  That was just a

18  civil case.  This is a criminal case and we, therefore, think

19  the Court has an even higher duty.

20      Now as the Court knows, we do not have the burden to prove

21  that the conspiracy extended beyond southeast Michigan, and we

22  don't attempt to -- we don't say that we can prove beyond a

23  reasonable doubt or beyond -- or even by a preponderance of

24  the evidence today that happened, because some of what we have

25  would not be admissible under the Rules of Evidence.  There're

63

1 a variety of different reasons.  We haven't had discovery.  We

2 don't have a right to take discovery in this proceeding.  But

3 we think there's a lot of evidence and the evidence is smoke,

4 and when there's that much smoke, there's bound to be fire.

5     We think there's enough evidence that the Court should be

6 very concerned about simply accepting the parties' conclusions

7 and the parties' statements about what the relevant conduct is

8 in this case.

9     The Court has already heard some of that evidence from

10 Mr. Mowery and some of that evidence presented on behalf of

11 Mr. McNulty.  We're going to present more.

12     We will speak of this -- or we sometimes have flippantly

13 spoken of this in the same terms that the government sometimes

14 speaks of it.

15     This is a letter that Mr. Culum wrote to Judge Borman in

16 connection with the civil case.  And in the first line he

17 says, "I am the lead attorney on a nationwide criminal

18 investigation focusing on antitrust conspiracies."  He doesn't

19 say that he's investigating a southeast Michigan conspiracy.

20 He acknowledges that he's investigating what he believed to be

21 a nationwide conspiracy.

22     I'm going to talk briefly, very briefly, about the high

23 points of the evidence that we've already discussed in our

24 objections, and then I'm going to turn to some new evidence.

25 But I do think it's important to look at some of the very

64

1    significant pieces of direct and circumstantial evidence that

2    we've already commented on, because I haven't had an

3    opportunity to do it in open court.

4        First, there is the cooperation itself and

5    self-incrimination provision.  This is paragraph 7 of the Plea

6    Agreement, and it says that, "Pursuant to" -- and I'm

7    referring to down near the bottom.

8        "Pursuant to United States Sentencing Guidelines 1B1.8,

9    the United States agrees that self-incriminating information

10   that the defendant provides to the United States pursuant to

11   this Plea Agreement," and then it goes on to discuss the

12   restrictions.

13       But the important point is, that this Plea Agreement, one

14   would assume -- I wasn't involved in, so I cannot say with

15   certainty -- but one would assume that this was provided --

16   that this was entered before the totality of the defendant's

17   cooperation, and that the defendant, as reflected by the

18   government's 5K motion, has therefore been talking about

19   additional antitrust defenses.  And it defies credulity to

20   think that -- first, to think that there would be a bunch of

21   similar antitrust conspiracies involving packaged ice around

22   the country in which the parties weren't really all working on

23   a multi-state basis.  But second, it defies credulity to

24   believe that if were the case, Arctic Glacier would know about

25   it, unless Arctic Glacier was involved.  Therefore, if Arctic

65

1   Glacier has been cooperating, it's very likely that Arctic

2   Glacier's cooperation has in some ways been

3   self-incriminatory.

4        And, obviously, I haven't seen the Plea Agreement so I

5   don't know, but I infer from what has gone forward that that

6   information is not in the Plea Agreement because it would

7   contradict the relevant conduct as described -- or, I'm sorry,

8   I infer that it's not in the Presentence Report, because that

9   would conflict with the relevant conduct as described in the

10  Plea Agreement.

11       So, the question, which I can't answer, is whether

12  information provided by Arctic Glacier that incriminates it in

13  connection with activities other than the conspiracy described

14  in the Plea Agreement has been provided and has been provided

15  to the Court.

16       Additionally, the Plea Agreement provides nationwide

17  transactional immunity.  Now, that's important because of

18  Antitrust Division policy.  But here's what the Plea Agreement

19  says:

20       It says that, paragraph 15, that the United States will

21  not bring criminal charges against any current or former

22  director, officer, employee or employer of Arctic Glacier for

23  any act or offense committed before the date of this Plea

24  Agreement while that person was acting as a director, officer,

25  or employee of Arctic Glacier that was undertaken in

66

1   furtherance of an antitrust conspiracy involving the sale of
2   packaged ice in the United States.
3       Now, what's important about that is the Antitrust Division
4   policy about that.  Because the Antitrust Division policy,
5   which I'm putting on the overhead, is that "The geographic
6   scope of the non-prosecution agreement should be limited to
7   where the defendant does business."
8       Now, we all know that Arctic Glacier only does business in
9   a relatively limited number of states and not throughout the
10  country.  One has to ask then, if Arctic Glacier wasn't
11  committing crimes throughout the country, why would it then
12  need -- and, more significantly, why would the government then
13  give nationwide transactional immunity?
14      The answer to me is obvious.  Arctic Glacier bargained for
15  that provision and they got that provision because their
16  exposure extends beyond southeast Michigan and beyond the
17  places where they do business.  They got that because they
18  could be prosecuted in connection with acts elsewhere absent
19  that provision.
20      Additionally, there's the *Chamberlain* complaint.  Now, it
21  is just a complaint and we recognize that it's just a
22  complaint.  But Rule 11 applied.  Counsel filed that
23  complaint, and there's every reason to accept counsel's
24  representations as to the facts that counsel had, just as the
25  Court accepted the representations by Arctic Glacier's

67

1    representative in the courtroom here.

2        That complaint very specifically alleges that there was a

3    nationwide conspiracy.  It alleges specific facts regarding a

4    nationwide conspiracy.  It describes witnesses who were in --

5    described as confidential witnesses, but nonetheless witnesses

6    who were in a position to observe that it was a nationwide

7    conspiracy, and it's very specific.  And it's not a case

8    that's connected to this one.  It's a securities class action.

9    It has nothing to do with Mr. Wild or with our class action --

10   actually not "ours" because I'm not counsel in it, but with

11   the antitrust class action in the Eastern District of

12   Michigan.

13       With the detail of those allegations and with the number

14   of witnesses described and with the kind of witnesses

15   described, I respectfully urge, Your Honor, that you ought to

16   be concerned, unless Mr. Culum can tell you that he has

17   followed up, that he has interviewed those witnesses and that

18   he has good reasons to believe that they're not telling the

19   truth.  If --

20            THE COURT:  You're going to tell him how to run his

21   case, huh?

22            MR. AXELROD:  You know, Your Honor?  Perhaps.

23            THE COURT:  I didn't think so, and I'm not going to

24   tell you how to run yours.  Go ahead.

25            MR. AXELROD:  Your Honor, we have additional -- we

68

1    have additional evidence that the conspiracy extended beyond

2    the -- southeastern Michigan, and it comes from Reddy Ice's

3    April 2007 Form 8-K.

4        Here's the cover sheet which I'll put on the screen just

5    to show what document I'm using.  But on page 9 of the

6    document, there is interestingly a map.  And the map -- I wish

7    I had a color copy of it here.  Unfortunately, I don't.  But

8    the map is Reddy Ice's description of how the country's

9    divided up.   This was prepared, as I understand it, for an

10   investor presentation.  But it shows that Home City does

11   business in this region, that Arctic Glacier does business in

12   this part of the country and in California, and that Reddy Ice

13   owns the rest of the country.

14       This is 100 percent consistent with the allegations in the

15   *Chamberlain* complaint.  It is 100 percent consistent with what

16   Mr. Mowery has told the Court, and it is 100 percent

17   consistent with the allegations in Mr. McNulty's amended

18   complaint, which we've already cited for the Court and in the

19   supplemental affirmation that the Court was provided with

20   during the lunch hour.

21       I've gotten a little bit out of order with my exhibits,

22   but I think this is important.  This is a paragraph from the

23   *Chamberlain* complaint, which is counsel there's summary of

24   what he believes he's going to prove in that case.

25       He says, "Pursuant to unlawful agreements with Arctic

69

1  Glacier and Home City, Reddy Ice dominated packaged ice sales

2  in the Sun Belt region, ranging from Arizona to Florida, as

3  well as in certain states in the mid-Atlantic region."

4       THE COURT:  Which exhibit is that now?

5       MR. AXELROD:  This is -- Your Honor, it's this one.

6  It's the -- I've gotten a little bit out of order.  This is

7  the Reddy Ice -- I'm sorry, the *Chamberlain Securities Class*

8  *Action* complaint.

9       THE COURT:  What page are you on?

10      MR. AXELROD:  I'm looking, Your Honor, on page 12,

11 paragraph 43.

12      MR. CULUM:  Just for the record, Your Honor, I don't

13 believe the entire complaint has been made an exhibit.

14      MR. AXELROD:  Well, we certainly have the entire

15 complaint.

16      MR. CULUM:  I would be delighted --

17      MR. AXELROD:  I'll provide copies to Mr. Culum.

18      THE COURT:  He's not going to tell you how to run

19 your case either.

20      MR. AXELROD:  Thank you, Your Honor.

21      THE COURT:  All right.  Go ahead.

22      MR. AXELROD:  So, paragraph 43 describes a division

23 of the country that is, in a way, that is perfectly consistent

24 with what we just saw in Reddy Ice's April 2007 8-K.  It's

25 specific.

70

1          THE COURT:  Well, doesn't that sort of belie your

2     argument that Arctic Glacier doesn't need transactional

3     immunity for the whole county?

4          MR. AXELROD:  Oh, absolutely not, Your Honor.  It

5     makes my case.  Apparently I'm not being clear.

6          THE COURT:  I mean, if I understand this math, you've

7     got them responsible for, what, I don't know, half the

8     country?  And 20 percent of the -- and $225 million worth of

9     the sales in Canada?

10          MR. AXELROD:  Well, Your Honor, my point is that

11     if --

12          THE COURT:  Well, I'm just talking about the one

13     point, why they need transactional -- I'm sorry; I'm sorry --

14     transactional immunity for the whole county -- or country.

15          MR. AXELROD:  Well, my answer, Your Honor, is that

16     this is a nationwide division of the country.  I mean, they've

17     divided up the whole country here among these three

18     defendants:  Home City, Arctic Glacier and Reddy Ice.

19          THE COURT:  And they need a witness to convict all

20     those nasty people.

21          MR. AXELROD:  Well, but we're not in a criminal

22     trial.  We're in a sentencing where obviously --

23          THE COURT:  Well, this is a criminal case.

24          MR. AXELROD:  But the burden at sentencing is not

25     proof beyond a reasonable doubt.  Section 3661 of Title 18

71

1    says that the Court can consider anything.

2            THE COURT:  All we're talking about is whether I can

3    accept or reject the Plea Agreement.

4            MR. AXELROD:  We are, Your Honor.  And my point is

5    simply that this should concern the Court enough that you

6    would have not -- not enough comfort, that --

7            THE COURT:  Well, your concern was the nationwide

8    transactional immunity, and that -- that's my only question at

9    this point.  It's -- obviously, it looks to me they needed it.

10           MR. AXELROD:  That's my point, Your Honor.  That's

11   exactly --

12           THE COURT:  Right.

13           MR. AXELROD:  -- my point.  And they needed it

14   because the offenses were not confined to southeast Michigan.

15   They needed it because it's a much bigger conspiracy than the

16   Plea Agreement described.  That's my only point.

17           THE COURT:  Well, the Plea Agreement is described by

18   the charging document -- I mean, the scope of the conspiracy

19   is defined by the charging document.

20           MR. AXELROD:  And it's much broader than that as

21   well, Your Honor.

22           THE COURT:  I understand that from your point of

23   view, and I hope from the government's, possibly.

24           MR. AXELROD:  Additional evidence is the supplemental

25   declaration of Mr. McNulty, which the Court was given at the

72

1    lunch hour.

2         And Mr. McNulty is very specific about what he was told

3    while he was an Arctic Glacier employee by Arctic Glacier

4    executives.

5         Paragraph 3 on page 18, he says that Arctic Glacier

6    executives -- paragraph 3.  He says:

7         "Arctic Glacier executive Keith Corbin told me that Arctic

8    Glacier's conspiracy with Reddy Ice extended throughout the

9    United States.  He describes a particular instance in which

10   Arctic Glacier had backed away from buying an ice company in

11   Nevada so that Arctic Glacier and Reddy Ice would not be in

12   direct competition."

13        That is an antitrust conspiratorial act that goes beyond

14   southeast Michigan.

15        A couple of other examples are on page 2 in paragraphs 6

16   and 7.

17             THE COURT:  When did that take place?

18             MR. AXELROD:  Your Honor, the affirmation does not

19   contain a date, but he's specific that it was while he was --

20        I'm not sure paragraph 3 was while or before he was a --

21             THE COURT:  I'm not either.  I just asked the

22   question.

23             MR. AXELROD:  But 6 and 7 clearly are while he was an

24   Arctic Glacier employee.  And paragraph 6 says that Keith

25   Corbin informed Mr. McNulty that if Mr. McNulty refused to

73

1   participate in the conspiracy and left Arctic Glacier, he

2   would ensure that he would not be hired by competing

3   manufacturers, including Home City.

4       And at the bottom of paragraph 7, that he would not be

5   able to get a job with another packaged ice company if he

6   continued cooperating with federal authorities in their

7   investigation.  Now, that actually relates to Mr. McNulty's

8   allegation of obstruction, which we'll turn to in a minute,

9   because that's something else that is not accounted for in the

10  Plea Agreement.

11      Under 8C2.5(e) --

12          THE COURT:  Are we done with this?

13          MR. AXELROD:  Well, actually, Your Honor, there is

14  one more --

15          THE COURT:  Are you going to introduce this as one of

16  your exhibits?

17          MR. AXELROD:  I am, Your Honor.

18          THE COURT:  All right.

19          MR. AXELROD:  There's one more -- there's one more

20  paragraph, paragraph 8 on the last page, where Mr. McNulty

21  describes he was being told he was being boycotted from

22  employment in the packaged ice industry by Arctic Glacier.

23      Now, in any other case that I've ever been involved in,

24  that would have gotten an obstruction adjustment under

25  8C2.5(e), which would have bumped up the credibility score by

74

1    three points and would have made a significant difference in

2    the ending Guideline calculation.

3        Obviously, I don't know what's in the Presentence

4    Investigation Report, but clearly the Plea Agreement does not

5    provide for it and does not authorize the Court to impose it.

6        Your Honor, I find personally, I guess, my --

7            THE COURT:  Well, you can figure out whether that was

8    in the Plea Agreement or not simply by computing the offense

9    level that I've already read in the record.

10           MR. AXELROD:  Well, what I meant to say, Your Honor,

11   was I'm not sure it's mentioned in the Presentence Report.

12   Clearly, it's not part of the calculation --

13           THE COURT:  I read what was mentioned in the report

14   in establishing the fine and the -- and the offense level.

15           MR. AXELROD:  Understood, Your Honor.  I merely was

16   pointing out that I have not.

17           THE COURT:  Well, that's the reason I read it,

18   because I knew with your expertise, you could figure it out as

19   well as I did.

20           MR. AXELROD:  Well, thank you, Your Honor.  I'm not

21   sure that I should, but I will take that as a compliment.

22       The Plea Agreement, it should concern the Court.  I think

23   it's particularly offensive to immunize obstruction of

24   justice.  But turning to paragraph 17(a) of the Plea

25   Agreement, it does exactly that.  It immunizes -- provides a

75

1  nationwide transactional immunity for acts undertaken in

2  connection with the investigation of such a conspiracy.  That

3  is immunizing -- that immunizes the conduct that Mr. McNulty

4  described where money was held back and where he was told that

5  he would be boycotted from the ice industry unless he stopped

6  cooperating with federal authorities.  So, that's now --

7  that's not conduct where if the Court accepts the Plea

8  Agreement, that can't be prosecuted.

9     Your Honor, we believe that both the government and Arctic

10 Glacier are -- I suppose there's no better word than

11 "indifferent" to the interests of the victims.  That's

12 reflected in several ways.

13    On the government's part, it's reflected in the

14 government's insistence on a $9 million fine.  This is a

15 company which, as we will see, is in precarious financial

16 condition.

17    Your Honor has already heard repeatedly throughout these

18 proceedings about the difficulty the company is having in

19 refinancing its debt.  And there is every reason to believe

20 that if this company has to pay millions of dollars in fines

21 to the government, its ability to pay real restitution,

22 restitution even approaching what it should pay, that that

23 will be in jeopardy.

24    As the Court knows, the Sentencing Guidelines require that

25 any fine be reduced to a level that permits the defendant to

1    pay restitution, as well as the specific provision of the

2    United States Code 18 U.S.C., Section 3574, says that no fine

3    shall be imposed that would interfere with a defendant's

4    ability to pay restitution.  And I suppose that's the

5    constraint that would prevent the Court from imposing a

6    hundred-million-dollar fine in this case, because then they'd

7    be gone and none of the victims would recover anything.

8              THE COURT:  Oh, shucks.  You mean I can't do that?

9              MR. AXELROD:  Well --

10             THE COURT:  I'm sorry.

11             MR. AXELROD:  Ask them to pay the restitution first.

12             THE COURT:  I'm sorry.  I'm sorry.

13             MR. AXELROD:  No apology to me necessary, Your Honor.

14       The defendant's indifference to the rights of the victims

15   is reflected in its Motion to Dismiss the civil case.

16       Now as the Court knows, the Plea Agreement says

17   restitution is for the civil case.  So it effectively annexes

18   the civil case, in a way, to the criminal case, yet Arctic

19   Glacier seeks to dismiss the civil case.

20       This is the -- this is the cover sheet for it.  And then I

21   pulled out page 5 of the Motion to Dismiss for one quotation,

22   which is in the paragraph at the top where it says:

23   "The Department of Justice, after an extensive

24   investigation, obviously concluded that there was no national

25   conspiracy and limited its charges against Home City and

77

1   Arctic to Michigan.  The results of the DOJ investigation

2   thus -- if anything -- suggests that Plaintiffs' theory of a

3   nationwide conspiracy is implausible."

4       In other words, restitution should be in that case, and

5   then that case should be dismissed because the government only

6   alleged a little corner of the conspiracy in this case.  That,

7   Your Honor, would not reflect justice and certainly does not

8   reflect true acceptance of responsibility.

9           THE COURT:  Well, this would have been filed by

10  Arctic Glacier in the civil case?

11          MR. AXELROD:  Yes, sir.

12          THE COURT:  All right.

13          MR. AXELROD:  Your Honor, we believe that sunlight is

14  in the public interest, and so does the Antitrust Division.

15  Its policy is stated -- this is a page from the Antitrust

16  Division Grand Jury Practice Manual, Chapter IX, page 17,

17  where --

18          THE COURT:  Do I have a copy of that?

19          MR. AXELROD:  You do, Your Honor.  And there's no

20  cover sheet on it.  It's just this.  It just looks like that.

21          THE COURT:  I missed that.

22          MR. AXELROD:  But with the Court's permission, in a

23  moment I will ask to tender --

24          THE COURT:  You can put it up there so I can

25  visualize it.  My next document was the 2008 annual report.

78

1          MR. AXELROD:  No, we must have missed it, Your Honor.

2      But what this says that is so significant for this case,

3  it's talking about charge bargaining.  It's talking about when

4  a defendant is charged with only a portion of what it really

5  does, either because the defendant is cooperating or for some

6  other reason.  Now, that does happen all the time and we don't

7  mean to suggest there's anything wrong with that.  But when it

8  happens, what's not charged shouldn't be a secret.

9      What the Antitrust Division Manual says is it's also

10  doubly important in such situations for the prosecutor to

11  ensure that the public record of the plea demonstrates the

12  full extent of the defendant's involvement in the criminal

13  activity giving rise to the prosecution.

14      So, even if -- even if it were okay to charge just a

15  corner of the conspiracy in this criminal case, Antitrust

16  Division policy would be that the evidence of a broader

17  conspiracy should be disclosed publicly.

18      Your Honor, did I see that you were just receiving a copy

19  of this?

20      Thank you.

21      Which reminds me of a comment Mr. Culum made a while ago,

22  which he said that the government had charged the most serious

23  readily provable offense and that was the reason why the Plea

24  Agreement should be accepted, and the implication was despite

25  the fact that there may have been other relevant conduct.

79

1        What Mr. Culum was citing was something that in the

2   Department of Justice is known as the Thornburgh memorandum.

3   It's a memorandum by former Attorney General Thornburgh that

4   says when you're deciding what to charge, you have to charge

5   the most serious readily provable case.  But that's

6   contemplating what you can prove beyond a reasonable doubt.

7   And all the lawyers in this courtroom know that that's not the

8   test for sentencing.

9        The typical case where we fight over these things is where

10  the government charges -- or where the defendant pleads guilty

11  to a relatively modest offense and the government comes in and

12  says, "We have all this evidence of other crimes.  We weren't

13  able to prove it beyond a reasonable doubt, so we didn't

14  charge it, but the Court should consider it at sentencing."

15       In this case, what appears to us to be happening is the

16  government has that evidence and is not disclosing it.  That

17  there's this other evidence that the Court should be

18  considering and should have an opportunity to decide whether

19  it shows that this Plea Agreement is not in the public

20  interest.  So, we believe that sunlight -- sunlight would aid

21  in the Court's determination of how to proceed in this case.

22       Now, I have mentioned that the company is in precarious

23  financial condition.  This is Arctic Glacier's third quarter

24  results for -- that were released on November 6, 2009.  And I

25  point to the second page that I've given to the Court under

80

1  the heading of Financial Position.

2      This shows something about the things that we've been

3  hearing about as -- during the periods when we've been

4  rescheduling things and Arctic Glacier's been concerned about

5  its refinancing.

6      This report says that Arctic Glacier had -- and we're

7  talking about the Canadian parent, incidentally.  It says it

8  had a working capital deficiency of $44 million at

9  September 30th, 2009.  "This resulted from the classification

10  of $60 million of senior secured notes of current liabilities

11  since they mature on January 4, 2010."

12      In other words, those notes have gotten close -- at the

13  time this was released, those notes had gotten close enough to

14  being due that they had to be reclassified and created the

15  deficiency.

16      In addition, the notes to the financial statement show

17  that Arctic Glacier had at that time a hundred and

18  sixty-seven million dollars in long-term debt.

19      In addition, in our objections to the Plea Agreement, we

20  pointed out that there's also a hundred million dollars

21  outstanding on a revolving credit arrangement.

22      So, this is a company with absolutely a mountain of debt,

23  struggling to get the debt refinanced so they can stay in

24  business.  And if the government gets its $9 million fine,

25  then the victims are going to get nothing.

81

1      Your Honor, while I'm talking about sunlight, I would like

2   to return to the *Bank of America* opinion which was the first

3   exhibit, because it shows -- it shows an analogy, at least, to

4   what will happen in this case if this Plea Agreement goes

5   forward.  This is the part I'm most interested in for this

6   purpose.  Starts in the third full paragraph.

7           THE COURT:  Of what page?

8           MR. AXELROD:  I'm sorry, Your Honor.  It's page 4.

9      And Judge Rakoff is describing more or less the sort of

10  thing that's going to happen if we go forward with the Plea

11  Agreement.  He says:

12     "For example, the Consent Judgment would effectively close

13  the case without the S.E.C. adequately accounting for why, in

14  contravention of its own policy, it did not pursue charges

15  against either Bank management or the lawyers who allegedly

16  were responsible for the false and misleading proxy

17  statements."

18          THE COURT:  Now is he talking about criminal charges?

19          MR. AXELROD:  He's talking about civil charges, Your

20  Honor.

21          THE COURT:  Oh, all right.

22          MR. AXELROD:  But similarly, if we go forward here,

23  it will close the books on this case without any explanation

24  of why the government has not come forward with any of the

25  evidence -- that is so apparent to anyone who looks at this --

82

1   of conspiratorial acts outside southeastern Michigan.

2       Now, Your Honor, there are -- there are -- excuse me.  My

3   notes have gotten a little jumbled here.

4       There are options for the Court should -- should the Court

5   decide to reject this Plea Agreement.  The Court has expressed

6   concern a number of times about its inability under this Plea

7   Agreement to impose -- or in this criminal context, rather,

8   because it's really not the Plea Agreement -- but the Court

9   has expressed concern about its inability to impose

10  restitution.

11      Now, we believe that there are ways that should the Plea

12  Agreement be rejected, the Court can impose restitution in

13  this case.

14      There is the creation of a restitution fund.  Now, again,

15  there is precedence for this in the *Bank of America* case.

16      I have here a proposed final consent judgment, and it's

17  proposed by the Securities and Exchange Commission, so we few

18  this as an admission by the government that the sorts of

19  things it proposes are practical and possible and could be

20  done.

21      And what the government in that case proposes is in

22  Section IX on page 7.  It says that:

23      "The Bank of America shall satisfy its obligations by

24  paying money within a certain period of time after entry of

25  the final judgment to the Clerk of the Court, together with a

83

1    cover letter identifying Bank of America Corporation as a

2    defendant in the Actions; setting forth the titles and civil

3    action numbers of the Actions and the name of the Court; and

4    specifying that payment is made pursuant to this Final

5    Judgment.

6        "Bank of America shall simultaneously transmit photocopies

7    of such payment and letter to the Commission's counsel in this

8    action.  By making this payment, Bank of America relinquishes

9    all legal and equitable right, title and interest in such

10   funds, and no part of the funds shall be returned to Bank of

11   America."

12       Now, Your Honor, that is exactly the sort of thing that

13   the Court could do in this case.

14       THE COURT:  Wouldn't that also diminish its financial

15   position?  You already explained what dire financial position

16   they're in.  And if they establish a trust that they cannot

17   rely on to increase their net worth, isn't that the same as a

18   bad loan?  I don't understand, but that's my problem with

19   that.

20       I know the Bank of America probably prints money, but

21   that's beside the point.

22       MR. AXELROD:  Well, Your Honor, I think that's just a

23   question of how much money the Court requires to be put in

24   such a restitutionary fund.  And if for example --

25       THE COURT:  But that would -- in other words, instead

84

1   of paying the nine million to the government, if I put it in

2   this fund, that makes everybody happy?

3       MR. AXELROD:  Well, it would be a start.  There are

4   other numbers you could use as a basis.  For instance, under

5   Sentencing Guidelines, there's a presumption of an extra ten

6   percent profit where there's an antitrust violation.  So, for

7   instance, the Court could take ten percent of sales and assume

8   that that is the unlawful profit and use that as the number to

9   go into the fund.

10      Just as the government is willing to accept its fine in

11  installments, the Court could allow Arctic Glacier to make its

12  deposits into the restitutionary funds on an installment

13  basis.

14      So, there're lots of creative ways to accomplish this, if

15  the Court's hands are not tied by an 11(c)(1)(C) Plea

16  Agreement that does not provide for it.

17      There are a couple of reasons why this sort of fund is

18  especially important.  First, when we talk about the

19  financials, we're talking about the income fund in Canada.  We

20  have no idea, no way to know, what the -- what the finances of

21  Arctic Glacier International, the U.S. operating entity, are.

22  I assume that that was in the Presentence Investigation

23  Report, but, again, since I haven't seen it, I don't know and

24  I certainly don't know what it says.

25      So, first, we at least have no idea what Arctic Glacier

85

1    has.  But, second, Arctic Glacier has the ability to be

2    sending money to Canada and making it that much more difficult

3    for civil litigants to whom the Plea Agreement would say

4    restitution is for the civil case, or the litigants in the

5    civil case would have that much more difficulty getting ahold

6    of money that has been upstream-ed to Canada.

7        So, if there aren't some sorts of restraint imposed on the

8    company, whatever available cash it has could be gone by the

9    time the civil litigants get to the point of any recovery.

10       In addition -- now, I'm not delving into speculation.  But

11   I can't say that I really know what this -- whether I'm right

12   about this.  I'm looking at again under Financial Position of

13   the Arctic Glacier financial statement.  And it at least

14   suggests that the company is prepaying debt, which, of course,

15   would lower -- lessen its cash position.

16       What it says in the second-to-last paragraph is that --

17   starting here.  It says, "A total of $28.1 million of cash was

18   applied to reduce debt following the suspension of

19   distribution."

20       Well, if it had previously -- if there had previously been

21   $28 million available for distributions, then the debts must

22   not have been due.

23       The company, it appears -- again, I'm sure that Arctic

24   Glacier will correct me if I'm wrong -- but it appears that

25   the company has suspended distribution to pay down debt that's

86

1   not currently due.  It's reduced its cash position.  It may

2   make it that much more difficult for the civil litigants to

3   recover if it engages in that sort of prepayment.

4       So, I identify this as a reason for concern that if the

5   Court doesn't impose some kind of restrain on this, then the

6   money simply will be gone.

7       Your Honor, again, this case -- there is a ton of smoke in

8   this case.  I don't pretend that I'm proving that the

9   conspiracy went beyond the -- southeastern Michigan.  I am

10  raising cause for concern that the Plea Agreement does not and

11  the charging instrument do not accurately describe what has

12  occurred and they suppress relevant conduct.

13      We believe the Court should ask some very pointed

14  questions for the government -- of the government before

15  considering further whether to accept the Plea Agreement.

16  I've written some of them down and this is just the beginning

17  of the list.  I'm sure we could come up with a thousand of

18  them.

19      But my first question for the government would be whether

20  information from either Mr. McNulty or Mr. Mowery was included

21  in the search warrant applications for the searches of the

22  premises of Home City and Reddy Ice.  Because if it was and

23  these were the government's informants, these were people the

24  government believed in and relied on, and so we ought to

25  believe in them and rely on them here when they both say quite

87

1    clearly that the conspiracy extended beyond southeast

2    Michigan.

3        Mr. Mowery told Your Honor on firsthand knowledge that the

4    conspiracy extended into Ohio.  Mr. McNulty tells the Court,

5    again on firsthand knowledge, that he was specifically told

6    that the conspiracy extended across the country.  So these

7    were the government's informants.

8        And if the government did include that information or did

9    include information from those two individuals in its search

10   warrant applications and he's now going to tell the Court that

11   they're not worthy of belief, that takes us to the second

12   question, which is if that were the case and the government

13   doesn't believe them credible, what steps have they taken to

14   correct the record with respect to search warrant affidavits

15   that are based on their testimony?

16       I also would suggest asking the government whether it has

17   contacted the attorney who filed the *Chamberlain* complaint

18   and/or sought to interview the confidential witnesses that are

19   described in that complaint, because they are people who are

20   very specifically described as senior executives and in a

21   position to observe what occurred.  So I think the Court

22   should be concerned if the government has not gone forward and

23   followed up on that sort of information.

24       Another good question would be whether the government has

25   asked large national supermarkets and convenience store chains

88

1   whether they sought to have Arctic Glacier, Home City, or

2   Reddy Ice sell outside of their allocated territory.

3      We've seen from Reddy Ice's financial statement and the

4   map that Reddy Ice prepared how the country was divided up.

5      The question would be, for instance, since California was

6   Arctic Glacier territory, have any of the grocery stores in

7   California ever tried to buy Reddy Ice?  And what was the

8   answer?  And the government ought to be asking those

9   questions.  I apologize for doing its investigation for it,

10   but it's certainly a legitimate question as to whether they've

11   done those sorts of things for the Court to have confidence

12   that the Court has the facts and that the facts are in -- or

13   that the conspiracy's accurately described in the charging

14   instrument and in the Plea Agreement.

15      Another good question would be what steps has the

16   government taken to investigate why Home City sells only to

17   Kroger in Tennessee, even though it has built distribution

18   facilities there sufficient to support business with lots of

19   other customers?  It doesn't make sense to build those

20   facilities and to sell only to Kroger, unless one looks at the

21   map and sees that that's not Home City's territory and that's

22   why they limit their business to Kroger.  Kroger is their

23   long-time customer from Ohio.  Kroger wants to do business

24   with them, but they've got to stay away from all the other

25   customers in Tennessee.  What steps has the government taken

89

1    to investigate that?

2         What steps has the government taken to investigate why

3    Home City doesn't compete with Arctic Glacier in California,

4    even though it has both manufacturing and distribution

5    facilities right there in the region so that they could sell

6    to a whole bunch of customers there?  Doesn't make sense to

7    build those facilities and then not use them.

8         These are just some examples of questions that we believe

9    the government should answer before the Court can have

10   confidence that this is a Plea Agreement that the Court should

11   accept.

12        And, so, the Court can ask those questions *in camera* to

13   preserve the secrecy of the government's investigation.  We

14   don't need to hear the answer.  We hope that the Court thinks

15   that you do.

16        For all of those reasons, Your Honor, we respectfully urge

17   that the Plea Agreement should be rejected.

18             THE COURT:  Let me ask some questions here.

19        Have you received notice of all public court proceedings?

20   And as far as I know you have.

21             MR. AXELROD:  Since my entry in the case, I believe

22   that I have.

23             THE COURT:  And I've not excluded you from any

24   hearings, have I?

25             MR. AXELROD:  You have been exceedingly gracious in

90

1   allowing me to speak and to make my arguments.

2          THE COURT:  And I've listened and encouraged you to

3   speak, in fact, and you have.

4      Have I been reasonable in that?  Or --

5          MR. AXELROD:  Your Honor, you have been more than

6   reasonable in that.

7          THE COURT:  And have you had the reasonable

8   opportunity or right to confer with the government attorney?

9          MR. AXELROD:  Yes, Your Honor, we have.

10         THE COURT:  And then the right to proceedings free

11  from unreasonable delay, I've tried to accommodate everyone on

12  the delay business.

13     Have I delayed you in any way?

14         MR. AXELROD:  No, Your Honor, you have not.  We

15  believe that we have received all of the rights to which we

16  are entitled under the Crime Victims' Rights Act, and more.

17         THE COURT:  Well, I thank you, and I do respect you

18  and I hope I'm trying to be fair.

19     And, therefore, that leaves the right to full and timely

20  restitution as provided by law.  Is that what we're talking

21  about?

22         MR. AXELROD:  That is certainly one of the things

23  we're talking about.

24         THE COURT:  All right.

25         MR. AXELROD:  That's our primary concern.

91

1          THE COURT:  Is there any other concern under the

2    Victims' Rights Act as the reason you're appearing here?  And

3    that's the reason that I'm listening, is because of the

4    Victims' Rights Act, other than the request for restitution or

5    the opportunity to gain restitution.

6          MR. AXELROD:  That's correct, Your Honor.  To extend

7    it a little further, since the civil case, pursuant to the

8    Plea Agreement, becomes the vehicle for restitution, we are

9    quite concerned that the company is now trying to get the

10   civil case dismissed.

11      We believe that among the options the Court would have,

12   for example, is to require the company, as a condition of

13   probation, to cooperate in the disclosure of the facts

14   concerning the full scope of the conspiracy, and that could

15   take the form of sitting for a deposition.  There're a variety

16   of different ways it could be done.  That's very similar to

17   what the Court does regularly in criminal tax cases where a

18   criminal tax defendant is required to cooperate with the IRS

19   in the assessment and collection of the tax.

20      Now, one could say, "Well, there are procedural safeguards

21   built into civil cases" --

22          THE COURT:  I wish you'd use the civil rights case as

23   an example rather than the tax case, because I have more fun

24   in civil rights cases.  I feel like I'm accomplishing

25   something there.

92

1          I'm sorry.  Go ahead.  Just --

2                MR. AXELROD:  I understand completely, Your Honor.

3                THE COURT:  -- choice of example.

4                MR. AXELROD:  But my overall point is, you know, if

5     by being ordered as a condition of probation to cooperate with

6     the civil claimant in the determining of the facts, if Arctic

7     Glacier were to lose some of its rights in the civil case -- I

8     mean, we take rights away from people in companies all time

9     when they're convicted of a crime.  That's one of the -- it's

10    part of the price you pay for conviction of a crime, is you

11    lose some of your rights.  You can lose your right to vote,

12    you lose your right to have a gun, and you could lose -- it

13    would not be offensive in any way for Arctic Glacier to lose

14    its rights to some of the procedural niceties and some of the

15    procedural devices and loopholes than it otherwise might be

16    able to use to resist discovery in the civil case.

17                THE COURT:  Wouldn't I be interfering with the

18    opportunity and jurisdiction of another federal judge in that

19    case under the circumstances of this case?

20                MR. AXELROD:  I understand the concern, but I do not

21    believe that would be the case if the Court simply ordered

22    Arctic Glacier to submit to an examination in this district.

23          I suppose -- I mean, if you were to make an order that

24    would intrude on that case, sure.  But if all you're ordering

25    is that they submit to examination in this district, in this

93

1    case, as a condition of their probation, I think the answer is

2    no.

3          THE COURT:  That is not one of the victims' rights in

4    this case, is it?  You would not be party to that -- that

5    interview, would you?

6          MR. AXELROD:  Well, you could make us parties to

7    them.  There are cases that we cited in our objections where

8    courts have done exactly that, where courts have used a

9    criminal case to effect restitution for civil claimants.  I

10   mean, I can --

11         THE COURT:  I'll accept your representation.

12         MR. AXELROD:  The cases are there, Your Honor.

13         THE COURT:  I understand.

14     All right.  Thank you.

15         MR. AXELROD:  Thank you very much, Your Honor.

16   Again, I appreciate your patience in listening to me.

17         THE COURT:  And, Darlene, I'll hand these to you now

18   so that I don't get them confused.  I don't know whether

19   they're all there or not.  I think so.  And here's this

20   affidavit.

21     Is there any other victim that wants to speak?

22     (No response.)

23         THE COURT:  I guess then it's time for the government

24   to justify its Plea Agreement.  And as I understand it, the

25   intention of the parties and the resolution of the Court now

94

1    includes my right of imposing a sentence of probation,

2    probation and a fine, and a fine.

3        So, I understand it.  And I understand that the fine that

4    I can impose is limited to the $9 million.  I mean, I'm not

5    trying to change that at all, because that is the definite

6    agreement in there, and it's either $9 million or I don't

7    approve the agreement.

8        And the probation will be administered, if we get to that

9    part of the proceedings, under Chapter 8 of the Sentencing

10   Guidelines.

11       Please justify your position, Mr. Culum.

12       (The Court and court reporter confer privately.)

13            THE COURT:  Proceed, Mr. Culum.

14            MR. CULUM:  Thank you, Your Honor.  Considering how

15   late it is, I'm not sure that I need to add more to what I

16   said earlier.

17            THE COURT:  Please do.

18            MR. CULUM:  Okay.  I shall.

19            THE COURT:  Please add a lot.  And if it takes

20   several days, that's fine, too --

21            MR. CULUM:  Okay.

22            THE COURT:  -- because I want to afford your position

23   every opportunity to justify it.

24            MR. CULUM:  Thank you, Your Honor.

25       In total, particularly with the addition of the probation

95

1    which does allow for change in conditions on the part of

2    Arctic Glacier to pay the $9 million over time, it allows the

3    Probation to oversee the distribution of this fine amount of

4    $9 million, because certainly when we agreed to the

5    $9 million, we were very concerned about the victims of the

6    crime in this case and that they would be entitled to

7    restitution.  And we crafted what we believed was a fine that

8    allowed the paying of a fine to the United States, which the

9    United States, the people, are entitled to.  There was

10   criminal conduct and there should be a fine imposed, and we

11   feel very -- that is an important part to prevent future

12   conduct from occurring.

13        (Mr. Kohnen exits the courtroom.)

14        MR. CULUM:  Likewise, we are concerned about the

15   victims.  And I note that the direct victims who I did call

16   again last week and asked specifically, "Are you planning to

17   appear here today?" and they said, one, they were aware of the

18   hearing, and, two, no, they were -- they were thankful for the

19   work we had done and they will continue to pursue their claims

20   in this civil court up in the Eastern District of Michigan.

21        THE COURT:  How many are there?

22        MR. CULUM:  Well, I talked to the counsel -- it's the

23   Kohn law firm.  In particular it was Bill Hoese that I spoke

24   with.  So, they represent theoretically all of the

25   class-action plaintiffs there, the plaintiffs, the

96

1    class-action plaintiffs.  There may be opt-outs along the way.

2        Certainly, we had talked to certain people who are

3    considering opting out and they, too -- at least the two that

4    I talked to -- were aware of the hearing here today and they

5    are not here.

6        Getting back to --

7            THE COURT:  Can you give me an estimate, a ballpark

8    figure?

9            MR. CULUM:  Sure.  Well, there's the direct class --

10   and forgive me, Your Honor, and I may defer to Mr. Majoras.  I

11   don't understand the civil class-action lawsuit.  Barely at

12   all.

13       My understanding is at this point the class-action counsel

14   has been identified.  They have filed a complaint.  My

15   understanding is Arctic Glacier and other companies involved

16   have filed responses.

17       I understand that Home City has filed a preliminary

18   settlement agreement with counsel for the plaintiffs -- for

19   the class -- settlement of the class.

20       At some point people, victims of the crime, the direct

21   purchasers of ice from Arctic or Home City, people who are

22   actually the victim of the crime, direct and proximately

23   harmed, there may be some that choose to opt out.  I do not

24   know how many potential opt-outs there could be.  But

25   certainly in terms of the number of customers in the southeast

97

1    Michigan, it's hundreds, potentially thousands.

2        Clearly, we have -- I'm not sure.  I'll go a little bit

3    off schedule.  We filed our newspaper ad December 20th, 2009,

4    as -- as defined by the statute, by the order of this Court.

5    It was -- it was run in the Detroit papers, and we didn't

6    receive a lot of phone calls, but we certainly provided the

7    notice of this.  The number of people who appeared here I

8    think are indicative of our notice being satisfactory.

9        But the people that I do know that are considering it,

10   obviously the class-action counsel, they are not here.  And

11   two individuals -- two people representing companies, that I

12   would prefer not to name in open court, are aware of the

13   hearing and they're not here as well.

14           THE COURT:  Now, the volume of commerce is

15   $50.7 million.

16           MR. CULUM:  Correct, Your Honor.

17           THE COURT:  And I have heard today that a bag of ice

18   costs under $2.

19           MR. CULUM:  I believe that the $2 figure that

20   Mr. Mowery referred to was a retail price of ice.  The

21   $50 million figure was determined from the wholesale price,

22   which is the price that Arctic sells to its customers.  So,

23   the $50 million is developed from the wholesale price.  I

24   think Mr. Mowery's referring to the retail price, which is --

25   a convenience store has a right to charge what it can

98

1    independently.

2            THE COURT:  And what I'm trying to get at, does that

3    help me in knowing the number of customers up there at all?

4            MR. CULUM:  I don't think so.

5            THE COURT:  Okay.

6            MR. CULUM:  I don't think so.

7            THE COURT:  But we're talking hundreds?

8            MR. CULUM:  I believe --

9        Do you guys know?

10           MR. MAJORAS:  Your Honor, I don't have a number.  But

11   I can offer the Court, I think, in terms of using common

12   experience as to who the direct buyers of ice would be, if you

13   think of anyplace that one would go to buy retail ice -- a gas

14   station, a convenience store, a grocery store -- all of these

15   are direct buyers of ice.  I don't know the exact number in

16   the southeast Michigan area.  Certainly it's in the hundreds.

17   May well exceed a thousand.

18           THE COURT:  But if it's under terms of this

19   conspiracy at least while it existed, it would have been all

20   the people that sold ice.

21           MR. CULUM:  Who purchased ice from --

22           THE COURT:  Who purchased ice from Arctic --

23           MR. MAJORAS:  In the affected area.

24           THE COURT:  In the affected area.

25           MR. MAJORAS:  Yes.

99

1          THE COURT:  And that would be thousands.

2          MR. MAJORAS:  I'm quite certain it's over a thousand.

3     I just don't have a number that I can represent to the Court.

4          THE COURT:  Thank you.  All right.

5          MR. CULUM:  Your Honor, with the addition of the

6     probation, it allows the -- the Plea Agreement allows for the

7     possibility that Arctic's financial condition will improve or

8     deteriorate.  But it allows modification, if necessary, to

9     provide for victims who may have been harmed from this -- from

10    this conspiracy.  At the same time -- so it provides for the

11    possibility for restitution, but it provides for the

12    punishment that's necessary to prevent further crimes in this

13    case.

14         THE COURT:  Explain how does it provide for

15    restitution if I can't determine in this -- this proceeding?

16         MR. CULUM:  What I -- what I mean, and I'll be more

17    explicit, is if, for example, three years down the road the

18    class plaintiffs obtain an order of -- a settlement or a civil

19    judgment against Arctic Glacier for X amount, and Arctic says,

20    "We cannot pay X amount because we owe the money to the

21    government," at that time, because of the probation, we could

22    come back, and are willing to come back, and either re -- you

23    know, reconfigure the numbers if we need to, or forego the

24    money if we have to.  But certainly the government, the United

25    States, has an interest in obtaining the $9 million, but we

1    believe that the probation allows us to impose a fine today.

2    And if circumstances in the future prevent the payment of

3    that, it will allow this Court, you in particular, to address

4    the issue if a civil judgment is not being able to be paid

5    because of the fine to the United States, which, my

6    understanding at least, is not all of the concerns of

7    Mr. Axelrod, but at least one of the concerns of Mr. Axelrod.

8                THE COURT:  What about the scope of the conspiracy?

9                MR. CULUM:  Your Honor, a criminal case is built on

10   evidence.  It's not built on smoke.  The idea that there's a

11   nationwide conspiracy, we have looked, we will continue to

12   look, we have not found it.

13       I reviewed the evidence.  My boss, the chief of the

14   Cleveland Field Office, has reviewed the evidence.  And not

15   only all the evidence -- his boss, the director of Criminal

16   Enforcement in the Antitrust Division, he reviewed the

17   evidence.

18       The Deputy Assistant Attorney General for the Criminal

19   Enforcement, he reviewed the evidence, and the Assistant

20   Attorney General reviewed the evidence.

21       All of the evidence -- we have not found a nationwide

22   conspiracy.  And though you're not specifically asking, I

23   think that there was a bit of a misrepresentation or

24   misunderstanding concerning my letter to Judge Borman.  This

25   was a nationwide investigation.  We were looking all over the

101

1   country to try to find antitrust conspiracy, and we continue
2   to look all over the country.
3       In this case, in the case before you, we found one.  We
4   found one in southeastern Michigan.  If we had found one where
5   everyone was together in a smoke-filled room, I assure you we
6   would have charged it.  We didn't find it.  And we will keep
7   looking.  And if for some reason we find it, I will let you
8   know.  But I don't think I'm going to find it.
9           THE COURT:  Well, you had --
10          MR. CULUM:  I'm sorry, but I get upset that -- the
11  implication I have not done my job, Mr. Lyon has not done his
12  job, anyone else at the Department has not done their job.
13  It's offensive to me and it is wrong.  We have done our job
14  and we did not find a nationwide conspiracy.  Apart from what
15  they may want us to find, they talk about smoke, I know about
16  the smoke, I've looked to see if there's any burning fire, I
17  haven't found it.
18          THE COURT:  There would be -- that would be a
19  different conspiracy than you've charged.
20          MR. CULUM:  Correct, Your Honor.
21          THE COURT:  So, the conspiracy that you've charged,
22  and is the one that is before me, is the one in southeastern
23  Detroit area, Michigan?
24          MR. CULUM:  Correct, Your Honor.
25          THE COURT:  And that -- you're exercising your

1    prosecutorial discretion in reaching that conclusion?

2            MR. CULUM:  Absolutely, Your Honor.

3            THE COURT:  Now, the -- well, I can ask the defendant

4    this or I'll ask you.  There is a financial statement stated

5    in the Plea Agreement -- or in the Presentence Report.  I

6    don't want to go into it, because evidently it confirms the

7    financial disarray of the company.

8        But maybe you could explain to me this setup that the

9    company has about trust, interest, rather than stock and so

10   forth, if you know.

11           MR. CULUM:  Your Honor, I will gladly take a shot.

12   However, the income trust is a unique Canadian corporate

13   structure.  And for me to try to explain it would be -- I

14   would defer to counsel for --

15           THE COURT:  Well, let me ask you -- well, all right.

16   That can be explained then.

17           MR. CULUM:  May I address one of your concerns --

18           THE COURT:  Sure.  Sure.

19           MR. CULUM:  -- and that is the concern of the money

20   going upriver?

21       Certainly, Your Honor, Arctic Glacier owns significant

22   assets in the United States.  If they were going to attempt to

23   run from a civil judgment that could be obtained in the

24   Eastern District of Michigan, I think is absurd.

25       Their business is in the United States.  They have

103

1    facilities in Canada, but the bulk of their sales are in the

2    United States.

3        For them to try to shelter their assets into the -- into

4    Canada is absurd.  They have hard assets in the United States.

5    If a civil judgment is obtained, if worse comes to worst, they

6    could attach the plants, the assets here in the United States.

7        I'm not -- I'm not a civil remedy person, but it just

8    seems absurd to me this idea that a company that is doing

9    business in the United States, obtains the vast majority of

10   their revenue from the United States, would not -- would be

11   able to shift their revenue to Canada and make it unobtainable

12   to a civil judgment obtained in the United States.

13       And I defer, because I'm not a civil lawyer.  I'm a

14   criminal lawyer.  I tried to find fire where there was smoke.

15   But my sense of what would occur is that I don't think that is

16   an issue, but I defer to Mr. Majoras and to your experience as

17   a judge, because I'm not -- I'm not a civil lawyer.

18           THE COURT:  But as I understand it, that the money

19   that Mr. Axelrod referred to was the quote -- and I'll use an

20   inappropriate term -- the "dividends" they paid.  They cut off

21   the dividends to these holders of these instruments.  Is that

22   correct?  In other words, like Fifth Third did, for example.

23           MR. MAJORAS:  I'll comment specifically about Arctic,

24   Your Honor.  But, yes, the payments were made to the unit

25   holders on an annual basis and those were suspended as a

104

1    requirement to obtain a financing to keep the company running.

2         THE COURT:  And then that is, from my inexperience,

3    like a dividend?

4         MR. MAJORAS:  Yes, sir.

5         MR. CULUM:  Any further questions of me, Your Honor,

6    in terms of establishing why this Plea Agreement should be

7    accepted?

8         THE COURT:  As I understand it, the issue raised by

9    the alleged victims before this Court deal with their rights

10   under the Victims' Act.  The Victims' Act specifically says

11   that you retain the right of your prosecutorial discretion.

12   I'll cite the number later on.

13        MR. CULUM:  Thank you, Your Honor.

14        THE COURT:  But that's what we're talking about here.

15     And, Mr. Axelrod, I'll give you your shot later.

16        MR. AXELROD:  Thank you, Your Honor.

17        THE COURT:  I saw you out of the corner of my eye.

18   I'm watching you.

19     But we get to the question that I've asked you in the

20   other sentencings:  The best-effort requirement.

21        MR. CULUM:  Thank you, Your Honor.

22     In terms of the notice to the victims pursuant to 18

23   U.S.C. 3771, it enumerates a number of rights entitled to

24   crime victims.

25     18 U.S.C. 3771(d)(2) recognizes the difficulties

1  associated with cases in which multiple victims, as in this

2  case where we may have thousands of victims, to accord the

3  rights discussed in 18 U.S.C. 37'(d) -- or 37'(a), excuse me,

4  to all victims -- in other words, sometimes it's hard to

5  provide notice of public proceedings which is an enumerated

6  right within 3771 to all the victims.  So, in this case it

7  allows you, the district court judge, to fashion a reasonable

8  procedure to accord such rights.

9      Here, the Antitrust Division asks you to establish such a

10  reasonable procedure and we did so.  And we agreed that -- we

11  fashioned a reasonable procedure.  And that procedure -- first

12  and foremost, the Antitrust Division was going to provide

13  notice to crime victims via our Web site, and, secondarily, to

14  provide notice of the notice through the Detroit papers.  That

15  notice was run December 20th, 2009, in the Sunday -- in a

16  widely circulated paper in the Detroit -- in *The Detroit Free*

17  *Press*.

18      The United States believes that this procedure has

19  satisfied the dictates of 18 U.S.C., Section 37'(d)(2) without

20  unduly complicating or prolonging these proceedings.

21      And for the record, we note the various victims who have

22  appeared here today as an indication that the victims have

23  been notified of all public proceedings.  And again as I

24  mentioned earlier, we did notify Class Counsel for the victims

25  of this proceeding and they have chosen not to be here.

106

1      THE COURT:  Now, does the assets that are listed in

2  the Presentence Report, are they the assessments of the Arctic

3  Glacier International, the mother company?

4      MR. MAJORAS:  Yes, sir.  They're a consolidated

5  statement.

6      THE COURT:  It's a consolidated statement.

7  So, this is an accurate statement that I can rely on as

8  the total liabilities and equity of the mother -- of the

9  entire company.

10      MR. MAJORAS:  Yes, sir.

11  There is one additional point that I'd like to raise

12  related to the issues that you're talking about and it is

13  something that is occurring, I believe, as we sit here.

14      As we had indicated to the Court in our prior hearings,

15  the company had been seeking refinancing of debt obligations

16  that were coming due on January 1.  The company was able to

17  extend that period, the due date of those obligations, to

18  March 1 of this year.

19      Just yesterday -- within the last day or two, a deal for

20  refinancing did close for those debt obligations.

21      I'm just reminded this is not public information, Your

22  Honor.  That is why I'm hesitating.

23      THE COURT:  Well, don't go into it.

24      MR. MAJORAS:  Thank you.

25      THE COURT:  I appreciate that you're leveling with

1    me, but I don't want to recess again and go into chambers.

2         MR. MAJORAS:  And, Your Honor, I did disclose parts

3    of this information to the probation officer prior to today.

4         THE COURT:  And I understand that it was the original

5    intent of the Board of Directors and the corporation to plead

6    guilty to a Rule 11(c)(1)(C) Plea Agreement that included my

7    right to -- or included the sentence of probation with

8    conditions that are provided for in Chapter 8 of the

9    Sentencing Guidelines.

10        MR. MAJORAS:  Yes, sir.

11        THE COURT:  All right.

12    Okay, Mr. Axelrod, you get the last word.

13        MR. AXELROD:  I will be very brief, Your Honor.

14        THE COURT:  You'd better be.

15        MR. AXELROD:  One minor point.  I spoke to lead

16    counsel for the class of directs last night, and he asked me

17    to say he neither endorses nor opposes anything that's going

18    on.

19        THE COURT:  I would imagine that he would --

20        MR. AXELROD:  He has no dog in the fight.

21    Mr. Culum has told the Court that the evidence has been

22    reviewed up through the Assistant Attorney General.  And, I

23    mean, I'm sure in the *Bank of America* case the same thing

24    could have been said.  And I don't mean to impugn anyone.  I

25    mean only to say that there can be all levels of review and

1  you still don't necessarily achieve the right results, because

2  different people have different interests.  And, so, the

3  review certainly didn't solve the problems there and we don't

4  believe that they solve them here.

5          THE COURT:  And that's why my friends are

6  downstairs --

7          MR. AXELROD:  I understand.

8          THE COURT:  -- on the fifth floor.

9          MR. AXELROD:  Your Honor has talked several times

10 about prosecutorial discretion.  And while Mr. Culum clearly

11 has all the discretion in the world as to what he charges,

12 there are some areas where there is no discretion.

13     Under 1B1.3 of the Sentencing Guidelines, certain things

14 are relevant conduct.  And even if they're not part of the

15 same conspiracy, they are relevant conduct.

16         THE COURT:  Where does it say that in the Guidelines?

17 Because it's my impression after reading the Guidelines that

18 the restitution is limited -- my right to order restitution is

19 limited to the crime of conviction.

20         MR. AXELROD:  Your Honor, I'm not prepared to dispute

21 that.

22         THE COURT:  That's my understanding.  That

23 restitution -- now this isn't loss.  This isn't Guideline base

24 offense or anything.  This is just hard, fast restitution,

25 which is the same as a judgment, in my opinion.  That the

109

1  person can leave this room and go down and get a certificate

2  of judgment for the restitution that I order.

3      But it's my understanding that restitution -- the amount

4  of restitution is limited to the crime of conviction.

5          MR. AXELROD:  As far as I know, Your Honor, you're

6  correct.  That was not the point, however, that I was making.

7          THE COURT:  All right.

8          MR. AXELROD:  The point that I was making is, if

9  there were -- if there were customer-allocations and

10  territorial-allocation conspiracies throughout the United

11  States in packaged ice and one were able to say -- I don't

12  know how this could be -- but one were able to say they were

13  not part of the conspiracy in southeast Michigan but Arctic

14  Glacier was involved, under the Guidelines that would all be

15  relevant conduct.  And there is no prosecutorial discretion to

16  withhold information.

17      Again, I go back to my theme, which is that we ought to

18  have some sunlight.  If Mr. Culum doesn't have enough evidence

19  to prove those things beyond a reasonable doubt, fine.  I

20  don't know -- I can't imagine why he resists disclosing what

21  he's got regarding a nationwide conspiracy.  If not to me,

22  then to the probation officer and to the Court.  And until the

23  Court can be satisfied with disclosure, the commentary to

24  1B1.8 specifically says that it does not authorize the

25  withholding of information.  It says what can be done with

110

 1    that information, but it does not authorize the withholding of

 2    information.

 3        So, whether I ever get to hear it or not, until the Court

 4    is satisfied that you heard what evidence there is of

 5    conspiracy that extends beyond southeast Michigan, I believe

 6    that the Court should not accept the Plea Agreement.

 7            THE COURT:  Your -- as I've tried to focus, your

 8    authority to appear in this case is to seek restitution for

 9    the people you represent.

10            MR. AXELROD:  I do not believe the Crime Victims'

11    Rights Act is limited in that way.

12            THE COURT:  I went through your rights with you on

13    that, and I asked you did -- did -- did you get this, and you

14    said, "Yes, except restitution."

15            MR. AXELROD:  Well, I said yes, you have given me all

16    of the procedural rights to appear and speak.  My comments --

17            THE COURT:  But restitution is still an open issue?

18            MR. AXELROD:  Restitution is still an open issue.

19            THE COURT:  And that's why you're here.

20            MR. AXELROD:  Well, I'm here for an additional

21    reason, Your Honor.

22            THE COURT:  For the interest of justice, I imagine.

23            MR. AXELROD:  You know --

24            THE COURT:  You're not an *amicus curiae*.  You're here

25    as a victim.

111

1          MR. AXELROD:  I wasn't going to say for the interest

2    of justice, Your Honor.

3        I'm here because restitution has been moved to the civil

4    case and they're seeking to dismiss the civil case.  And

5    they're seeking to dismiss it because the allegations aren't

6    specific enough.  The allegations aren't specific enough

7    because, at least in part, because the evidence here has not

8    been disclosed.

9        Whether the Court takes the Plea Agreement or not, the

10   evidence should be disclosed, and then we can get on with

11   figuring out what the restitution should be in the civil case.

12          THE COURT:  All right.  Thank you.

13          MR. AXELROD:  Thank you, Your Honor.

14     (The Court and court reporter confer privately.)

15          THE COURT:  We'll have a fifteen -- ten-minute

16   recess.

17          THE CLERK:  All rise.

18     (At 3:52 p.m., a recess was taken.)

19                    *   *   *          (4:04 p.m.)

20          THE COURT:  Please be seated.

21     Is the United States ready to proceed?

22          MR. CULUM:  Yes, Your Honor.

23          THE COURT:  Defense ready to proceed?

24          MR. MAJORAS:  Yes, Your Honor.

25          THE COURT:  The Court will proceed with its

112

1  sentencing at this time, and I will, of course, give the -- if

2  I agree or disagree with the Plea Agreement, I will give the

3  defendant an opportunity to withdraw his plea of guilty.  But

4  we'll see what comes.

5      The defendant has appeared here in court today, and the

6  purpose of our meeting was the sentencing of the defendant.

7      The defendant pled Guilty to a one-count Information

8  pursuant to a Rule 11(c)(1)(C) Plea Agreement that provided

9  for the appropriate sentences provided by law.  I will

10 specifically state the law later on.

11     Pled Guilty to Conspiracy to Restrain Trade in violation

12 of Title 15, Section 1 of the United States Code, which is a

13 Class C felony.

14     Pursuant to Title 18 United States Code, Section 3553, the

15 Court makes the following findings of relevant facts, relevant

16 facts, to impose -- for the imposition of sentence.

17     The defendant is guilty of violating Title 15, Section 1,

18 which subjects defendant to a $400 special assessment, a fine

19 of $1 million, or twice the pecuniary -- the pecuniary gain or

20 loss, or up to five years' probation, restitution, forfeiture

21 and order of notice.

22         MR. CULUM:  Your Honor, I believe it's 100 million.

23 I think you said one million.

24         THE COURT:  Did I say -- well, thank you.  I've got

25 100 million written here.

113

1          MR. CULUM:  I'm sorry, Your Honor.

2          THE COURT:  No, no.  No, no.  I probably said one

3    million.  I'm not used to hundred million dollars, although

4    I've granted judgments in that amount.

5       The offense concluded on July 17, 2007.

6       And, please, point out anything that I might omit in my

7    discourse.

8       The defendant entered a plea of guilty on November 10,

9    2009.  The provisions of the Antiterrorism and Effective Death

10   Penalty Act of 1996 apply because the commission of the

11   offense occurred after April 24, 1996, and the applicable

12   sentencing Guideline Manual is the 2009 edition.

13      The addendum to the Presentence Report discloses that no

14   objections remain for resolution by the Court.  The Court

15   understands, of course, that the victims, alleged victims,

16   have entered their appearance and have argued their positions

17   in this case.

18      Pursuant to Title 18 United States Code Section

19   3663(a)(1)(A), the Court, when sentencing a defendant

20   convicted of an offense under Title 18, certain sections of

21   Title 21 or Title 49, may order the defendant to pay

22   restitution to the victim of the offense.

23      For purposes of this section, the term "victim" means a

24   person directly and proximately harmed as a result of the

25   commission of the offense for which restitution may be

114

1    ordered.

2        All the information received by the Court in this case,

3    including the pleadings filed in this case, convinces the

4    Court that the conspirators were the two ice companies, the

5    victims were their customers who purchased ice in Michigan,

6    and the conspiracy charged in this case restrained and

7    affected the volume of commerce enjoyed by Arctic Glacier in

8    the amount of 50,000 -- $50.7 million in Michigan.  The object

9    of the conspiracy was to allocate exclusive sales territories

10   for Home City Ice Company and Arctic Glacier in Michigan.

11       The Supplemental Addendum to the Presentence Report

12   discloses that two requests for restitution have been received

13   by the Probation Office in this case by persons claiming to be

14   victims of Arctic Glacier.  Mr. Gary Mowery, a former owner of

15   an ice company in Grand Rapids, Ohio, acquired by a

16   co-conspirator in this case, claims he was paid too little for

17   his company because of the existence of the allocation

18   agreement.  Mr. Martin McNulty, a former employee of Arctic

19   Glacier International, claims he is a victim because he

20   refused to participate in the allocation conspiracy and was

21   fired and blackballed in the ice business.

22       Additionally, the record discloses requests to reject the

23   Rule 11(c)(1)(C) sentencing agreement.

24       Pursuant to 18 United States Code, Section 3771, the

25   Crimes Victims' Rights, the rights of crime victims are:

1     A crime victim has the following rights:

2     The right to be reasonably protected from the accused;

3     The right to reasonably [verbatim] accurate, and timely

4  notice of any public court proceeding or any parole

5  proceeding, involving the crime or of any release or escape of

6  the accused;

7     The right to not be excluded from any such public court

8  proceedings, unless the Court, after receiving clear and

9  convincing evidence, determines that testimony by the victim

10  would be materially altered if the victim heard other

11  testimony at that proceeding;

12     The right to be reasonably heard at any public proceeding

13  in the district court involving release, plea, sentencing, or

14  any parole proceeding;

15     The right -- the reasonable right to confer with the

16  attorney for the government in the case;

17     The right to full and timely restitution as provided in

18  law;

19     The right to proceed free from unreasonable delay;

20     The right to be treated with fairness and with respect for

21  the victim's dignity and privacy.

22     Best efforts to accord rights:

23     The officer and employees of the Department of Justice and

24  other departments and agencies of the United States engaged in

25  the detection, investigation, or prosecution of crime shall

116

```
1   make their best efforts to see that crime victims are notified

2   of and accorded the rights described in subsection (a).

3       Section (d), Enforcements and Limitations:

4       The crime victim or the crime victim's lawful

5   representative and the attorney for the government may assert

6   the rights described in subsection (a).  A person accused of

7   the crime may not obtain any form of relief under this

8   chapter.

9       Multiple Crime Victims:

10      In the case where the Court finds that the number of crime

11  victims makes it impractical to accord all the crime victims

12  the rights described in subsection (a), the Court shall

13  fashion a reasonable procedure to give effect to this chapter

14  that does not unduly complicate or prolong the proceedings.

15      Nothing in this chapter shall be construed to authorize a

16  cause of action for damages or to create, to enlarge, or to

17  imply any duty or obligation to any victim or other persons

18  for the breach of which the United States or any of its

19  officers or employees could be held in damages.  Nothing in

20  this chapter shall be construed to impair the prosecutorial

21  discretion of the Attorney General or any officers under his

22  discretion.

23      Pursuant to 3964 (verbatim)(c), the provisions of this

24  chapter, the Chapter 227 -- or Chapter 227 and Rule 32(c) of

25  the Federal Rules of Criminal Procedure shall be the only
```

1   rules applicable to proceedings under this section.

2       The Court determines the victims of the offense in this

3   case were the customers of the conspirators located in the

4   southern -- in Michigan and Detroit, Michigan area.  The count

5   of conviction is a violation of 15 United States Code, Section

6   1, which is not listed -- which is not a listed offense under

7   18 United States Code, Section 3663(a)(1)(A).

8       The offense of conviction charges a conspiracy to allocate

9   packaged ice customers in southern Michigan and the Detroit,

10  Michigan area by and between Home City Ice and Arctic Glacier.

11      Mr. Mowery is not claiming restitution as a customer of

12  the defendant, rather as a former competitor.  He is not

13  located in Michigan.  The count of conviction is a violation

14  of 15 United States Code, Section 1, which is not a listed

15  offense under 18 United States Code, Section 3663(a)(1)(A).

16  He is not a victim of the offense charged in the case.

17      Mr. McNulty was an employee of defendant, not a customer.

18  There is no evidence he was directly or proximately harmed by

19  the conspiracy.  The court [verbatim] of conviction is a

20  violation of 15,000 -- or of 15 United States Code, Section 1,

21  which is not a listed offense under 18 United States Code,

22  Section 3663(a)(1)(A).  He is not a victim of the offense

23  charged in this case.

24      Pursuant to 18 United States Code, Section 3663, the

25  defendant [verbatim], in determining whether to order

118

1 restitution under this section, shall consider:

2     (I) the amount of the loss sustained by each victim as a

3 result of the offense; and

4     (II) the financial resources of the defendant.  The

5 financial needs and earning ability of the defendant and the

6 defendant's dependents and such other factors as the Court

7 deems appropriate.

8     To the extent that the Court determines that the

9 complications and prolongation of the sentencing process

10 resulting from the fashioning of an order of restitution under

11 this section outweighs the need to provide restitution to any

12 victim, the Court may decline to make such an order.

13     In this case, the victims would be the customers of Arctic

14 Glacier who did not benefit from competition in their

15 respective areas.  Determining a restitution figure is

16 difficult due to the nature of the offense.  Allocation of

17 customers, rather than price fixing, make quantifying damages

18 difficult, if not impossible to determine.

19     Pursuant to United States Sentencing Guidelines

20 8B1.1(b)(2), this Court finds from the facts on the record

21 that determining complex issues of fact related to the cause

22 or amount of the victim's losses would complicate or prolong

23 the sentencing process to a degree that the need to provide

24 restitution to any victim is outweighed by the burden on the

25 sentencing process.  Thus, no restitution order can be made.

1    Arctic Glacier pled guilty pursuant to the Federal Rules

2    of Criminal Procedure 11(c)(1)(C) Plea Agreement.  In it, the

3    parties stipulated to what they believe is the appropriate

4    sentence in this case:  A sentence requiring defendant to pay

5    to the United States a criminal fine of $9 million payable in

6    installments on a schedule set forth in the Plea Agreement

7    over a five-year time span and a $400 special assessment.

8        The Court also notes that they have also agreed in the

9    sentencing agreement that the Court may impose probation and

10   under the Chapter 8 of the United States Sentencing

11   Guidelines.

12       The Court has an independent obligation to ensure that the

13   stipulated sentence is sufficient, but not greater than

14   necessary, to comply with the purposes set forth in 18 United

15   States Code, Section 3553(a).

16       Once a district court accepts a Federal Rule of Criminal

17   Procedure 11(c)(1)(C) Plea Agreement, it is bound by the

18   bargain.  I'm omitting the cited references.  "The district

19   court is not authorized to go beyond the confines of a Rule 11

20   in accepting or rejecting plea agreements."  "Nothing in the

21   rules even remotely allow the district court to accept a

22   guilty plea but rewrite the plea agreement, if the

23   modification agreement is more favor -- even if the

24   modification agreement is more favorable to the defendants."

25   I'm omitting the cite.  Furthermore, this Court has yet to

120

1   adopt a position that a district court may modify or reform a

2   Rule 11(c)(1)(C) sentencing on the basis of a mutual mistake

3   of facts.  See *United States versus*, P-E-V-E-L-E-R, 359

4   Fed.3d. at 369, and it's page 7 -- excuse me, 378, Note 4, and

5   that's a Sixth Circuit case.

6       "Plea agreements are contractual in nature.  In

7   interpreting and enforcing them, we are to use traditional

8   principles of contract law."  I'm omitting the cite.

9   Moreover, "any ambiguities in the language of a plea agreement

10  must be construed against the government."

11      A sentencing court can, of course, reject the results of a

12  plea negotiation if it concludes that the resulting agreement

13  is not sufficient under 18 United States Code, Section

14  3553(a).  I'm omitting the cite.  (Continuing) Holding that

15  the district court did not abuse its discretion by concluding

16  the plea would not adequately represent the defendant's

17  criminal conduct or a decision that a plea bargain will result

18  in the defendant's receiving too light a sentence are sound

19  reasons for a judge's refusing to accept the agreement.

20  Others have looked to whether the Plea Agreement complies with

21  and advances the purposes of criminal sentencing as expressed

22  in Congress.  Judge Posner observing -- observed that 3553(a)

23  sentencing factors can provide a standard for evaluating the

24  acceptability of a plea agreement.  I'm omitting the cite.

25      The Court inquires -- the Court's inquiry into whether a

1    plea agreement is sufficient must be based on an

2    individualized analysis of the specific facts presented by the

3    case.

4        The statutes provide some guidance.  Pursuant to 18 United

5    States Code 3551, we are instructed as to the sentence we can

6    impose against an organization.  I'm going to read it for

7    record:

8        "Exempt as otherwise specifically provided, a defendant

9    who has not been found guilty -- excuse me -- a sentence

10   [verbatim] who has been found guilty of an offense described

11   in any federal statute, including Section 13 and 1153 of this

12   title, other than an Act of Congress applicable exclusively in

13   the District of Columbia or the Uniform Code of Military

14   Justice, shall be sentenced in accordance with the provisions

15   of this chapter so as to achieve the purposes set forth in

16   subparagraphs (A) through (D) of Section 3553(a)(2) to the

17   extent that they are applicable in the light of all the

18   circumstances of the case."

19       Section (c) Organizations:

20       An organization found guilty of an offense shall be

21   sentenced in accordance with the provisions of Section 3553,

22   to:

23       (1) a term of probation as authorized by subchapter B; or

24       (2) a fine as authorized by subchapter C.

25       A sentence to pay a fine may be imposed in addition to a

1    sentence of probation.  A sanction authorized by Sections

2    3554, 3555 or 3556, may be imposed in addition to the sentence

3    required by this subsection.

4         Pursuant to 18 3553(a)(2), the sentence needs -- the need

5    for the sentence imposed to...

6         Reflect the seriousness of the offense, to promote respect

7    for the law, and to provide just punishment for the offense;

8         To afford adequate deterrence to criminal conduct;

9         To protect the public from further crimes of the

10   defendant; and

11        To provide the defendant with needed educational or

12   vocational training, medical care, or other correctional

13   treatment in the most effective manner.

14        Section 18 United States Code, Section 3572, the factors

15   to be considered:

16        In determining whether to impose a fine and the amount,

17   time for payment, and method of payment of a fine, the Court

18   shall consider, in addition to the factors set forth in

19   3553(a) whether the defendant can pass on to consumers or

20   other persons the expense of the fine; and

21        If the defendant is an organization, the size of the

22   organization and any measures taken by the organization to

23   discipline any officer, director, employee, or agent of the

24   organization responsible for the offense and to prevent a

25   reoccurrence of such an offense.

1       The fine's not to impair the ability to make restitution:

2       If, as a result of a conviction, the defendant has the

3   obligation to make restitution to a victim of the offense,

4   other than the United States, the Court shall impose a fine or

5   other monetary penalty only to the extent that such fine or

6   penalty will not impair the ability of the defendant to make

7   restitution.

8       Responsibility for payment of monetary obligations

9   relating to an organization:

10      If a sentence includes a fine, special assessment,

11  restitution, or other monetary obligation -- including

12  interest -- with respect to an organization, each individual

13  authorized to make disbursements for the organization has a

14  duty to pay the obligation from assets of the organization.

15  If such an obligation is imposed on a director, officer,

16  shareholder, employee, or agent of an organization, payments

17  may not be made, directly or indirectly, from the assets of

18  the organization, unless the Court finds that such payment is

19  expressly permissible under applicable state law.

20      Default:

21      A fine or payment of restitution is in default if a

22  payment is delinquent for more than 90 days.  Notwithstanding

23  any installment schedule, when a fine or payment of

24  restitution is in default, the entire amount of the fine or

25  restitution is due within 30 days after notification of the

124

1    default, subject to the provisions of Section 3613A.

2        3613(A), Effect of Default:

3        Upon a finding that the Defendant is in default on a

4    payment of a fine or restitution, the Court may, pursuant to

5    3565, revoke probation or a term of supervised release, modify

6    the term or conditions of probation, or a term of supervised

7    release, re-sentence a defendant pursuant to 13 -- or 3614,

8    hold the defendant in contempt of court, enter a restraining

9    order or injunction, order the sale of property of the

10   defendant, accept the performance bond, enter or adjust a

11   payment schedule, or take any other action necessary to obtain

12   compliance with the order of a fine or restitution.

13       3611 -- 18 3611:

14       A person who is sentenced to pay a fine, assessment, or

15   restitution, shall pay the fine, assessment, or restitution

16   including any interest or penalty as specified by the Director

17   of the Administrative Office of the United States Court.  Such

18   Director may specify that such payments be made to the Clerk

19   of Court or in the manner provided for under Section

20   604(a)(18) of Title 28 United States Code.

21       18 3614, Resentencing:

22       Subject to the provisions of subsection (b), if a

23   defendant knowingly fails to pay a delinquent fine or

24   restitution, the Court may resentence the defendant to any

25   sentence which might originally have been imposed.

1     Pursuant to 18 United States Code, Section 3615, whoever

2  having been sentenced to pay a fine willfully fails to pay the

3  fine, shall be fined not more than twice the amount of the

4  unpaid balance of the fine or $10,000, whichever is greater,

5  imprisonment not more than one year, or both.

6     Those are the instructions in the statutes given us by

7  Congress.

8     Sentencing Guidelines:

9     Pursuant to U.S. Sentencing Guidelines 8C2.3(a), for each

10  count covered by United States Sentencing Guidelines 8C2.1,

11  use the applicable Chapter Two Guideline to determine the base

12  offense level and apply, in the order listed, any appropriate

13  adjustments contained in that Guideline.  The Guideline for a

14  violation of 15 United States Code, Section 1 is found at U.S.

15  Sentencing Guideline 2R1.1, which covers offenses involving

16  bid-rigging, price-fixing or market-allocation agreements

17  among competitors.  According to U.S. Sentencing Guidelines

18  2R1.1(a), the base offense level is 12.

19     Pursuant to U.S. Sentencing Guidelines 2R1.1(b)(2), the

20  only specific offense characteristic that applies is the

21  enhancement for volume of commerce.  In this case, the volume

22  of Congress -- of commerce in the affected areas of business

23  for the years in which the offense took place was $50.7

24  million.  A six-level enhancement is appropriate to pursue

25  U.S. Sentencing Guideline -- excuse me.

126

1    A six-level enhancement is appropriate pursuant to U.S.

2    Sentencing Guideline 2R1.1(b)(2)(C), because the volume of

3    commerce was more than $40 million but less than $100 million.

4    The total offense level is 18.  Pursuant to the table under

5    U.S. Sentencing Guidelines 8C2.4(d), an offense level of 18

6    generates a fine of $350,000.

7        Pursuant to United States Sentencing Guidelines 8C2.4, the

8    base fine is the greatest of:

9        The amount from the table in subsection (d) of this

10   Guideline determined under U.S. Sentencing Guideline 8C2.3; or

11   the pecuniary gain -- the pecuniary loss or gain from the

12   offense caused by the organization.  Pursuant to United States

13   Code, Section 2R1.1(d)(1), in lieu of the pecuniary loss under

14   Section (a)(3) of the United States Sentencing Guidelines

15   8C2.1 [verbatim] (Base Fine) use 20 percent of the volume of

16   affected commerce.  In this case, the volume of affected

17   commerce was $50,700,000.  Twenty percent of this figure is

18   $10,140,000.  The pecuniary gain to the organization is

19   unknown.  Therefore, 20 percent of the volume of affected

20   commerce will be the base offense level, as this figure is

21   greater than the fine on the table -- on the table in

22   subsection (d) of $350,000.

23       Pursuant to United States Sentencing Guidelines 8C2.5(a),

24   the culpability score starts at 5.  According to U.S.

25   Sentencing Guidelines 8C2.5(b)(3)(B)(1), if the organization

127

1  has 200 or more employees in Michigan and an individual within

2  high-level personnel of the organization participated in the

3  offense, three points are added.  In this case, three Vice

4  Presidents of the corporation participated in the instant

5  offense.  Between 2001 and 2007, the corporation had between

6  200 and a thousand employees.

7       The corporation -- and that was in the Southern District,

8  in Michigan.

9       The corporation had made a statement in this case

10 accepting responsibility for its role in the offense.

11 Therefore, pursuant to U.S. Sentencing Guidelines 8C2.5(g)(2),

12 since the organization fully cooperated in the investigation

13 and clearly demonstrated recognition and affirmative

14 acceptance of responsibility for its criminal conduct, the

15 culpability score is decreased by two levels.

16      According to United States Sentencing Guidelines 8C2.6,

17 the applicable minimum and maximum fine multipliers are

18 determined from the table under this Guideline.  Based on a

19 culpability score of 6, the minimum multiplier is 1.2, while

20 the maximum multiplier is 2.4.  The base fine is 10,140,000.

21 Therefore, the fine range is 12,168,000 to 24,336,000.

22      The government has indicated that the defendant has

23 provided substantial assistance and is requesting a downward

24 departure pursuant to 8C4.1, that the defendant be sentenced

25 to a $9 million fine pursuant to the payment schedule included

128

1   in the Plea Agreement at paragraph 8(b).  As provided in the

2   Rule 11(c)(1)(C) Plea Agreement, based on the government's

3   request and its representation that the defendant has provided

4   substantial assistance to the government in the prosecution of

5   other defendants, the Court finds that a downward departure is

6   justified in this case and departs to a fine of $9 million.  A

7   sentence in this range will reward the defendant for its

8   assistance but will also satisfy the statutory purposes of

9   sentencing, including the need to reflect the seriousness of

10  the offense, promote respect for the law, and provide a just

11  punishment for the defendant's involvement in the instant

12  offense.  Accordingly, the fine establishes nine million as

13  the fine sentencing range.

14      Pursuant to -- as we've already indicated, restitution has

15  not been ordered in this case.

16      Pursuant to United States Sentencing Guidelines 8B1.2(a),

17  to the extent it was not addressed in the restitution of

18  organizations, a remedial order posed as a condition of

19  probation may require the organization to remedy the harm

20  caused by the offense and to eliminate or reduce the risk that

21  the instant offense will cause future harm.

22      Pursuant to 18 United States Code, Section 3013, a special

23  assessment of $400 is mandatory.

24      Pursuant to Title 18 United States Code, Section 3553,

25  among the factors to be considered in imposing a sentence are:

1    The nature and circumstances of the offense and the

2  history and the characteristics of the defendant;

3    The need for the sentence imposed to reflect the

4  seriousness of the offense, to promote respect for the law,

5  and to provide just punishment for the offense;

6    To afford adequate deterrence to criminal conduct;

7    To protect the public from further crimes of the

8  defendant; and

9    To provide the defendant with needed correctional

10  treatment in the most effective manner.  The usual admonition

11  that it also must -- needed educational or vocational training

12  and medical care are certainly not applicable in this case.

13    (3) the kinds of sentences available;

14    The kind of sentences available to this court are

15  probation, a fine, or probation and a fine.

16    The kind of sentencing and the sentencing range

17  established by the United States Guidelines -- we have done

18  that; and

19    Any pertinent policy statements;

20    The need to avoid unwarranted sentencing disparities among

21  defendants with similar records who have been found guilty of

22  a similar conduct; and

23    The need to provide restitution to any victims of the

24  offense -- which in this case we have decided is not possible

25  without prolonging or complicating this sentencing process.

130

1      Now, the Court is --

2      Well, the recommendation of the Probation Officer has

3  stated:

4      "The defendant corporation stands before the Court for

5  sentencing on one count of conspiracy to restrain train --

6  trade.  Between 2001 and 2007, three Vice Presidents of the

7  corporation perpetrated a scheme to make an agreement with

8  Home City Ice, Inc. to allocate customers in the Detroit,

9  Michigan area in order to reduce competition.

10      "The defendant corporation has no history of misconduct

11  and the corporate officers involved have been persecute --

12  prosecuted and no longer work in the packaged ice industry.

13      "The defendant corporation has instructed" -- excuse me.

14      "The corporation has instituted changes in its business

15  practices and is dedicated to conducting business in an

16  ethical manner.

17      "It is recommended that the corporation be placed on

18  probation for a period of five years in order to make

19  installment payments on the fine.  The corporation shall pay a

20  total fine of $9 million, as they are unable to pay a fine

21  within the Guideline range.  A fine within the range would be

22  unreasonable and serve to cripple the corporation.  It would

23  also be unfair to the remaining employees who were not

24  involved in the instant offense.  Additionally, the

25  corporation may suffer collateral consequences of conviction,

1    such as civil obligations arising from the organization's

2    conduct pursuant to United States Sentencing Guideline 8C21

3    [verbatim] -- 8(a)(3).

4         "The corporation has the resources to pay the fine through

5    installment payments.  The only additional recommendation is

6    for the corporation to pay the special assessment.

7         "The recommended sentence is one of the sentences

8    available and is in compliance with the Sentencing Guidelines

9    and Policy Statements.  It will also promote respect for the

10   law, provide deterrence, and specifically protect the public

11   pursuant to 18 United States Code, Section 3553(a)(2).

12   Additionally, the recommended sentence is made to avoid

13   unwarranted disparities between similarly-situated defendants.

14   And there is not restitution -- there is not a restitution

15   issue in this matter, and neither is there any reason for a

16   departure or variance."

17        Does the United States have anything that they want to

18   expound on, other than what we have already done so far as the

19   determination under 3553 and, in particular, the reason for

20   the downward departure without going into a chamber session?

21             MR. CULUM:  No, Your Honor.  We have provided

22   Probation, and we'll continue to provide you, information

23   justifying the downward departure.  But to the extent that you

24   need additional information, we would request that discussion

25   be in chambers.

132

1        THE COURT:  Does the defendant have anything they

2    wish to add to the discussion of the matter?

3        MR. MAJORAS:  Your Honor, the defendant would like to

4    simply state for the record that it is with great remorse that

5    it accepts responsibility in this matter.  It has undertaken

6    and will continue to undertake measures to avoid any potential

7    for a repeat of this, and it takes its responsibilities very

8    seriously in that regard.

9        THE COURT:  The Court has determined to accept the

10   Rule 11(c)(1)(C) Plea Agreement, which establishes the

11   sentence in this case, and finds that the sentence is

12   sufficient, but not greater than necessary, to comply with the

13   purposes set forth in 18 United States Code, Section 3553(a).

14   And please understand that probation will be added when I

15   finish my discourse.

16   A statutory sentence as set forth in Rule 11(c)(1)(C)

17   sentencing agreement takes into account the provisions of 18

18   United States Code, Section 3553(a)(1), which include the

19   nature and circumstances of the offense and the defendant's

20   Criminal History Category.  The sentence reflects the

21   seriousness of the offense, promotes respect for the law, and

22   provides just punishment, which is consistent with the

23   provisions of 3553(a)(2), by serving as a deterrence,

24   protecting the community, providing the defendant with needed

25   education or vocational training, medical care and other

133

1    correctional treatment in the most effective manner.

2        As stated in 18 3553(a)(3), the available sentences have

3    been considered, and the sentence is within the scope of the

4    sentences available to the Court.  This sentence avoids

5    unwarranted disparity among defendants who committed similar

6    offenses and had similar backgrounds, as mandated by

7    3553(a)(4), (5) and (6).  The provisions of 3553(a)(7) do not

8    apply, since restitution is not being ordered.

9        I'm about to declare my sentence.  I have one, two, three,

10   four, five, six, seven, eight, nine conditions on -- that I am

11   adding to the -- being placed on probation.  They're all

12   indicated as appropriate, and some of them are mandated by

13   Chapter 8 of the Sentencing Guidelines.

14       Does the United States -- does the defendant wish to

15   withdraw his plea of guilty?

16       (Messrs. Majoras and Adams confer privately.)

17           MR. MAJORAS:  No, Your Honor, we do not wish to

18   withdraw our plea.

19           THE COURT:  Does the United States have anything

20   further to say they wish to add to the record before I

21   pronounce sentence in this case?

22           MR. CULUM:  No, Your Honor.

23           THE COURT:  Does the defendant?

24           MR. MAJORAS:  No, Your Honor.

25           THE COURT:  Mr. Adams, do you have anything you wish

134

1    to add to the record in behalf of the corporation?

2          MR. ADAMS:  I'd only like to add that the defendant

3    clearly has gone through a very troubling time.  It's a public

4    entity.  It takes its responsibilities very, very greatly.

5       As counsel has said, throughout the course of the

6    investigation the company has exhibited that responsibility,

7    has cooperated, will continue to cooperate.  And we respect

8    the law, take our responsibilities deeply to heart.  We

9    recognize that this is a criminal proceeding, it's not to be

10   taken lightly, and it won't happen again.

11      Thank you, Your Honor.

12          THE COURT:  Anything further, Mr. Culum?

13          MR. CULUM:  No, Your Honor.

14          THE COURT:  Mr. Adams, do you have anything further

15   to say as to why the judgment of this Court should not be

16   imposed upon you at this time?

17          MR. ADAMS:  No, Your Honor.

18          THE COURT:  It is the judgment of this Court that you

19   be sentenced to a period of probation for a term of five years

20   under the following conditions:

21      You shall not commit another federal, state or local

22   crime -- and I'm, of course, referring to the corporation.

23      The defendant shall continue to publicize the nature of

24   the offense committed, the fact of conviction, the nature of

25   the punishment imposed, and the steps that will be taken to

1    prevent the recurrence of similar offenses.

2       The defendant shall notify the probation officer

3    immediately upon learning of a material adverse change in its

4    business or financial condition or prospects or the

5    commencement of any bankruptcy proceedings, major civil

6    litigation, criminal prosecution, or administrative

7    proceedings against the corporation, or any investigation or

8    formal inquiry by governmental authorities regarding the

9    organization, and you shall do that within 30 days.

10      You shall make periodic payments as established by the

11   Plea Agreement as follows:

12      Within 30 days of imposition of sentence, $1 million, plus

13   any accrued interest at the first -- at the one year

14   anniversary of the imposition of sentence, $1 million, plus

15   any accrued interest.  At the two-year anniversary,

16   $1.5 million, plus any accrued interest.  At the three-year

17   anniversary, $1.5 million, plus any accrued interest.  At the

18   fourth year anniversary, $1.35 million, plus any accrued

19   interest.  At the five-year anniversary, $2.5 million, plus

20   any accrued interest, provided, however, that the defendant

21   shall have the option at any time before the five-year

22   anniversary of prepaying any part of the remaining balance,

23   plus any accrued interest that's then owing on the fine.

24      The defendant has represented to the Court that his --

25   that it has in effect a compliance and ethics program

1    consistent with 8B2.1.  The defendant shall comply with its

2    plan and make periodic reports to the probation officer, as

3    directed by the probation officer, regarding the

4    organization's progress in its effort to remedy the harm

5    caused by the offense and to eliminate or reduce the risk that

6    the information -- reduce the risk that the instant offense

7    will cause future harm.

8        The defendant shall continue to notify its employees and

9    shareholders of its criminal behavior and its program.  And I

10   should probably say the "trust holders."  Because of my

11   ignorance, I'll say shareholders.

12       That within 30 days the defendant shall report to the

13   probation officer any criminal prosecution, civil litigation

14   or administrative proceedings commenced against the

15   organization, or any investigation or formal inquiry by

16   government authority of which the organization learns.

17       The defendant shall continue to cooperate with the

18   government as it has agreed in the Plea Agreement.

19       The defendant shall appoint a corporate representative in

20   Minnesota to report to the probation -- to the Probation

21   Office on behalf of the corporation.  The defendant shall

22   appoint a corporate representative in Minnesota to report to

23   the probation office on behalf of the corporation.

24       The defendant shall pay a fine in the amount of

25   $9 million, payable in installments as stated in the Rule

1   11(c)(1)(C) sentencing agreement, and a special assessment in

2   the amount of $400.00, which is due immediately.  Interest

3   shall accrue on the fine.

4       Has the $400 been paid?

5           MR. MAJORAS:  It has not been paid yet, Your Honor,

6   but we're prepared to do so.

7           THE COURT:  All right.  Do you have any question

8   about this, this sentence?

9       (Messrs. Majoras and Adams confer privately.)

10          THE COURT:  You all left me.

11      Do you have any questions about this sentence?

12          MR. MAJORAS:  No.

13          MR. CULUM:  No, Your Honor.  And I apologize:  I

14  thought my cell phone was off.  I apologize.

15          THE COURT:  Do you have any question about this

16  sentence?

17          MR. MAJORAS:  No, sir.

18          THE COURT:  You're advised that in accordance with

19  the Rules of Appellate procedure you must file -- well, I'll

20  start over again.

21      I notify you that you have a right to appeal this

22  sentence.  If you're unable to pay the cost of an appeal, you

23  have the right to apply to this Court for leave to proceed *in*

24  *forma pauperis*.

25          If you are indigent and cannot retain a lawyer, you

138

1   may apply and one would be appointed to represent you on your

2   appeal.

3       You're further advised that in accordance with the

4   provisions of Rule 4(b) of the Rules of Appellate procedure,

5   you must file your Notice of Appeal with the Clerk of the

6   United States District Court within ten days of the filing of

7   the judgment, which will be filed later -- will be filed

8   tomorrow.  It would be -- my gosh, it'll be filed Tuesday.

9   Tuesday.  And I think --

10      (To the Law Clerk) Is that the 25th?  What's Tuesday?

11          THE LAW CLERK:  Sixteenth, I think.

12          THE COURT:  You have the 25th here.

13      (The Court and Law Clerk confer privately.)

14          THE CLERK:  Judge, if we file --

15          THE COURT:  What's that?

16          THE CLERK:  If we file it on the 16th, it would be

17  March the 2nd.

18          THE COURT:  March the 2nd. All right.  And when is

19  the 16th?

20          THE CLERK:  This coming Tuesday.

21          THE COURT:  All right.  So you'll understand, I've

22  got a commitment in Columbus tomorrow, Monday's a holiday, and

23  that's why I'm saying Tuesday.  I don't like it, but I'm stuck

24  with it.  And so we hope to file it on February the 16th.  And

25  March the --

139

1          THE CLERK:  Second.

2          THE COURT:  Is the 14 days?

3          THE CLERK:  Yes.

4          THE COURT:  March the 2nd would be the 14 days.

5      I feel rather -- it's probably inappropriate that I remind

6  you of all that, because I'm sure you can count better than I.

7      The Court hereby advises you that if you so request, I'll

8  order the Clerk of Courts to file your Notice of Appeal on

9  your behalf.

10     It is further ordered that you will notify the United

11 States Attorney for the Southern District of Ohio within

12 30 days of any change in residence or mailing address until

13 all fines are paid, special assessments imposed by this

14 judgment are fully paid.

15     Do you have any questions about this sentence?

16     (Messrs. Majoras and Adams confer privately.)

17          MR. MAJORAS:  No, sir.

18          THE COURT:  Mr. Culum, do you have anything you wish

19 to add to the record on behalf of the government to protect

20 it?

21          MR. CULUM:  No, Your Honor.

22          THE COURT:  Do you have anything further to add?

23          MR. MAJORAS:  No, sir.

24          THE COURT:  Mr. Axelrod?

25          MR. AXELROD:  Your Honor, I just have one question --

140

1  one clarification, because we are concerned about the

2  precedent.

3       When imposing sentence, you referred to the victims as the

4  customers of Arctic Glacier and Home City.  Did Your Honor

5  mean to rule that indirect purchasers are not victims under

6  the Criminal Victims' Right Act?

7            THE COURT:  I said customers.

8            MR. AXELROD:  That was --

9            THE COURT:  And that depends on the interpretation of

10  the law as to who the customers that are protected under the

11  Sherman Antitrust Act are.  And that, too, is a very

12  complicated decision.  I don't believe -- if you've come up

13  with a case since we last talked or since you last filed

14  documents that definitively determine that, I would appreciate

15  to hear it so I could answer your question.

16            MR. AXELROD:  I have not.  So I understand Your Honor

17  to say it is still an open question.

18            THE COURT:  It's an open question as far as I'm

19  concerned, and that is one reason why I can't order

20  restitution in this case.

21            MR. AXELROD:  Thank you, Your Honor.

22            MR. CULUM:  Your Honor, just for the record, the

23  United States, our understanding is, the law is direct and

24  proximately harmed.

25       I believe that *Illinois Brick* defined "indirect

141

1    purchasers" as indirectly harmed.  But that certainly --

2        The government renews its stance that the indirect

3    purchasers not -- do not have standing under the Crime

4    Victims' Rights Act.  I just want to make sure it's for the

5    record.

6            THE COURT:  Well, I'm sorry.  Maybe I'm getting fuzzy

7    here.  I don't understand what you just said.

8            MR. CULUM:  Oh, okay.  Your Honor, as we said from

9    the beginning, the standing issue within the ability to assert

10   rights under the Crime Victims' Right Act is defined as

11   someone who is direct and proximately harmed.

12       I certainly understand the argument of indirect

13   purchasers.  The United States reasserts its belief that

14   indirect purchasers pursuant to *Illinois Brick*, which is

15   United States Supreme Court, says that they are not direct and

16   proximately harmed.  And I just want to renew that -- our

17   standing argument.

18           THE COURT:  I understand that, and I do not -- that's

19   why I avoid the issue.  And I understand that --

20       It will be interesting to see how the indirect purchasers

21   establish their damages.  It all melted away.  I'm sorry.

22       (Laughter.)

23           THE COURT:  I'm sorry.

24       Is there anything further from the United States?

25           MR. CULUM:  No, Your Honor.

1      THE COURT:  Is there anything further from the

2 defendant?

3      MR. MAJORAS:  No, sir.

4      THE COURT:  I know the probation officer will

5 probably have a short discussion with you today.

6   And we are contemplating that the supervision will be in

7 Minnesota.

8   Is that right?

9      MS. JENSEN:  Yes, Your Honor.  I've already spoken to

10 the district of Minnesota, and they are awaiting a call from

11 either Mr. Majoras or the company's-appointed Minnesota

12 representative.

13      THE COURT:  And so we're trying our very best to

14 accommodate you.

15   And understand that the Court is, of course, very deeply

16 concerned about the effect of the crime on the people that are

17 "victims" of the offense, and I am satisfied that the

18 government has exercised its best effort in that regard.

19   Anything further from the United States?

20      MR. CULUM:  No, Your Honor.

21      THE COURT:  Anything further from the defendant?

22      MR. MAJORAS:  No, sir.

23      THE COURT:  Okay.  I do want to state for the record

24 that I appreciate the professionalism displayed by the

25 attorneys that have appeared in my chambers, and I really

143

1  appreciate it and I compliment you for it.

2          MR. MAJORAS:  Thank you, Your Honor.

3          MR. CULUM:  Thank you.

4          THE COURT:  Since there is nothing further, this

5  court is adjourned.

6      As I said, the judgment entry will probably -- will go on

7  as near as we know on the 16th of this month.

8          THE CLERK:  All rise.          (5:00 p.m.)

9                        -  -  -

10                   PROCEEDINGS CONCLUDED

11                        -  -  -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

144

# C E R T I F I C A T E

I, Mary Ann Ranz, the undersigned, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


s/Mary Ann Ranz
Official Court Reporter